1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6

7   UNITED STATES OF AMERICA,                  Case No. 17-cr-00533-EMC-2
8                        Plaintiff,
                                               ORDER MEMORIALIZING THE
9              v.                               COURT'S *BATSON* RULING
10  RAYMOND MICHAEL FOAKES, et al.
11                       Defendants.

12
13
14                    I.      **INTRODUCTION**

15          Jury selection in this case began on March 13, 2023, and ended on March 15, 2023.  After

16  excusing jurors for hardship and cause, only one black juror—Juror No. 56—remained in the jury

17  venire.  With its third peremptory challenge, the Government struck Juror No. 56.  Mr. Ranieri

18  objected, claiming the Government's use of a peremptory challenge to exclude the only black

19  juror remaining in the venire violated his Fourteenth Amendment right to equal protection.  The

20  Court **OVERRULED** Mr. Ranieri's motion.  This order sets forth the Court's reasoning.

21                    II.     **LEGAL STANDARD**

22          The use of peremptory challenges by the prosecution to exclude potential jurors on the

23  basis of race is forbidden by the Equal Protection Clause of the Fourteenth Amendment. *Batson v.*

24  *Kentucky*, 476 U.S. 79, 89 (1986).  *Batson* permits prompt rulings on objections to peremptory

25  challenges under a three-step process:

26              First, a defendant must make a prima facie showing that a
                peremptory challenge has been exercised on the basis of race;
27              second, if that showing has been made, the prosecution must offer a
                race-neutral basis for striking the juror in question; and third, in light
28              of the parties' submissions, the trial court must determine whether

the defendant has shown purposeful discrimination.

*Davis v. Ayala*, 576 U.S. 257, 270 (2015).

The focus of this order is on the first step of the *Batson* test, *i.e.*, whether Mr. Ranieri made a prima facie case that the Government's peremptory challenge was exercised on the basis of race. A "prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 169 (2005) (quoting *Batson*, 476 U.S. at 94). "The inference of discrimination standard 'is a less burdensome standard of proof than the preponderance ("more likely than not") standard.'" *Krueger v. Pallares*, No. 21-CV-06145-HSG, 2022 WL 15173738, at *20 (N.D. Cal. Oct. 26, 2022) (quoting *United States v. Collins*, 551 F.3d 914, 920 (9th Cir. 2009)). "The Supreme Court 'did not intend the first step to be . . . onerous.'" *Id.* (quoting *Johnson*, 545 U.S. at 170).

At the first step of *Batson*, the Court "must consider 'all relevant circumstances' surrounding the challenges." *Fernandez v. Roe*, 286 F.3d 1073, 1079 (9th Cir. 2002). Accordingly, the Ninth Circuit has explained that a prima facie case can be established in a number of ways:

> The Supreme Court has said that the existence of a pattern of striking minority panel members is a relevant consideration that may raise an inference of discrimination. *Batson*, 476 U.S. at 96–97. We have found an inference of discrimination where the prosecutor strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group. *Fernandez*, 286 F.3d at 1078. Striking members of more than one protected group is also relevant and may indicate a discriminatory intent. *Id.* at 1079–80. A prosecutor's questions and statements to the venire are relevant because they might provide insight into her motive. *Batson*, 476 U.S. at 97. Likewise, the fact that the prosecutor fails to "engage in meaningful questioning of any of the minority jurors" might indicate the presence of discrimination. *Fernandez*, 286 F.3d at 1079.

*Collins*, 551 F.3d at 921 (alteration in original).

The variety of ways a prima facie case of discrimination may be established is consistent with conventional anti-discrimination law: discrimination may be established by *e.g.*, historical patterns of exclusion, deviation from normal procedures and processes, employment of criteria

United States District Court
Northern District of California

2

that have an obvious exclusionary impact on particular groups, disparaging comments, or dissimilar treatment of similarly situated persons.  *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977) (explaining a prima facie case of discrimination can be established based on a non-exhaustive list of factors, including (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history"); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (explaining a prima facie case of discrimination under Title VII can be established through a comparison of similarly situated employees outside the plaintiff's class); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (noting that in the Title VII context, a plaintiff can establish "an inference of discrimination in whatever manner is appropriate in the particular circumstances."); *NAACP v. Town of E. Haven*, 70 F.3d 219, 225 (2d Cir. 1995) ("[E]vidence that an employer in an area with a sizeable black population has never hired a single black employee . . ., by itself, supports an inference of discrimination."); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n. 23 (1977) (stating that "the inference of discrimination came . . . from 'the inexorable zero,'" *i.e.*, the glaring absence of minorities in higher paying jobs).

In establishing an inference of an intent to exclude protected groups from the jury, defendants may rely, *inter alia*, on "comparative juror analysis" which refers "in this context, to an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group."  *Boyd v. Newland*, 467 F.3d 1139, 1145, 1147–48 (9th Cir. 2006); *Shirley v. Yates*, 807 F.3d 1090, 1097 (9th Cir. 2015) (finding additional support for inference of discrimination where black venireperson was struck while similarly situated white venireperson was not); *Collins*, 551 F.3d at 922 ("An inference of discrimination may arise when two or more potential jurors share the same relevant attributes but the prosecutor has challenged only the minority juror.").

### III.     LEGAL ANALYSIS

A.     Eye-witness Testimony

The Government initially argued that it challenged Juror No. 56 because he was the only juror who expressed skepticism about eye-witness testimony, and that because this is an eye-witness testimony case, no other juror whom the Government allowed to remain in the venire could be said to be similarly situated.[1]  *See* Trial Tr. 773:20–774:23.  Thus, the Government claimed that Mr. Ranieri failed to raise an inference of discriminatory purpose because it did not "treat[] otherwise similar jurors differently because of their membership in a particular group." *Newland*, 467 F.3d at 1145.

The Court found that the Government's assertion that the comparative juror analysis required exact similarity—that another comparable juror also expressed skepticism about eye-

---

[1] While the Ninth Circuit has stated that courts "should not even consider the prosecutor's unsubstantiated explanations at the stage of determining whether a *prima facie* case exists[,]" *Fernandez v. Roe*, 286 F.3d 1073, 1079 (9th Cir. 2002), it is clear that this statement was made in reference to a prosecutor's asserted race-neutral reasons for a challenge and not a prosecutor's assertions as to whether another juror is similarly situated.  *See Arteaga v. Biter*, No. 2:11-CV-3181 GEB DAD, 2013 WL 5819698 (E.D. Cal. Oct. 29, 2013) ("At least one court has suggested that a reviewing court 'should not even consider the prosecutor's unsubstantiated explanations at the stage of determining whether a prima facie case exists.'  However, . . . the court will consider the prosecutor's stated reasons as part of the totality of relevant circumstances in determining whether petitioner has shown a prima facie case of racial discrimination." (internal citation omitted)).  The court would be unduly limited in its ability to engage in a meaningful comparison of jurors if it were unable to consider the Government's statements about whether another juror is similarly situated.   The court must consider the "totality of relevant circumstances" which logically inform the comparative juror analysis.

To be sure, in *Shirley v. Yates*, the Ninth Circuit purported to disregard the prosecution's assertions about the distinctions between two jurors at *Batson* Step One.  *Shirley*, 807 F.3d at 1102 n.10 ("Although [the prosecutor's] asserted race-neutral reasons for striking R.O. (i.e., his testimony at Step Two) would inform a comparative juror analysis at Step Three, by specifying that he considered relevant particular distinctions between R.O. and Juror Number 3, the distinctions are irrelevant at the (precedent) Step One.") (citing *Fernandez*, 286 F.3d at 1079).  However, the court necessarily considered the prosecutor's questions (and the jurors' responses thereto) in determining whether the jurors were comparable.  *See id.* at 1102 ("While Juror Number 3 had attended but had not (yet) graduated from college, and had a job that may have involved somewhat more responsibility, they were certainly similar enough—apart from race—to help support an inference of discrimination at *Batson* Step One.").

Inevitably, there is overlap between Step One and Step Three.  Regardless of where that line between them precisely lies, this Court did not assess whether the Government's statements advancing a race-neutral reason were credible—an assessment reserved for *Batson* Step Three.  *See Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).  Instead, the Court relied on the Government's statements to inform its comparative juror analysis at *Batson* Step One.

witness testimony—was far too narrow.  *See* Trial Tr. 774:6–776:12.  A defendant is not required
to identify an *identically* situated juror that the prosecution treated differently, but a *similarly*
situated juror that the prosecution treated differently.  *See Miller-El v. Dretke*, 545 U.S. 231, 247
n. 6 (2005) (noting that the Supreme Court has never declared a rule for a *Batson* challenge that
"similarly situated jurors must be identical in all respects"); *Kesser v. Cambra*, 465 F.3d 351, 366
(9th Cir. 2006) ("A per se rule that a defendant cannot win a Batson claim unless there is an
exactly identical white juror would leave Batson inoperable[.]" (quoting *Miller-El*, 545 U.S. at 247
n. 6)).  For instance, in *Shirley v. Yates*, the Ninth Circuit compared differences in "life
experience" between a black juror ("R.O.") and a white juror ("Juror Number 3").  807 F.3d at
1112.  Both jurors lived at home with their parents, but "Juror Number 3 was enrolled in college at
'Sac State' and worked as a gym manager while R.O. had not taken college courses and worked as
a photography technician at a pharmacy."  *Id.*  Nevertheless, the court concluded that "[w]hile
Juror Number 3 had attended but had not (yet) graduated from college, and had a job that may
have involved somewhat more responsibility, they were certainly *similar enough*—apart from
race—to help support an inference of discrimination at *Batson* Step One."  *Id.* at 1102 (emphasis
added).  As in other similar contexts, the question is whether the comparators are similar in all
*material* respects.  *See*, *e.g.*, *Ballou v. McElvain*, 29 F.4th 413, 423 (9th Cir. 2022) ("To establish
similarity under the *McDonnell Douglas* framework, 'the individuals being compared need not be
identical; they must only be similar in all material respects.'" (quoting *Hawn*, 615 F.3d at 1157);
*Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1115 (9th Cir. 2011) (The similarly situated
standard "is not an unyielding, inflexible requirement that requires near one-to-one mapping
between employees." (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.
2007)); *see also Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) ("The
Equal Protection Clause . . . keeps governmental decisionmakers from treating differently persons
who are in all *relevant* respects alike." (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992))
(emphasis in *Brewer*).

Hence, Mr. Ranieri was not required to identify a juror that the Government allowed to
remain in the venire that shared the same specific skepticism of eyewitness testimony as Juror No.

56.  What should be compared are the respective risks jurors pose to the Government's case—the question is whether the Government has exhibited a greater tolerance of that risk for jurors of one particular group than another.  Thus, it was sufficient for Mr. Ranieri to establish that the Government allowed another juror to remain in the venire who, considering all relevant circumstances, posed a similar risk to the Government's prosecution; that risk could be based on skepticism of a similarly relevant category of evidence.  *See Batson*, 476 U.S. at 96–97 (noting that in assessing "whether the defendant has made" a prima facie showing, trial courts "should consider *all* relevant circumstances" based on their "experience in supervising *voir dire*") (emphasis added to "all"); *Collins*, 551 F.3d at 920 ("A single inference of discrimination based on 'all [the] relevant circumstances' and the 'totality of relevant facts' is sufficient to move the *Batson* inquiry to step two." (quoting *Batson*, 476 U.S. at 94, 96)).

To illustrate, imagine a case in which law enforcement testimony and forensic fingerprint reports will play an equal role in the Government's case.  Further, imagine that during voir dire, a black prospective juror expresses distrust of law enforcement testimony, and a white prospective juror expresses distrust of fingerprint reports, but each state they can follow the court's instructions notwithstanding their preconceived notions.  In such a scenario, where the difference in risk these jurors pose to the government's case is "far from significant," *Miller-El*, 545 U.S. at 247, a government decision to strike only the black juror suggests the government has a disparate risk-tolerance with respect to black jurors.  This can fairly raise an inference of discriminatory exclusion.

That is the scenario presented in the instant case.  The AUSA's questioning of Juror No. 56 was as follows:

> **AUSA**: If I'm remembering your questionnaire correctly, you have some problems with reasonable doubt as well.  Could you get into that a little bit?
>
> **JUROR NO. 56**: Yeah, so if I'm remembering correctly my questionnaire, I have concerns about eyewitness testimony.  Because, you know, in college, I took classes in how like in the criminal justice system, some wrong convictions were due to faulty eyewitness accounts in court.  So that's one concern I have.  So, for the U.S. Government to convince me, you would need to have other evidence supporting your witness, I would hope.  That that's—that

United States District Court
Northern District of California

was my concern.

**AUSA**: So, the Government would need corroborative evidence? Someone says X happened, you'd need other evidence to support that?

**JUROR NO. 56**: Yeah.  Or it would have to be a very reliable witness.  I don't know, it would be like someone qualified to . . . describe what they're claiming . . .

**AUSA**: Is it—again . . . Judge Chen is going to tell you some of the instructions on how to evaluate witness credibility.

. . . .

**AUSA**: Is it impossible for you to credit a witness from the get-go if they're…only saying "This is what I saw, this is what I encountered," and there isn't corroboration; is it impossible for you to believe that that actually happened?

**JUROR NO. 56**: Impossible for me to believe it?  No, it's not impossible; but I'm saying for me to not have a reasonable doubt, you know, it's not certainty.  Like . . . I would have to look, [ ] the witness would say what they say happened; and I'm, like: Okay, was it dark?  I don't know.  Did they see it properly?  Do you know [what] I'm saying?  Like, it's not . . . a certain thing . . .

**AUSA**: So, is it just a sort of a general skepticism about eyewitness testimony?

**JUROR NO. 56**: Sure. Yes.

**AUSA**: But not a categorical problem?

**JUROR NO. 56**: Not categorical, no.  No.

Trial 2 Tr. 520:4–521:21.

As noted below, other prospective jurors who expressed skepticism about other kinds of prosecution evidence were not challenged.  Before detailing those facts, the Court first notes three important takeaways from the colloquy with Juror No. 56.  First, Juror No. 56 did not have an absolute or categorical skepticism of eye-witness testimony, but a "general skepticism" particular to eyewitness identification.  *Id.* at 521:8–521:21.  His explanation was tempered and thoughtful. Indeed, it was entirely reasonable.[2]  Second, Juror No. 56 stated he would be able to follow the

---

[2] Juror No. 56's concerns are well founded—countless studies have demonstrated that eye-witness misidentification has resulted in a disproportionate number of wrongful convictions.  *See, e.g.*, Sandra Guerra Thompson, *Beyond A Reasonable Doubt? Reconsidering Uncorroborated Eyewitness Identification Testimony*, 41 U.C. Davis L. Rev. 1487 (2008); Nat'l Inst. of Justice,

United States District Court
Northern District of California

Court's instructions on how to evaluate witness credibility. *See id.* at 520:23–521:2; *cf. id.* at 522:11–522:21. In fact, the exact questions Juror No. 56 raised about eyewitness testimony— "Did [the witness] see it properly?" and whether the testimony is corroborated—are reflected in the Court's final jury instructions on witness credibility: "In considering the testimony of any witness, you may take into account the following: (1) the witness's opportunity and ability to see or hear or know the things testified to[,]" and "(6) whether other evidence contradicted or corroborated the witness's testimony[.]" *See* Docket No. 3279, Jury Instruction No. 10 (Credibility of Witnesses). And third, Juror No. 56's concern about eye-witness *identification*, was virtually irrelevant to this case. *See* Trial 2 Tr. 521:8–521:13; *id.* at 790:15–792:25. The main issue here is "not based on misidentification [or] cross-cultural misidentification[.]" *Id.* at 791:17–791:22. In this case, there is no dispute about whether the Defendants have been correctly identified; rather, the central question here is "whether or not this informant is lying" about what the informant purportedly heard the conspirators say in various meetings. Trial 2 Tr. 791:22. This is not a case of eye-witness identification.

As to the treatment of comparators, similar to Juror No. 56, several non-black jurors expressed general skepticism of a relevant category of the Government's evidence, *i.e.*, law enforcement testimony. For example, Juror No. 104 indicated that he is skeptical of law enforcement testimony, *see* Trial 2 Tr. 518:25–519:18; Juror No. 119 stated in his questionnaire that "[i]t is difficult to see numerous cases of police violence and abuse of power brought to light in recent years and not question the qualifications and judgment of individual law enforcement officers"; and Juror No. 136 expressed a particularly negative view of prosecutors and law enforcement in his questionnaire. Juror No. 119 Questionnaire, Q88, Mar. 5, 2023; Juror No. 136 Questionnaire, Q48, Q88, Mar. 3, 2023. Law enforcement testimony will play a significant role in this case—indeed a far more significant role than eyewitness identification. Yet, the Government did not challenge any of these jurors for cause, *see id.* at 609:1–609:3, 613:21–614:19; with

---

U.S. Dep't of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999), available at http:// www.ncjrs.gov/pdffiles1/nij/178240.pdf.; *see generally* National Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014).

United States District Court
Northern District of California

1    respect to Jurors No. 119 and 136, the Government did not even raise their issues on voir dire.

2    And above all, the Government did not exercise a peremptory challenge against any of these three

3    prospective jurors.  *See id.* at 806:19–807:14.

4         In sum, it appears the Government tolerated the risk to its case presented by non-black

5    prospective jurors, but not that of the sole black prospective juror.  If anything, those prospective

6    jurors skeptical of law enforcement testimony would appear to present a *greater* risk than the

7    prospective juror who expressed skepticism of eyewitness testimony since eyewitness

8    identification is not a significant issue here.  Indeed, it is noteworthy that several of the answers

9    Juror No. 56 provided in his questionnaire were actually *favorable* to the prosecution.  For

10   example, Juror No. 56 stated "police officers on average uphold the law, so if they testify someone

11   broke it I am more likely to believe them[,]" and also that sexual assault and murder, "goes against

12   everything I believe in."[3]  *See* Juror No. 56 Questionnaire, Q98, Q71, Mar. 5, 2023.

13        As such, the prospective jurors in question were similarly situated for purposes of the

14   comparative juror analysis.  *See Miller-El*, 545 U.S. at 247 n. 6.  The Government's disparate

15   treatment of these similarly situated prospective jurors establishes a prima facie case under Step

16   One of *Batson*.

17        The Court need not and does not find that the inference of race-based exclusion means that

18   the prosecutors in the case engaged in conscious purposeful discrimination.  The analysis above

19   addresses only the first step of *Batson*.  The Court did not reach the second and third steps of

20   *Batson*.  Furthermore, differences in risk-tolerance of comparable prospective jurors may well be

21   the result of implicit unconscious bias rather than conscious purposeful discrimination.  As Justice

22   Marshall foresaw in his *Batson* concurrence, "Even if all parties approach the Court's mandate

23   with the best of conscious intentions, that mandate requires them to confront and overcome their

24   own racism on all levels—a challenge I doubt all of them can meet."  *Batson*, 476 U.S. at 106–07

25   (Marshall, J., concurring); *Miller-El*, 545 U.S. at 267–69 (Breyer, J., concurring) ("*Batson* asks

26

27   ─────────────────────
     [3] To the extent Juror No. 56 qualified these responses, the Court views this as further proof that
28   Juror No. 56 has a level of thoughtfulness and awareness of potential bias that it would hope to
     find in all jurors.

                                                9

1   judges to engage in the awkward, sometime hopeless, task of second-guessing a prosecutor's

2   instinctive judgment—the underlying basis for which may be invisible even to the prosecutor

3   exercising the challenge." (citing *Batson*, 476 U.S. at 106) (Marshall, J., concurring)).  *Cf.*

4   *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972) ("'The result bespeaks discrimination, whether

5   or not it was a conscious decision on the part of any individual jury commissioner.'" (quoting

6   *Hernandez v. State of Tex.*, 347 U.S. 475, 482 (1954)).

7       A decision predicated on a subjective prediction of an individual's future behavior, in this

8   case the predicted proclivities of a potential juror in exercising their judgment upon assessing the

9   evidence, is the kind of assessment that may be particularly susceptible to implicit biases or

10  categorical heuristics.  *See* Antony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the*

11  *Peremptory Challenge*, 85 B.U. L. REV. 155 (2005) ("Stereotypes can greatly influence the way

12  we perceive, store, use, and remember information.  Discrimination, understood as biased

13  decision-making, then flows from the resulting distorted or unobjective information.  The attorney

14  exercising the peremptory challenge will be unaware of this biased information processing and so

15  will be unaware of her gender-or race-based discrimination.").  *Cf.* David Arnold, Will Dobbie &

16  Crystal S. Yang, *Racial Bias in Bail Decisions*, 133 Q.J. ECON. 1885, 1887 (2018) (finding that

17  racial disparity in bail decisions is likely the product of judges making racially biased prediction

18  errors) (first citing Roland Fryer & Matthew O. Jackson, *A Categorical Model of Cognition and*

19  *Biased Decision Making*, 8 B.E.J. THEORETICAL ECON. 1 (2008); and then citing Pedro Bordalo,

20  Katherine Coffman, Nicola Gennaioli & Andrei Shleifer, *Stereotypes*, 131 Q.J. ECON. 1753

21  (2016)).  *Accord* Stephanie Holmes Didwania, *Discretion and Disparity in Federal Detention*, 115

22  NW. U. L. REV. 1261 (2021).

23      Indeed, the Ninth Circuit has recognized the risk of implicit bias in jury selection.  *See*

24  *Shirley*, 807 F.3d at 1111 n. 26 ("The risk of implicit bias is acutely relevant when considering

25  circumstantial evidence of the sort at issue here, because a prosecutor's jury selection approach

26  offers no support at all for the state's case if it is not consistently employed in a race-neutral

27  fashion." (citing Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury*

28  *Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and*

United States District Court
Northern District of California

10

1  *Proposed Solutions*, 4 HARV. L. & POL'Y REV. 149 (2010)).  In endeavoring to meet the call of

2  *Batson*, it may well be appropriate for the court to find an inference of discrimination even where

3  the disparate treatment may be influenced by implicit bias.[4]  *See Collins*, 551 F.3d at 920 (The

4  inference of discrimination standard "is a less burdensome standard of proof than the

5  preponderance ("more likely than not") standard.'").  *See also Johnson*, 545 U.S. at 170.  *Cf.*

6  *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 540

7  (2015) ("Recognition of disparate-impact liability under the FHA also plays a role in uncovering

8  discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised

9  animus that escape easy classification as disparate treatment.").

10        Nonetheless, the Court did not reach the second and third steps of *Batson*, because the

11  peremptory challenge was also based on a separate ground.

12  B.    <u>Religious and Ethical Views</u>

13        The Court **OVERRULED** Mr. Ranieri's *Batson* challenge because, in addition to its

14  qualms about Juror No. 56's skepticism of eye-witness testimony, the Government explained it

15  chose to strike Juror No. 56 due to his religious views which prevent him from passing judgment

16  on others.  *See* Juror No. 56 Questionnaire, Q36, Mar. 5, 2023 ("My religious views have shaped

17  my conscience, and this may affect my ability to convict.").  After engaging in a comparative juror

18  analysis on this issue, the Court found that all other jurors who expressed similar views were

19  excused from the venire.  For example, Juror No. 2 expressed discomfort about making a decision

20  that would impact the Defendants' lives, *see* Trial 2 Tr. 186, and noting that discomfort, the

21  Government raised a successful for-cause challenge.  *Id.* at 291.  Jurors No. 24 and 127 expressed

22  similar religious views so emphatically in their questionnaires that the Court and parties agreed

23  _____

24  [4] "It could be argued . . . that 'purposeful discrimination' already encompasses unconscious bias.
This argument flows from the idea that the 'purposeful discrimination' requirement was never

25  intended to be a proxy for . . . anything resembling a conscious mens rea, but rather a signpost for
distinguishing between discriminatory purpose and disproportionate impact."  *State v. Saintcalle*,

26  178 Wash. 2d 34, 54 n. 8 (2013) (citing Ralph Richard Banks & Richard Thompson Ford, *(How)
Does Unconscious Bias Matter?: Law, Politics, and Racial Inequality*, 58 EMORY L.J. 1053

27  (2009)), *abrogated in part on other grounds by City of Seattle v. Erickson*, 188 Wash. 2d 721, 398
P.3d 1124 (2017); *see also* Banks & Ford, *(How) Does Unconscious Bias Matter?: Law, Politics,*

28  *and Racial Inequality*, at 1090–93 (concluding that "discriminatory purpose" includes unconscious
bias under current equal protection jurisprudence).

United States District Court
Northern District of California

United States District Court
Northern District of California

they should be excluded from voir dire all together.  *See* Docket No. 3258; *see also* Juror No. 24 Questionnaire, Q36, Mar. 5, 2023 ("[M]y opinion and thinking is shaped by Bible knowledge and understanding, not by secular law."); Juror No. 127 Questionnaire, Q36, Mar. 4, 2023 ("God is the supreme controller who controls every single action of every creature in the world . . . I do not have any rights to punish any individual.").  To be sure, Juror No. 56, after a thoughtful exchange with the prosecutor, stated he understood the difference between: (1) assessing the evidence and determining whether the government had met its burden of proving guilt and (2) passing judgment on an individual, and that he thought he could comply with the Courts instructions.  *See* Trial 2 Tr. 522:2–522:21.  However, his statements in his questionnaire raised questions about the potential religious impediment to fulfilling his duties as a juror, and importantly, Mr. Ranieri conceded that with respect to religious and ethical views, he could not identify a juror similarly situated to Juror No. 56 that was left unchallenged.  *See id.* at 803:9–803:12 ("I can find no other example to cite to you from the group that we have empaneled today.").  Accordingly, although the Court believes Juror No. 56 could have served and fulfilled his obligations as a juror, Mr. Ranieri failed to make a prima facie case of discrimination under *Batson*.  The Government's peremptory challenge was not constitutionally impermissible.

## IV.    CONCLUSION

For the foregoing reasons, the Court **OVERRULED** Mr. Ranieri's *Batson* challenge.

The Court emphasizes, however, its concern about the effect of the Government's peremptory challenge in this case, a concern that transcends the doctrinal limits of *Batson*.  Just because the Government *can* exercise a peremptory challenge does not mean that it *should*.  "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case . . . . [T]he broad representative character of the jury should be maintained . . . as assurance of a diffused impartiality[.]"  *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)).  The spirit of the Sixth Amendment embodies and recognizes the value of juries which reflect the full and fair cross-section of society.  "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room

United States District Court
Northern District of California

1  qualities of human nature and varieties of human experience, the range of which is unknown and

2  perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503 (1972).  Indeed, studies demonstrate that

3  "[t]he nature and quality of jury deliberations is better when jury diversity is greater."  Equal

4  Justice Initiative, Illegal Racial Discrimination in Jury Selection: A Continuing Legacy, 41 (Aug.

5  2010).[5]  The Government shares a responsibility to consider fully this "diffused impartiality" in

6  exercising its peremptory challenges.

7       The Government's role in a criminal case is not simply to win.  It is charged with the larger

8  responsibility to do justice and foster the appearance of justice.  *See generally* Model Rules of

9  Prof'l Conduct R. 3.8 cmt. 1 (Am. Bar Ass'n 2017) ("A prosecutor has the responsibility of a

10  minister of justice and not simply that of an advocate.").  As the Supreme Court declared in

11  *Berger v. United States*, 295 U.S. 78, 88 (1935):

12           The United States Attorney is the representative not of an ordinary
            party to a controversy, but of a sovereignty whose obligation to
13           govern impartially is as compelling as its obligation to govern at all;
            and whose interest, therefore, in a criminal prosecution is not that it
14           shall win a case, but that justice shall be done.

15       In this case, the Government might have done more to fulfill the breadth of its

16  responsibilities as sovereign.  Exercising a peremptory challenge to remove the sole representative

17  of a "large and identifiable segment of the community," *Kiff*, 407 U.S. at 503—here, an individual

18  who demonstrated a frank and thoughtful approach to jury service and who, in the Court's view,

19  could have performed those duties faithfully—limits the "diffused impartiality" of the jury and has

20  the potential to "destroy the appearance of justice and thereby casts doubt on the integrity of the

21  judicial process." *Rose v. Mitchell*, 443 U.S. 545, 555–56 (1979) (alterations in original).  "The

22  injury is not limited to the defendant—there is injury to the jury system, to the law as an

23  institution, to the community at large, and to the democratic ideal reflected in the processes of our

24  courts." *Id.*; *accord Buck v. Davis*, 580 U.S. 100, 124 (2017).  This is so even if the Government

25  _____

26  [5] "Racial diversity significantly improves a jury's ability to assess the reliability and credibility of
   witness testimony, evaluate the accuracy of cross-racial identifications, avoid presumptions of
27  guilt, and fairly judge a criminally accused."  Equal Justice Initiative, Illegal Racial Discrimination
   in Jury Selection: A Continuing Legacy, at 41 (citing Samuel R. Sommers, *On Racial Diversity
28  and Group Decision Making: Identifying Multiple Effects of Racial Composition in Jury
   Deliberation*, 90 J. PERSONALITY & SOC. PSYCH. 597, 608 (2006)).

stays within the wide confines of the constitution under *Batson*.  The Government would do well

to recognize fully the magnitude of its role as a minister of justice representing "a sovereignty

whose obligation to govern impartially is as compelling as its obligation to govern at all."  *Berger*,

295 U.S. at 88.


      **IT IS SO ORDERED**.


Dated: April 7, 2023

                                            _____

                                            EDWARD M. CHEN
                                            United States District Judge

United States District Court
Northern District of California