1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

UNITED STATES OF AMERICA,

Case No.  17-cr-00533-EMC-1

8

Plaintiffs,

9

v.

**ORDER DENYING DEFENDANTS'
RULE 29 MOTION FOR ACQUITTAL**

10

RAYMOND MICHAEL FOAKES,
CHRISTOPHER RANIERI

Docket No. 3584, 3580

11

Defendants.

12

13

## I.       INTRODUCTION

14

On May 17, 2023, in the second trial of members and associations of the Hells Angels of

15

Sonoma County ("HASC"),[1]  a jury convicted Defendants Raymond Michael Foakes and

16

Christopher Ranieri of conspiracy in violation of the Racketeer Influenced and Corrupt

17

Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One).  In addition, Raymond Foakes

18

was convicted of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C.

19

§ 1959(a)(3) (Count Six) and tampering with a witness in violation of 18 U.S.C. § 1512(b)(1)

20

(Count Eight).  *Id.*  Mr. Ranieri was convicted of conspiracy to commit murder in violation of the

21

Violent Crimes in Aid of Racketeering Activity ("VICAR"), 18 U.S.C. § 1959(a)(5) (Count Two).

22

*See* Docket No. 3493 ("Jury Verdict").

23

Now pending are Defendants' motions for acquittal pursuant to Federal Rule of Criminal

24

25

26

[1] This case originally involved 11 defendants.  *See* Superseding Indictment.  The Court opted to
try the case in groups due in part to difficulties caused by the COVID-19 pandemic.  *See* Docket

27

No. 1110.  Group One consisted of Ott, Mr. Wendt, and Nelson.  *Id.*  Group Two consisted of
Raymond Foakes, Christopher Ranieri, and Brian Burke.  Brian Burke was found not guilty of

28

tampering with a witness in violation of 18 U.S.C. § 1512(b)(1) (Count Eight).  *See* Jury Verdict.
Other defendants pled.

Procedure 29.  *See* Docket No. 3580 (Foakes Motion), Docket No. 3584 (Ranieri Motion).  For the following reasons, the Court **DENIES** Mr. Foakes and Mr. Ranieri's Rule 29 motions.

## II.   <u>LEGAL STANDARD</u>

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment of acquittal after a jury verdict.  Fed. R. Crim. P. 29.  A Rule 29 motion challenges the sufficiency of evidence.  *See United States v. Johnson*, 874 F.3d 1078, 1080 (9th Cir. 2017).  In reviewing the sufficiency of the evidence, a district court must consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*).

It is not the district court's function to "second-guess the jury's credibility assessments; rather, under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."  *Id.* at 1170.  Indeed, "[i]t is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction."  *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015); *United States v. Williams*, No. 3:13-CR-00764-WHO-1, 2018 WL 2724337, at *7 (N.D. Cal. 2018).

## III.   <u>FACTUAL BACKGROUND</u>

The following are the facts presented at trial viewed in favor of the government under Rule 29.

A.   <u>The Hells Angels Motorcycle Club and Hells Angels Sonoma County</u>

The Hells Angels Motorcycle Club ("Hells Angels" or "HAMC") is what the Government refers to as an Outlaw Motorcycle Gang ("OMG").  *See* Trial Transcript (TT) 2429.  Hells Angels is a global organization.  *Id.* at 2605.  Within the United States, Hells Angels are one of 14 dominant OMGs, also known as "One Percent" clubs.  *Id.* at 2697.  A One Percent club refers to "the one percent of bikers that don't follow the rules. They don't follow laws.  They don't answer to anybody."  *Id.* at 1252-53 (Verhagen testimony).

Hells Angels chapters are called charters and are organized regionally.  *Id.* at 2441.  In the

United States District Court
Northern District of California

United States, charters are organized into West Coast and East Coast regions. *Id*. at 2442. Each charter acts semi-autonomously with its own set of rules; however, charters are still required to adhere to Hells Angels "world rules." *Id.* at 2448-49; 2457. With some variation, the world rules govern how an individual can become a member of a particular Hells Angels charter. *Id.* at 3421. Individuals begin as "hang-arounds" and are then required to "prospect" for a minimum of 12 months before they can become "full-patch" members. *Id.* at 1087-88, 3421. A "full-patch" member is a full member of the club, and refers to the three-piece patch on members' vests. *Id.* at 1065, 1086. The patch consists of a "top rocker," which states the name "Hells Angels"; the center patch has the Death Head logo, a skull with its mouth stitched shut; and below the Death Head is the "bottom rocker," which denotes the state the member is from. *Id.* at 2475-76; 2477. Only full-patch members are permitted to wear something that displays the Hells Angels name or the Death Head. *Id.* at 2476. Members can also earn tags that they wear on the front of their vests. Among these is the "Filthy Few" tag, which the Government asserted members earn by committing a violent act in furtherance of the club. *Id.* at 2501-02.

Charter leadership structure consists of a president, vice president, secretary, treasurer, and a sergeant-at-arms. *Id.* at 2445. Charters hold weekly meetings referred to as "church." *Id.* at 2473. At church, members discuss charter business and vote on significant charter issues. *Id.* at 2557-58. Most charter decisions are subject to a "one man, one vote" rule. *Id.* at 2557.

Hells Angels Sonoma County ("HASC") is a charter that operates in Sonoma County. As the next section demonstrates, HASC has exhibited two purposes relevant to this trial. First, HASC seeks to promote their reputation through violence. *Id.* at 1346  This purpose involves, *inter alia*, violence toward rival OMGs, *e.g.*, *id.* at 1812-13, violence toward members who "disrespect" other Hells Angels, *e.g.*, *id.* at 1028-1050, and violence toward anyone who disrespects the patch in public. *Id.* at 1203-06; 1376; 1396-1403; 4980-81. Second, HASC seeks to evade law enforcement scrutiny. *See id.* at 2495. This purpose involves, *inter alia*, assaults on members of law enforcement and globally enforced "no snitching" rules. *Id.* at 2506; 2477. The stitched shut mouth of the Death Head logo reflects the no snitching rules. *Id.* at 6414.

Defendant Raymond Foakes, "Ray," was a former president of HASC and a former

sergeant-at-arms. *Id.* at 1882; 3715. He had a reputation for being a "badass," a "rock star," and "Mr. Hells Angel." *Id.* at 1249. Defendant Mr. Ranieri was a president of the Boston Hells Angels charter. *Id.* at 3672-73. He had close connections to the HASC and Fresno charters. *Id.* at 1370; 2332. For example, celebrations were held for Mr. Ranieri when he visited the HASC clubhouse. *Id.* at 2332. An HASC member, Russell Lyles, visited Mr. Ranieri in Massachusetts "pretty often," and even wanted to name his son after Mr. Ranieri. *Id.* at 2333-34. The Government also presented numerous photos of Mr. Ranieri with HASC and Fresno members. *See*, *e.g.*, Ex. 811. Mr. Ranieri also wore a Sonoma tag and sleeve tattoo, designating his affiliation with the HASC. TT 1391; 2498; Ex. 843.

Other Hells Angels members relevant to this case are as follows. Russel Ott was the president of HASC before Mr. Foakes. TT 4956. Jonathan Nelson was the most recent president of HASC. *Id.* at 3666. Russell Lyles was the sergeant of arms of HASC. *Id.* at 1327. Brian Wendt was the president of the Hells Angels Fresno charter, and was close with Nelson. *Id.* at 4620-21; 1374-75.

A murder victim in this case, Joel Silva, was also an HASC member. *Id.* at 2361. Silva had a reputation for being a bully and reportedly created problems at the HASC, Fresno, and New Hampshire clubhouses. *Id.* at 2402. In the first trial of HASC members and association in this case, Ott, Nelson, and Wendt were convicted for his murder. *See* Jury Verdict Docket No. 2886.

B.   Overt Acts, Predicate Acts, and Uncharged Conduct

1.   Assaults

Former member Troy Conte was assaulted and kicked out of HASC for sleeping with the girlfriend of Mr. Foakes. TT 5040-5041. In November 2016, Conte received a text message that all HASC members needed to come to the clubhouse for a meeting. *Id.* at 5035. After Conte arrived, Mr. Foakes walked in and struck Conte in the face. *Id.* at 5039. Conte attempted to leave, but Mr. Lyles and Mr. Foakes dragged him back inside and proceeded to beat him. *Id.* at 5040. Conte admitted to sleeping with Mr. Foakes' partner, Desiree Maclean. *Id.* at 5040. Eventually, the assault was paused so the members could vote on Conte's membership. *Id.* at 5041. All voted to revoke Conte's membership. *Id.* at 5041. Conte was then beaten, including hit with a baseball

4

bat, bullwhipped, and pistol whipped for four-and-a-half hours. *Id.* at 5041. Conte was also held down so Mr. Foakes could run a tattoo gun across his face. *Id.* at 5044-5045.

As a result of the assault, Conte had to stay at a hospital overnight. *Id.* at 6192-93. Medical records showed that he suffered facial fractures, including to the orbital walls of his left eye. *Id.* at 6170-90. He also had to have plastic surgery to remove the tattoos on his forehead. *Id.* at 6215.

The Government also presented evidence of other HASC members' involvement in two other assaults: the assault of Javad Trew and the assault of Mariano Malvino.[2] Javad Trew testified that he was assaulted by Nelson and HASC member Jeremy Greer. *Id.* at 1043. Trew explained that he considered joining HASC after meeting Greer at a tattoo convention in 2015. *Id.* at 1029. Greer then began to ask favors of Trew. In one instance, Greer called Trew late at night asking to borrow Trew's utility trailer. *Id.* at 1034. When Trew declined, Greer became "very aggressive on the phone about it." *Id.* Next, Greer asked to borrow Trew's vehicle. *Id.* at 1035. Trew again declined, and Greer again became aggressive. *Id.* Eventually, in approximately 2016, Trew told Mariano Malvino, a member of the HASC support club Ghost Warriors, that he was uncomfortable with Greer's aggressive responses. *Id.* at 1036.

Malvino subsequently told Trew to go to the HASC clubhouse. *Id.* at 1038. When Trew arrived, Greer and Nelson were waiting for him with a clear plastic sheet spread across the floor. *Id.* at 1043. Greer began yelling at Trew for talking about him to Malvino. *Id.* at 1043. Nelson then struck Trew in the back of his head with a baseball bat. *Id.* at 1044. Others at the clubhouse joined in and beat Trew for a few minutes. *Id.* at 1045. Trew stated that he thought he "was going to die," *id.* at 1044, and that there was a lot of blood on his face and body. *Id.* at 1046. Malvino then walked Trew to the bathroom and instructed Trew to clean himself off with a

---

[2] While assaults do not qualify as racketeering acts, *see* 18 U.S.C. § 1961(1), they can be considered as enterprise evidence and serve, in part, as a basis for the inference that a defendant joined the enterprise agreeing members would engage in a pattern racketeering. *Cf. See United States v. Jaimez*, 45 F.4th 1118, 1122 (9th Cir. 2022) (utilizing of assaults as evidence of an enterprise), *cert. denied*, 143 S. Ct. 1038 (2023); *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) (utilizing evidence of assaults to prove a defendant's participation in an enterprise).

bottle of bleach. *Id.* at 1045-46. After leaving the bathroom Nelson asked Trew "What the fuck happened tonight?" *Id.* at 1047. Trew responded, "Nothing happened tonight," as he was under the impression that he would be killed if he told anyone about the assault. *Id.* at 1047. On his way home after the assault, he discovered that his phone was factory reset and all his data was cleared. *Id.* at 1048.

Malvino was assaulted by HASC members Nelson and Lyles for interacting with David Clark, a non-member in bad standing with the Hells Angels. *Id.* at 1107-1109. Lyles had previously informed HASC and Ghost Warrior members that they could not associate with David Clark. *Id.* at 1106. Despite Mr. Lyles' instruction, Malvino continued to do so, and was arrested after committing a robbery with David Clark. *Id.* at 1106-07. While released on bail, Malvino told the Ghost Warriors about his and David Clark's arrest. *Id.* at 1108. The Ghost Warriors told Malvino he was required to inform Mr. Lyles about the incident, and Malvino did so. *Id.* at 1108. Lyles told Malvino to meet at the clubhouse. *Id.* at 1108.

When Malvino arrived, Mr. Lyles and Nelson attacked him. *Id.* at 1109. Lyles punched Malvino in the face. *Id.* at 1110. Malvino was struck in the head with what he described as the teeth side of a framing hammer. *Id.* at 1110. When the assault ended, Malvino was on the ground and saw a pool of blood. *Id.* at 1111. Members of the Ghost Warriors then went to Malvino's house and took all his Ghost Warrior paraphernalia. *Id.* at 1112.

### 2.    Witness Intimidation and Extortion

The night Troy Conte was severely beaten and removed from HASC, Mr. Foakes sexually assaulted Conte's wife, Michelle Conte, and subjected her to witness intimidation. *Id.* at 5373-5378. During the assault on Troy Conte, Mr. Foakes called Ms. Conte and told her to come to the HASC clubhouse. *Id.* at 5372. Once she arrived, Mr. Foakes drove Ms. Conte to a secluded location. *Id.* at 5372. He told her, "if I don't do what he says, that Troy is going to get worse than what he already has, and if I say anything to anybody, then he'll come after me." *Id.* at 5374. Mr. Foakes then forced Ms. Conte to perform fellatio on him. *Id.* at 5375. Ms. Conte then returned home. *Id.* at 5376. Mr. Foakes returned to the clubhouse to resume the beating of Troy Conte while telling Troy Conte what Mr. Foakes had just done to Ms. Conte. *Id.* at 5050. Before Troy

Conte returned from the HASC clubhouse, Mr. Foakes went to the Contes' house and attempted to assault Ms. Conte again while she was in her bed. *Id.* at 5377. HASC member Josh Johnson, who was bringing Troy Conte home after the assault at the clubhouse, arrived before Mr. Foakes could do so and convinced Mr. Foakes to leave. *Id.* at 5378. Ms. Conte then took her husband to the hospital. *Id.* at 5380. The next day, Ms. Conte informed her husband that Mr. Foakes sexually assaulted her. *Id.* at 5381. Even though the Contes typically avoided dealing with law enforcement, Troy Conte told Ms. Conte that she should report the incident to the police—a normally forbidden act by a member or association of the Hells Angels. *See id.* at 5381; 5059. Ms. Conte did so, and Mr. Foakes was arrested. *Id.* at 5383.

Also, after Malvino was assaulted, Nelson and Lyles told Malvino to "get [his] story straight." *Id.* at 1112. Malvino drove himself to the hospital and lied about what happened. *Id.* at 1113.

### 3. Spencer Robbery

The Government also presented evidence of two robberies committed in furtherance of HASC. In 2015, HASC members Damien Cesena and Jeremy Greer showed up at the house Spencer was in to claim marijuana that Spencer had taken from a person named Casey Jones. *Id.* at 1759, 1766. Cesena and Greer told Spencer that the marijuana belonged to the Hells Angels and to give it back so nothing would happen to Spencer. *Id.* at 1763. When Spencer declined to give them the marijuana, Greer and Cesena forced themselves in through the gate, and Cesena struck Spencer with a pistol. *Id.* at 1769-71. After he was struck, Spencer fled through the back door. *Id.* Later that night, Spencer returned home and found that Cesena and Greer had taken several marijuana plants and a duffel bag with approximately six to eight points of marijuana. *Id.* at 1771, 1781. A couple of days later while only Gruber's mother was home, Cesena returned to the house wearing his Hells Angels patch and said that he wanted to talk to Spencer. *Id.* at 1802; 5019. Troy Conte testified that Cesena's purpose in returning to Cesena's home was for intimidation. *Id.* at 5018-19.

Notably, both the robbery and Cesena's return were captured by Gruber's surveillance system. *Id.* at 1803-04. Gruber showed the surveillance footage to his martial arts instructor,

7

HASC member Herb Cody.  *Id.* at 1804.  Upon viewing the footage, Herb Cody asked to purchase the surveillance hard drive from Gruber and purchased it.  *Id.* at 1804-05.  At the next church, when the other HASC members learned of the robbery, Greer and Cesena were made to split the proceeds because Cesena wore his Hells Angels patch when he returned to the grow house.  *Id.* at 5018-19.

> 4.    Eban Hale Robbery

HASC was also implicated in the robbery of Eban Hale.  *Id.* at 2133-35.  In the spring of 2016, Hale won an auction for an abandoned storage unit and, much to his surprise, discovered around 200 pounds of packaged marijuana inside.  *Id.* at 2124.  Eventually, word of Hale's find spread, and individuals began harassing Hale, demanding he give them some of the marijuana.  *Id.* at 2127-30.  Hale met with Troy Conte, then a Hells Angels member, to exchange 30 pounds of marijuana for protection.  *Id.* at 2133-35.  Hale testified that he felt as if he had no option but to pay for his protection.  *Id.* at 2133-35.  After the meeting, the harassment immediately ceased.  *Id.* at 2135.

In December 2016, HASC member Jeremy Greer showed up at Hale's home.  *Id.* at 2138.  When Hale saw Greer, he was already inside the house holding a gun.  *Id.* at 2138.  Greer told Hale that the marijuana was his and demanded its return.  *Id.* at 2139.  When Hale explained to Greer that he had already sold the marijuana for $100,000, Greer cocked his gun and demanded the $100,000.  *Id.* at 2140.  After Hale told Greer he didn't have the money, Greer stated "Do you know who I represent?"  *Id.* at 2141.  Hale understood Greer to be referencing the Hells Angels.  *Id.* at 2139.  Hale then gave Greer everything he had on hand: $4,000 worth of marijuana and $1,000 in cash.  *Id.* at 2143.

> 5.    Violence against Rivals

The Government provided evidence that HASC contemplated violence which could result in the killing of rival OMGs.  Rival OMGs—such as the Mongols, Vagos, and Wanted—were considered enemies, *id.* at 1418, and Hells Angels members were expected to attack enemies on sight.  *Id.* at 3972.  Government Witness Joseph Hardisty testified that the Hells Angels recruited him for "big game hunting and small game hunting," *i.e.*, to hunt and kill Mongols ("big game")

and Vagos ("small game"). *Id.* at 3961. However, Hardisty also testified that he never tried to kill nor planned to kill any specific Mongol. *Id.* at 3972.

In one instance, after a member of the Mongols murdered the president of the San Francisco Hells Angels, *id.* at 5049–50, HASC members were told to look out for Mongols and attack them on sight. *Id.* Members who failed to do so lost status in HAMC. *Id.* at 5052. For example, a full-patch HASC member who failed to report seeing a Mongol license plate in HAMC territory was relegated to a prospect. *Id.*

Verhagen testified that he participated in two "runs" to Arizona in which HASC and related charters contemplated the possibility of killing rivals. Verhagen explained that after a Phoenix Hells Angels member was killed by a Mongol, HASC travelled to Arizona in force for the funeral. *Id.* at 1418. The members chose to take a route through Mongol territory rather than the most direct route to "make a statement; we were showing force." *Id.* at 1420. Before leaving, Nelson gave a speech in which he explained that they could be ambushed by other motorcycle clubs and there was a "very good chance that we might not come home from it." *Id.* at 1423. Verhagen testified that on that trip, he felt prepared to die for the Hells Angels and that he desired "to have that honor." *Id.* at 1423.

6. Drug Trafficking and Fraud

Around 2008, Russel Lyles operated a marijuana grow house in Willits, California. *Id.* at 1175. Mr. Foakes' then girlfriend, Meghan Jaynes, *id.* at 1152, testified that Mr. Foakes ordered her to move to the location of the grow house and work for Mr. Lyles without pay. *Id.* at 1163. Ms. Jaynes explained that Hells Angels members would often visit the grow house, including a member of the Boston Hells Angel charter. *Id.* at 1170. Eventually, the grow house was raided, and Mr. Lyles was arrested. *Id.* at 1175-76, 1181. Law enforcement discovered Hells Angels paraphernalia and a number of firearms in the grow house. *Id.* at 1793, 1795–97. A sign on the window of the grow house read "This property belongs to a Hells Angel. Fuck around and find out. I don't call the Sheriff." *Id.* at 1172. A member from the Boston Hells Angels was also present at the raid. *Id.* at 1198.

C.      Murder of Joel Silva

Among the RICO acts, and the basis for Mr. Ranieri's VICAR murder conviction, is the conspiracy to murder and murder of former HASC member Joel Silva.

Silva was a sergeant at arms of HASC and had been in the club for five years at the time of his death. *Id.* at 4631-32. In June 2014, Silva attended the annual Laconia Motorcycle Week in New Hampshire with Hardisty, and Fresno charter members Wendt, Robbie Huff, and Tio Bueno. *Id.* at 3848-49. While there, Silva and Hardisty spent time at the Laconia charter clubhouse, where they were reckless and causing problems. *Id.* at 3849. At one point, a dispute arose between Silva and Boston charter member "Sweeney," who was Mr. Ranieri's best friend. *Id.* at 3850. Silva got upset and jealous that a prospect was wearing a chain that Sweeney had previously given to Silva, but then had taken back. *Id.* at 3900-03; 3907. Silva then threatened Sweeney, saying he wanted to kill Sweeney. *Id.* at 3850. After Silva made the threat he told Wendt, Huff, and Hardisty. *Id.* at 3851. Hardisty explained that Silva's threat was a significant problem because "you're talking about killing a member over a chain, just 'cause your feelings are hurt." *Id.* at 3900. Wendt was "very upset," and went to tell Mr. Ranieri. *Id.* at 3851. The Fresno charter gave Hardisty an ultimatum, "you're going to stay here with [Silva] or you're coming with us. Pick a side." *Id.* at 3852. Mr. Hardisty chose to go with the Fresno charter because "If I stayed with [Silva], that meant I was going to face the same fate as him" and that the Fresno charter "were the more powerful ones." *Id.* at 3853.

Hardisty testified that he and the Fresno charter went to Mr. Ranieri's house in Boston, Massachusetts, where Mr. Ranieri and Wendt privately discussed Silva's threat. *Id.* at 3854. Mr. Ranieri and Wendt then rejoined the group, and told Mr. Hardisty that Silva "had to go," *i.e.*, Silva "had to be killed." *Id.* at 3855. Mr. Hardisty and the Fresno charter flew back to California. *Id.* at 3855-56. The next day at Mr. Hardisty's residence in Antioch, the HASC president Nelson, Wendt, and a few other Fresno charter members had a discussion about the need to kill Silva. *Id.* at 3856. They decided to kill him. *Id.* at 3856.

After the meeting in Antioch, Hardisty and Nelson had a separate meeting where Nelson asked Hardisty to "take care of" the murder because there was no place to do it in Sonoma. *Id.* at

United States District Court
Northern District of California

3857.  Hardisty initially agreed, and even moved to Sonoma to make Silva feel more comfortable. *Id.* at 3858.  At this time, Silva became more withdrawn and unusual, as he "knew that everyone was mat at him." *Id.* at 3858.  Hardisty then repudiated his role in the murder to Nelson, after spending more time with Silva.  *Id.* at 3859.  Nelson said that the Fresno charter would take care of it, but Hardisty was still to help Silva feel comfortable to get down to Fresno.  *Id.* at 3859-60.

During this time, Mr. Hardisty remained in frequent contact with Silva until he received a text "letting [him] know that it was taken care of and not to text [Silva] anymore."  *Id.* at 3859-61.  A few weeks later, Mr. Hardisty went to the Fresno clubhouse for a party, where Wendt told him the details of the murder.  *Id.* at 3862.  Wendt told Silva to come to the Fresno club house to "squash the beef they had" and "move some weed" that was for Silva.  *Id.*  After Silva arrived at the Fresno clubhouse, Wendt told him to grab marijuana from a cubby under a stage.  *Id.*  When Silva bent down to grab the marijuana, Wendt shot Silva in the back of the head.  *Id.*

Other evidence and testimony corroborated Mr. Hardisty's testimony.  Cell-site data showed that Silva and several Fresno charter members were in Boston and Laconia, New Hampshire areas in June of 2014.  *Id.* at 3498-99.  By 3:30 p.m., Wendt's and Huff's phones registered in Lynn, Massachusetts, near the residence of Mr. Ranieri, while Silva's phone shortly after was registered at the Manchester Boston Airport. *Id.* at 3501-02.  By 6:00 p.m. that evening, Wendt's phone registered at the Boston Logan International Airport.  *Id.* at 3501.  The next day, June 17, 2014, cell-site data placed Wendt's, Huff's, and Nelson's phones in the proximity of Antioch, California, near the residence of Mr. Hardisty.  *Id.* at 3503.

Approximately one month later, on July 14, 2014—only one day before Silva's disappearance—cell-site data showed that Nelson and Wendt's phones were in the vicinity of Mr. Ranieri's residence in Lynn, Massachusetts from 8:00 a.m. to 4:00 p.m.  *Id.* at 3504, 3506.  Mr. Ranieri was in regular contact with Wendt and Nelson.  *Id.* at 3505.  From 5:00 p.m. to 5:55 p.m., cell-site records show Wendt was at Boston Logan International Airport, where contacts between him, Nelson, and Mr. Ranieri continued.  *Id.* at 3508-08.

Then, on the morning of July 15, 2014, the day of Silva's disappearance, cell-records show Mr. Ranieri was in regular contact with Wendt, Silva, and Nelson.  *Id.* at 3516.  The same

United States District Court
Northern District of California

1    morning, the Silva phone reaches out to Ott's phone, and Ott reaches back out to the Silva phone.

2    *Id.* at 3517.  Wendt is shortly in touch with Ranieri for a series of text messages and a phone call.

3    *Id.* at 3520.  Around an hour after the 11:06 a.m. call, Ott's phone and Silva's phone travelled in

4    tandem from Santa Rosa to the vicinity of the Fresno clubhouse.  *Id.* at 3520.  Cell-site data

5    showed that after arriving in the vicinity of the Fresno clubhouse, Silva's phone made a series of

6    outgoing contacts to Wendt's phone, the last of which was an outgoing call made at 4:36 p.m.  *Id.*

7    at 3520-21.  Despite numerous incoming contacts, no outgoing calls or texts were made from

8    Silva's phone thereafter.  Gov't Ex. 127 at 27-36.  Unlike Silva's phone, however, Mr. Ranieri's

9    phone continued to make outgoing calls to Wendt.  Gov't Ex. 127 at 25.

10       Cell data also corroborates Mr. Hardisty's testimony about the cover-up.  Records showed

11   that on the morning of July 16, 2014—the day after Silva's disappearance—Fresno charter

12   member Merl Hefferman contacted Levi Phipps, the manager of the California Crematory

13   associated with the Yost & Webb funeral home in Fresno.  TT 3527.  Phipps testified that Merl

14   Hefferman told him "You better be there."  *Id.* at 2943.  After receiving the text, two men arrived

15   at the crematory, flashed a gun at Phipps, and moved from their vehicle what Phipps believed to

16   be a body and placed it in the crematory incinerator.  *Id.* at 2947-2950.  Phipps set the time for a

17   second body to be cremated, after the first legitimate one that was cremated earlier in the morning.

18   *Id.* at 2952.  Merl Hefferman later contacted Mr. Phipps and told him to keep quiet.  *Id.* at 2953.

19   Cell-site data further showed that Huff was in the vicinity of Dos Palos on July 16, 2014, near

20   where Silva's burned out truck was found on fire in an isolated area later that day.  *Id.* at 3529,

21   2721.  The fire captain who found Silva's truck testified that he believed the fire was most likely

22   the result of arson.  *Id.* at 2725.

23       A month after Silva disappeared, HASC members went to his house to take all of his Hells

24   Angels related materials.  *Id.* at 3178-80.  Silva's daughter Stevie Silva saw an HASC member

25   riding Silva's bike.  *Id.* at 3135-37.  Law enforcement also found Silva's dog tags during a search

26   of Lyles' residence.  *Id.* at 4630.  None of the Hells Angels approached Silva's family to offer

27   assistance in locating him, even though they had done so once previously when Silva was missing.

28   *Id.* at 3177.  Members also shunned Silva's family members in public.  *Id.* at 3128-29; 3182.  Silva

1 was also voted out of HASC.  *Id.* at 5026.

2                                    **IV.      ANALYSIS**

3    **A.**      Count One: RICO Conspiracy

4               1.       The RICO Conspiracy statute

5               The RICO Conspiracy statute, 18 U.S.C. § 1962(d), criminalizes conspiring to violate the

6    RICO statute, 18 U.S.C. § 1962(c). The RICO statute, in turn, makes it unlawful for "any person

7    employed by or associated with any enterprise engaged in, or the activities of which affect,

8    interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

9    such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  The

10   Supreme Court has established three predominant elements for a subsection (c) violation: "(1) the

11   conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United*

12   *States*, 522 U.S. 52, 62 (1997).

13              For the third element, the sole element in dispute, a "pattern of racketeering activity"

14   requires proving "at least two predicate racketeering acts." U.S.C. § 1961(5).  The defendant need

15   not have personally committed a predicate act, or even an overt act.  *Salinas v. United States*, 522

16   U.S. 52, 64 (1997) ("§ 1962(d), broadened conspiracy coverage by omitting the requirement of an

17   overt act; it did not, at the same time, work the radical change of requiring the Government to

18   prove each conspirator agreed that he would be the one to commit two predicate acts.").  A

19   defendant can be guilty of RICO conspiracy if he "knowingly agree[d] to facilitate a scheme

20   which includes the operation or management of a RICO enterprise."  *United States v. Fernandez*,

21   388 F.3d 1199, 1230 (9th Cir. 2004).  The defendant must also be "aware of the essential nature

22   and scope of the enterprise and intended to participate in it."  *Baumer v. Pachl*, 8 F.3d 1341, 1346

23   (9th Cir. 1993).

24              2.       Raymond Foakes

25              Mr. Foakes argues that the evidence was insufficient to show he agreed to a pattern of

26   racketeering consisting of two or more predicate acts.  Mot. at 3; (citing *United States v. Mouzone*,

27   687 F.3d 207, 218 (4th Cir. 2012) ("the RICO conspiracy statute does not 'criminalize mere

28   association with an enterprise.'")).  The Government makes two arguments in response.  First, the

United States District Court
Northern District of California

                                                    13

evidence was sufficient to show that Mr. Foakes had "general knowledge" of HASC's criminal

acts and agreed the HASC would commit the types of acts which constitute racketeering acts.

Second, the evidence was in fact sufficient to show that Mr. Foakes participated in at least one

overt HASC predicate acts, the witness intimidation of Michelle Conte.

For the reasons below, sufficient evidence exists that Mr. Foakes agreed that at least two

predicate racketeering acts would be committed by HASC members and associations.[3]  First, as

President of HASC, he knew of and agreed to the essential nature and scope of the HASC

enterprise, and therefore intended to participate in it.  Next, he agreed that members would commit

numerous predicate acts including robbery, extortion, drug trafficking, arson and obstruction of

---

[3] Mr. Foakes has not raised the issue of whether the pattern of predicate racketeering acts was formed through the "continuity plus relationship" test.  Predicate racketeering acts form a pattern when they exhibit "continuity plus relationship."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).  Predicate acts are related where they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id.* at 240.  As for continuity, the Supreme Court has divided continuity into two analytical types: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.

Closed-end continuity is satisfied by "a series of related predicates extending over a substantial period of time."  *Id.* at 242.  Open-ended continuity is satisfied by "past conduct that by its nature projects into the future with a threat of repetition."  *Id.* at 241.  Predicate acts that specifically threaten repetition or that become a "regular way of doing business" satisfy the open-ended continuity requirement.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995); *see, e.g., Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 829 (7th Cir. 2016) (finding no open-end continuity in only one quid pro quo agreement to exchange a campaign contribution for a legislative bill signature).  The continuity requirement ensures that RICO targets "long-term criminal conduct."  *See Allwaste, Inc. v. Hecht, 65 F.3d 1523, 1528 (9th Cir. 1995)* (observing that a pattern of activity lasting only a few months did not reflect "long term criminal conduct").

Although Mr. Foakes argues that the evidence does not show a "pattern of racketeering," he does not argue that the "relationship plus continuity" requirement is not met.  Here, the predicate racketeering acts met the relationship requirement because they have the same purpose of furthering the HASC enterprise.  For instance,  as discussed further herein, there was evidence that HASC members discussed predicate racketeering acts of robbery and committed numerous acts of witness intimidation, destruction of inculpatory evidence, as well as extortion all in furtherance of the HASC's purpose as argued at trial.

The predicate racketeering acts that the jury could have found Mr. Foakes was aware of also met both the closed-end and open-ended continuity requirements because of the large number of acts committed and because they were a "regular way of doing business" of the HASC that was likely to continue.  *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 250 (1989).

justice.  Additionally, Mr. Foakes himself directly committed at least one predicate act of witness intimidation.

a.    Agreement

At the outset, Mr. Foakes need not participate in any specific, overt predicate racketeering act to be convicted of RICO conspiracy.  *Salinas v. United States,* 522 U.S. 52, 63 (1997).  The evidence shows that he "knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise" and was aware of the "essential nature and scope" of the enterprise based on his status and position in HASC.  *See United States v. Fernandez,* 388 F.3d 1199, 1230 (9th Cir. 2004); *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir. 1993).

First, the evidence depicted Mr. Foakes' prominence as the former president of HASC. Verhagen testified that nobody controlled Mr. Foakes.  TT 1250.  He had the "highest level of respect" and was "highly admired," *id.* at 1356, was regarded as "somebody extremely powerful within the club" even when he was in prison.  *Id.* at 1356.  Verhagen stated "Whatever Ray Ray needed, Ray Ray got; and if that's because he was a member of Sonoma County or just a Hells Angel in general, that's Ray Ray and Ray Ray gets what he wants."  *Id.* at 1363.  Troy Conte testified that Mr. Foakes raised the status of HASC because he was known among other Hells Angels.  *Id.* at 4964.  Mr. Foakes was president of HASC at least up until 2008 when he went to prison, and he continued to have significant status in HASC long after that.  *Id.* at 3146.

Next, the evidence showed that Mr. Foakes had a reputation for violence which gave him power and influence in HASC.  Verhagen testified that Mr. Foakes was respected within the Sonoma charter because he would "take care of business if necessary," specifically taking care of business with violence.  *Id.* at 1731.  Troy Conte testified that Mr. Foakes' impact on the club was because he fought, saying "if you didn't agree with what Ray was saying and you were really not a fighter, then why even bring it up?"  *Id.* at 4956.  Conte also testified that Mr. Foakes called the shots even from prison.  *Id.* at 4966-67.  He received moral and financial support from HASC while in prison.  *Id.* at 4968-69.  His motorcycle was still on display at the clubhouse while he was in prison.  *Id.* at 1320.  As an example, Verhagen testified that Mr. Foakes stated that Desiree McClean's boyfriend needed to be "fucked up."  *Id.* at 1366.  Desiree McClean was the ex of

15

1    "someone high up in the Hells Angels and off limits." *Id.* at 4382.  After Jeremy Greer talked to

2    Desiree McClean at a concert, Greer hit him in the back of the head and yelled "you don't mess

3    with someone's old lady." *Id.* at 4384.

4           Third, the Government presented substantial evidence that all HASC members, as well as

5    prospects, shared broad knowledge of each other's criminal cases and potential criminal liability.

6    Troy Conte testified that members followed the progress of members' criminal cases as a general

7    practice. *Id.* at 4988.  Verhagen testified that when he was a prospect, an HAMC charter's

8    president and sergeant of arms showed him the PACER report containing his case history, and

9    even confronted him about discrepancies in the report. *Id.* at 1308-1310.  The Government also

10   offered evidence that incarcerated HAMC members were given "BHC" or "Big House Crew"

11   designation. *Id.* at 4702.  Conte testified that he received moral support, visits, and letters from

12   members and associates when he was previously in the "BHC." *Id.* at 4991.  A rational juror

13   could infer that Mr. Foakes was generally aware of HASC criminal acts based on HASC

14   members' general knowledge of each other's criminal cases and conduct, and that Mr. Foakes

15   agreed with the acts based on his leadership within the enterprise.

16                  b.      Predicate Racketeering Acts by HASC Members

17          Under 18 U.S.C. § 1961(1), predicate racketeering acts include, as is relevant here, murder,

18   arson, robbery, extortion, and dealing in a controlled substance, and additionally includes

19   obstruction of justice, 18 U.S.C. § 1503, and tampering with a witness, including witness

20   intimidation), 18 U.S.C. § 1512.  18 U.S.C.A. § 1961(1); *see United States v. Lawson*, 535 F.3d

21   434, 443 (6th Cir. 2008) (alleging four predicate acts for a RICO conspiracy charge against a

22   member of the "Outlaw Motorcycle Club": conspiracy to distribute controlled substances,

23   distribution of marijuana, distribution of valium, and murder).  Given Mr. Foakes' leadership in

24   HASC, the evidence showed numerous direct and indirect ways he agreed that HASC members

25   would commit at least two predicate racketeering acts.

26                          i.      Robbery

27          The first predicate act is robbery.  As noted above, there was evidence of multiple

28   robberies by HASC members.  In 2015, Damien Cesena and Jeremy Greer Cesena and Greer

16

assaulted Spencer and robbed him of marijuana. TT 1759. Cesena returned to Spencer's house to extort more marijuana and intimidate Spencer into not talking to law enforcement. *Id.* at 1771-72; 1802. In connection with the 2016 robbery of Eban Hale by Jeremy Greer, Conte extorted Hale of marijuana when Hale "agreed" to pay Conte thirty-pounds of marijuana in exchange for protection. *Id.* at 2133-35. After Conte himself was kicked out of HASC in November 2016, Greer robbed Hale of marijuana at gunpoint. *Id.* at 2138-39. Days later, Greer then followed Hale in a white van filled with weapons, burglary, and kidnapping tools, until Greer was arrested. *Id.* at 2145-51; Government Exhibit (GX) 2038. Nothing suggests these act were out of character for the HASC, and a reasonably jury could conclude that Mr. Foakes agreed that these types of predicate racketeering acts would be committed by members and associates of the HASC. Indeed, Troy Conte testified that the Spencer robbery was discussed at a HASC meeting, and the proceeds of the robbery were divided amongst members. TT 4992. Conte testified that Mr. Foakes called into meetings from prison, and was informed of club activities. *Id.* at 4967-68. Even if Mr. Foakes did not attend that particular meeting, the jury could infer based on his status and continued involvement with the HASC that Mr. Foakes knew what was going on.

ii.    <u>Witness intimidation</u>

The second predicate racketeering act is witness intimidation. Witness intimidation was typical for HASC members. Troy Conte testified that when HASC discussed members' criminal charges at church, they also discussed whether anyone knew or could talk to prospective witnesses to get them not to testify. *Id.* at 4987-88; 5015. Javad Trew testified that after he had gotten hit in the back of the head with a baseball bat and beaten by several HASC members at the HASC clubhouse, he was threatened to keep quiet. *Id.* at 1044-45, 1047. Jamie King was attacked by Mark Guardado and Jonathan Nelson, and was threatened afterwards not to report to law enforcement. *Id.* at 2247-48. Troy Conte testified that the assault was discussed among HASC members and there was an expectation to tell the victim not to go to court. *Id.* at 4995. Mariano Malvano was assaulted by multiple HASC members and hit in the back of the head by a claw hammer. *Id.* at 1112. After he was told to "get [his] story straight," he lied to the doctors about what happened to him. *Id.* at 1112-13.

1    There was more evidence of witness intimidation.  Dylan Ghaderi was assaulted by Mr.

2    Lyles, and was intimidated into not testifying at Mr. Lyles' probation violation.  *Id.* at 2313.

3    HASC members discussed intimidating Ghaderi's mother.  *Id.* at 2314.  Mr. Lyles' old lady went

4    to Ghaderi's gilfriend's place to intimidate her so Ghaderi would not testify.  *Id.* at 2313.  Taylor

5    Blanford was assaulted by Jeremy Greer and refused to cooperate with law enforcement out of

6    fear of retaliation.  *Id.* at 4054-55.  Verhagen believed he would be killed if he was found out as an

7    informant.  *Id.* at 1242, 1262-63.  And, of course, Michelle Conte was intimidated by Mr. Foakes

8    while Troy Conte was being beaten at the HASC clubhouse.  *See id.* at 4892-93.  The jury

9    convicted Mr. Foakes of witness intimidation in Count Eight in connection with the witness

10   intimidation of Michelle Conte.  Docket No. 3493 at 3 (Jury Verdict).

iii.    Extortion

12   The third predicate racketeering act is extortion.  Extortion is "the obtaining of property

13   from another, with his consent, induced by wrongful use of actual or threatened force, violence, or

14   fear, or under color of official right."  18 U.S.C. §1951.  The evidence at trial showed that HASC

15   members extorted property from non-members, and thus a rational juror could infer that Mr.

16   Foakes, as a leader of HASC, agreed that members would commit the predicate act of extortion.

17   A member of a puppet club, who had no "voluntary agreement" with HASC, testified that he was

18   required to pay dues to HASC and non-payment would lead to violence.  TT 1096.  Troy Conte

19   also testified that Mr. Foakes used the patch to get away with things and not pay people money,

20   including when dealing with the public.  *Id.* at 4983-83; 5018.  Troy Conte also extorted 30

21   pounds of marijuana from Eban Hale.  *Id.* at 2133-35.

22   Mr. Foakes argues that the HASC practice requiring individuals who are kicked out to

23   forfeit their bike and other property is not extortion, but a voluntary and consensual agreement

24   between members within a private organization.  Foakes Mot. at 6.  He also argues that there is no

25   evidence of violence in obtaining ex-member property.  *Id.* at 8-9.  However, these arguments are

26   unpersuasive for two reasons.  First, Mr. Foakes agreed to the predicate racketeering act of

27   extortion given the HASC extortion of non-members for various property such as dues and

28   marijuana.  Second, ex-members generally understood that HASC would threaten violence if there

18

was resistance to the confiscation of bikes and property marked with HA emblems.  Troy Conte explained that if a kicked-out prospect refused to give up their motorcycle when required, they would get beaten up.  TT 5033.  Verhagen believed that if he had failed to give his motorcycle to HASC willingly after he was told to "step back as being a prospect," he would have been "beaten and it would be taken." *Id.* at 4285-87.  Greer and another HASC member went also went to Verhagen's home and took all of his Hells Angels related possessions, as well as his personal laptop and digital camera. *Id.* at 4286.  Even if there is an "agreement" to forfeit motorcycles to HASC, if the taking of those motorcycles was done under an implied threat of violence f the victim refused or resisted, that would constitute extortion.  See *United States v. Gil*, 724 F. App'x 517, 519 (9th Cir. 2017) (extortion can be based on "express or implied" threat); *United States v. Garcia*, 754 F.3d 460, 470 (7th Cir. 2014)("an implied threat can be the basis for an extortion conviction");  *United States v. Lazarenko*, No. CR 00-284 MJJ, 2003 U.S. Dist. LEXIS 25940, at *8 (N.D. Cal. 2003) ("Extortion by color of office may be in the form of implied threats or a reasonable fear of economic harm or reprisals based on the official's position of influence or power over others");  *Fin. Express v. Nowcom*, No. SACV 07-1225-CJC(ANx), 2008 U.S. Dist. LEXIS 126459, at *6 (C.D. Cal. 2008)("The sending of a writing that contains an express or implied threat, with intent to extort money or property, also constitutes extortion. Cal.Penal Code § 523").  *See also Curtis v. City of Gooding*, No. 1:10-CV-00097-REB, 2010 U.S. Dist. LEXIS 160604, at *4 (D. Idaho 2010).

iv.    <u>Drug trafficking</u>

HASC members generally knew about other members' marijuana growing operations.  TT 4985 (Conte testimony).  Troy Conte testified that he, Nelson, and Silva were all involved in marijuana growing. *Id.* at 4985.  Mr. Foakes contends that his knowledge of a members' grow house concerned a private person who happened to be a Hells Angel and thus was not an HASC racketeering act.  Foakes Mot. At 10.  But a rational juror could find that the grows were HASC related and that Mr. Foakes, as a former president and longtime member, had broad knowledge of its activities and understood and agreed that at least one member of HASC would engage in drug dealing.  Because Mr. Foakes was the president of HASC, a rational juror could have inferred that

he also generally knew about HASC members' growing operations.

### v.      Obstruction of Justice

Fifth is obstruction of justice.  Evidence at trial showed that members, after being assaulted, were told to clean up, and at least one member's phone was erased.  TT1045-46; 1048.  Verhagen testified that Jonathan Nelson got angry at Verhagen for sending a potentially incriminating text.  *Id.* at 1427.  Verhagen testified about "go bags" which were bags members carried that contained a change of clothes and materials to clean up a crime scene after anticipated violence.  He testified, "We had lighter fluid.  We had stuff to burn any evidence or clothing that needed to be burned in case of a situation."  *Id.* at 1404.  Hell's Angels globally enforced the "no snitching" rule, which is reflected in the organizational logo of a stitched shut mouth.  *Id.* at 2506, 2477, 6414.  Mr. Foakes argues that because the Court instructed the jury that he was not involved in the conspiracy to murder Joel Silva, he did not agree to any obstruction of justice in that context.  Foakes Mot. At 10.  However, the evidence showed numerous acts of obstruction of justice beyond the murder.

### vi.      Assaults

Finally, assaults are not predicate racketeering acts but tend to show the "essential nature and scope" of HASC.  The jury heard evidence of numerous assaults that HASC members committed: the assaults of Javad Trew, Mariano Malvino, Jamie King, and Taylor Blanford.  TT 1028-1051 (Trew); 1108-1111 (Malvino); 2247-48 (King); 4375 (Blanford).  The jury heard evidence of violence towards victims at bars, when passing a HASC pack on the highway, when speaking to a member's wife or girlfriend, and when wearing Hells Angels clothing without permission.  *Id.* at 1203-06; 1376; 1396-1403; 4980-81.  Members were expected to fight if they observed disrespect to the patch in public.  *Id.* at 4980.  Mr. Foakes also directly participated in assault, including when he hit Troy Conte in the face and forcefully tattooing him when he was kicked out of HASC.  *Id.* at 5038-39.

### vii.      Murder Conspiracy

The Government argues that Mr. Foakes participated in a conspiracy to commit murder because he agreed generally to commit murder of rivals as part of HASC.  They point to the

following pieces of evidence:

- Verhagen testified that during an HASC funeral procession through Mongol territory, he was prepared for a confrontation, including up to death.  TT 1420-23.

- Joseph Hardisty testified that Hells Angels understood if they saw the Mongols, it was "on sight," as in kill on sight.  TT 3972.

- When Hardisty beat a rival gang member badly with a barstool, he was awarded the Soldier patch by Mr. Ranieri.  TT 3871.  Mr. Ranieri gave the soldier patch to "people who committed crimes against other motorcycle gangs."

- Troy Conte testified that interactions between Hells Angels and rivals could lead to serious violence or death.  TT 5000.

- Troy Conte also testified that a member would be kicked out if they were not willing to kill for the patch.  TT 4998.

While HASC had a general understanding that there *could* be serious violence against rivals, this evidence does not meet the highest standard of intent for murder.  Murder is defined as "the unlawful killing of a human being with malice aforethought," which requires an intent to kill or cause serious bodily harm to another person.  18 U.S.C. §111.  In contrast to the intentional killing of Joel Silva, here with respect to rivals, there is no evidence that HASC members intended to kill rivals that crossed their path.  Hardisty defined being "on sight" among rivals as in "If you see each other, you fight."  TT 3972.  He also said that he never tried to kill a Mongol, and never made an agreement with anyone in HASC that he would kill a Mongol.  *Id.* at 3972.  Beating a rival gang member is one thing; purposefully killing them is another.

Mr. Foakes points out that the jury did not find the special sentencing factor consisting of conspiracy to commit murder.  Foakes Mot. at 5.  Therefore, Mr. Foakes argues that because the special sentencing factor is identical to conspiracy to commit murder, he is acquitted of both.  *Id; United States v. Cervantes*, No. 16-10531 2021 U.S. App. LEXIS 19324, at *24 (9th Cir. 2021) (the same elements that apply to conspiracy to commit murder as a predicate racketeering act under § 1962(d) of RICO, apply to the special sentencing factor).  Because the Court finds that there was insufficient evidence to show Mr. Foakes agreed that HASC would commit murder, it

21

does not need to address this argument.  However, it is worth noting that the argument mischaracterizes both the special sentencing factor and the predicate act of conspiracy to commit murder.  The special sentencing factor requires the additional finding that the conspiracy was to commit "deliberate and premeditated" murder.  18 U.S.C. § 1962(d).  Further, the jury instruction stated the "specific intent to commit deliberate and premeditated murder."  Docket No. 3267 at 61.  The jury's finding that Mr. Foakes did not participate in a specific, premeditated murder raises a different issue from whether Mr. Foakes agreed that HASC members would commit murder of rivals e.g. in the context of a spontaneous confrontation.

The Government also argues that the Joel Silva murder involved numerous predicate racketeering acts that Foakes agreed to, including murder and conspiracy to murder, witness intimidation, and obstruction of justice.  Foakes Opposition at 8. However, there is no evidence that Foakes knew about nor agreed to the murder.  First, the jury instructions directed that Mr. Foakes was not involved in the conspiracy to murder or the murder.  Docket No. 3444 (Jury Instruction No. 60).  Second, the conviction of co-defendants Nelson, Wendt, and Ott in the first trial of VICAR murder and conspiracy to commit VICAR murder does not establish Mr. Foakes agreed to the murder; there was no evidence of his involvement as there was with respect to the other defendants.

### c.   Predicate Racketeering Act by Mr. Foakes

Mr. Foakes was also directly involved in at least one specific predicate racketeering act: witness intimidation.  The jury convicted Mr. Foakes of witness intimidation against Michelle Conte.  Docket No. 3493 at 3 (Jury Verdict).  The totality of all his actions shows he engaged in witness intimidation consistent with the jury verdict, despite that the specific act of sexual assault was his own act unrelated to HASC.  Jury Verdict at 3; TT 6517 (jury instructions).  Michelle Conte testified that Mr. Foakes told her to do what he said or Troy would "get beat up worse than he already has" and "that if I say anything to anybody, that he'll come after me."  TT 5374.  She believed that if she said anything to law enforcement or else, "he would either beat me up or kill me or have someone else do it."  *Id.* at 5375.  The jury could have concluded the intimidation pertained not only to her sexual assault but also to Conte's beating which unlike the sexual assault,

1    was an HASC matter.

2           The Government argues that Mr. Foakes had direct involvement in the predicate

3    racketeering act of extortion during the HASC effort to beat Troy Conte and kick him out of the

4    club.  The night Conte was assaulted, HASC members went to his house and took all of his Hells

5    Angels paraphernalia.  *Id.* at 4867.  Michelle Conte, Conte's wife, was home at the time.  *Id.* at

6    4868–69.  She testified that she allowed the members to take the items because she was fearful of

7    what they would do if she tried to stop them.  *Id.* at 5370-71.  However, there is no evidence that

8    Mr. Foakes went to the Conte's house to take his property or even knew what the other HASC

9    members were doing.  Therefore, there is no evidence of Mr. Foake's involvement in the

10   extortion.

11                  d.       Summary

12          In sum, the evidence shows that Mr. Foakes had long-term involvement in the HASC and

13   that he enjoyed leadership and power in HASC and was "aware of the essential nature and scope

14   of the enterprise and intended to participate in it," *Fernandez*, 388 F.3d at 1230, including the

15   various predicate racketeering which were relatively common to the HASC.  There was evidence

16   that Mr. Foakes agreed that members would engage in two or more predicate racketeering acts,

17   with Mr. Foakes himself committing at least one predicate racketeering act: witness intimidation.

18   The Government thus produced sufficient evidence for a rational juror to find that Mr. Foakes

19   conspired to participate in the conduct of HASC's affairs through a pattern of racketeering in

20   violation of the RICO conspiracy statute.

21          3.      Christopher Ranieri

22          Mr. Ranieri argues that the evidence was insufficient to show he knowingly agreed that

23   members and associates of HASC would participate in a pattern of racketeering in violation of

24   RICO conspiracy, because he was not a member of HASC.  Ranieri Motion at 10-11.  The

25   Government makes two arguments in response.  First, the evidence was sufficient to show that

26   given Mr. Ranieri's high status within HASC, a rational juror could find that he participated in and

27   agreed to at least two predicate racketeering acts. Second, a rational juror could find that Mr.

28   Ranieri directly participated in a predicate racketeering act in the context of the Silva homicide.

United States District Court
Northern District of California

1    Ranieri Opposition at 25, 24.

2                    a.    Agreement

3          First, sufficient evidence exists that Mr. Ranieri knew of and agreed to the "essential nature

4    and scope" of the HASC enterprise because of his status and close relationship to HASC, despite

5    not being a member.  The jury heard substantial evidence that Mr. Ranieri had high status within

6    HASC.  *See, e.g.,* TT 1386 (Verhagen Testimony).  HASC members respected Mr. Ranieri and he

7    was the subject of discussion amongst them.  *Id.* at 5006-07; 5020 (Troy Conte testimony).  HASC

8    hosted a party for Mr. Ranieri when he visited in 2015.  *Id.* at 1449.  Mr. Ranieri was depicted

9    prominently at the HASC clubhouse, including a photograph of him wearing a Sonoma patch.  *Id.*

10   at 2851, Ex. 949.  He wore a Sonoma patch, suggested that HASC held him in high regard and that

11   he valued his association with the HASC.  TT 1391.  Mr. Ranieri also had a tattoo displaying his

12   association with HASC.  Ex. 843.  Additionally, Mr. Ranieri was particularly close to Nelson and

13   Mr. Lyles.  TT 5007.

14         Mr. Ranieri's connection to HASC went back early as 2008, where Mr. Lyles and a Boston

15   Hells Angel Manny Monteiro were arrested at an HASC-associated marijuana growing site.  Ex.

16   1521; 1951.  Mr. Foakes and Mr. Lyles discussed Manny's status on a recorded jail call, where

17   Mr. Foakes described this as a "lifestyle" and said that an arrest could happen to any one of them

18   at any given time.  Ex. 1521; 1951.  Mr. Foakes said that he discussed the case with Mr. Ranieri,

19   was coordinating with Mr. Ranieri for Manny's bail, and that he told Mr. Ranieri what Mr. Ranieri

20   needed to do.  *Id.*

21         Mr. Ranieri prominently displayed his "Filthy Few" status, a tag that earned respect within

22   Hells Angels because it indicated that he committed violence on behalf of the enterprise.  He

23   shared with HASC the combined symbols of the "Filthy Few" tag and an "SS" lighting bolt.  Ex.

24   1413 at HA-00001272.  Hardisty testified that Mr. Ranieri gave him the "soldier" patch after

25   beating a rival member badly with a barstool.  TT 3871.  The "soldier" patch was only given

26   "from [Ranieri] to people who committed crimes against other motorcycle clubs that, like, were

27   violent enough to come out in the newspaper or make headlines or like it had to have been

28   something – a major attack on another motorcycle club to get that patch."  *Id.* at 3872-71.  Mr.

United States District Court
Northern District of California

Ranieri's longstanding connection to HASC and his use of violent symbolism disproves his assertion that the evidence only showed that he had "non-culpable" relations with HASC members. *See* Ranieri Mot. at 11.

To be sure, the evidence that Mr. Ranieri knew of and agreed that members of the HASC would engage in a pattern of racketeering activity, including at least two predicate acts is thin – until, as noted below, his participation in the murder of Silva. While he was close to the HASC and individual members therein and spent considerable time with HASC members and appears to have encouraged their culture of violence, there is little evidence of his knowledge of any specific racketeering acts until the murder of Silva. The Court need not resolve that question however, because, as discussed below, there is substantial evidence that Mr. Ranieri agreed to two or more predicate racketeering acts in connection with the murder of Silva.

                  b.     Predicate Racketeering Acts

                      i.     Murder

Mr. Ranieri agreed to the predicate racketeering act of murder as a result of the underlying murder of Silva. Hardisty's testimony directly implicated Mr. Ranieri. He testified that Mr. Ranieri was involved in the conspiracy since 2014, when Mr. Ranieri and Wendt agreed that Silva "had to go." TT 3855. After the motorcycle run in Laconia, New Hampshire, the Fresno Hells Angels and Hardisty went to Mr. Ranieri's house, where Mr. Ranieri and Wendt privately met. *Id.* at 3853-54, 3919, 3928. After returning to the entire group, they discussed the fact that Silva had to be killed. *Id.* After Silva was murdered, Hardisty met with Mr. Ranieri during a party at the Fresno clubhouse, and they discussed the killing again. *Id.* at 3929-31, 3962, 3966.

Corroborating evidence shows Mr. Ranieri's involvement in the conspiracy to murder Silva. The CAST analysis of call detail records showed frequent communications between Mr. Ranieri and Wendt, and Mr. Ranieri and Nelson in the hours leading up to the killing, and in the day after. Ex. 127 at 17, 23-25. The evidence also showed that Wendt and Nelson's phones traveled to the areas of Boston, Mr. Ranieri's residence, and the Salem Hells Angels clubhouse a day or two before the murder. Ex. 127 at 15-16, 108. The winter after the murder, Mr. Ranieri attended an HASC party for him where he left a Filthy Few patch at the clubhouse. TT 1387-88.

A rational juror could infer from the timing of that act that it was a nod to HASC's murder of Silva.

Mr. Ranieri asserts "substantial concerns" regarding the evidentiary competence and credibility of Mr. Hardisty's testimony, and that the circumstantial evidence was insufficient, inconsistent, and not corroborative of Hardisty's testimony.[4]  Ranieri Mot. at 12-16.  However, under Rule 29, the court does not weigh witness credibility.  "The reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses," *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir. 1977).  Further, "[i]t is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction."  *Katakis,* 800 F.3d at 1028.  Hardisty's testimony alone is sufficient for a rational juror to have found that Mr. Ranieri conspired to commit the predicate racketeering act of murder.

ii.     Obstruction of Justice and Arson

The cremation of Silva's body shows that Mr. Ranieri agreed to the predicate racketeering acts of obstruction of justice and arson, given his key role in the murder.  A rational juror could infer that Mr. Ranieri knew that after the murder, HASC would have to dispose of Silva's body in a way to conceal the murder and that this is a matter that would likely have been discussed and planned by the conspirators.  The following evidence supports that the obstruction of justice and arson was planned:

- Levi Phipps, a crematory operator, testified that the Hells Angels placed a body in his incinerator the day after Silva was murdered, and that Fresno Hells Angel Merl Hefferman arranged with Phipps the day before the murder to make sure the crematorium would be available the day of the murder and threatened him before and

---

[4] He points to the following specific circumstantial evidence: phone records and CSLI targeting were not enough to implicate Ranieri. Mot. at 12-16; parts of Mr. Hardisty's testimony are inconsistent with Task Force Officer Menke's testimony, and points to discrepancies between where Mr. Hardisty states he was and his cell phone location. Mot. at 15; no corroborative evidence for Mr. Hardisty's stories; and no circumstantial evidence like call records, photos, airline tickets, travel itineraries, credit card receipts, or anything else that shows Hardisty traveled to Boston in 2014 as he claims. Mot. at 16.  Even though these shortcoming in evidence were pointed out to the jury, the jury could nonetheless have found (and did find) there was other sufficient evidence of Ranieri's involvement in the murder conspiracy.

United States District Court
Northern District of California

after to keep quiet.  TT 2945-54.

- Corroborative evidence of call detail records show communications between Hefferman and Phipps on the day before Silva was killed.  Ex. 127 at 17, 23-25.

- Hefferman, Wendt, and a Fresno member Robbie Huff were in regular contact at this time.  TT 3512-3515.

A discussion about what to do with Silva's body must have naturally arisen from the discussion of how to murder Silva.  Mr. Ranieri was in constant communication with Nelson and Wendt in the days leading up to and on the day of the murder.  *Id.* at 3512-3515.

There was also evidence suggesting that Mr. Ranieri likely agreed that HASC and Fresno members would burn Silva's truck after his murder, resulting in the predicate racketeering act of arson.  Silva's burned out truck was found on fire in an isolated area.  *Id.* at 2721.  Cell-site data showed that Huff, a Fresno charter member, was in the vicinity of Dos Palos on July 16, 2014, near where the truck was.  *See id.* at 3529.  The fire captain who found Silva's truck testified that he believed arson was the most probable cause.  *Id.* at 2725.  There was evidence that the day before the murder and the morning of the murder, Wendt had phone communications with Mr. Ranieri, Huff, and Nelson.  *Id.* at 3514-15.  A rational juror could infer that Mr. Ranieri agreed that members would conceal evidence of the murder, including the necessary concealment of Silva's truck – concealment by arson.

### iii.   Witness intimidation

Finally, Hefferman's threat to Levi Phipps while the cremation was taking place is a separate action that constitutes another predicate racketeering act of witness intimidation.  Phipps testified that Hefferman said leading up to the day of the cremation, "if this was to happen, you better be there. This will happen or else."  *Id.* at 2943.  He felt threatened, and that Hefferman would either hurt Phipps' family or Phipps himself.  *Id.* at 2945.  Again, it would be natural that the conspirators would plan to destroy evidence of Mr. Silva's murder by cremating his body, and that that would have to done by extra-legal means which likely would necessitate the assistance of and coerced silence by the crematorium staff.

In sum, Mr. Ranieri agreed that members of HASC would engage in at least two predicate

racketeering acts given his direct participation in the conspiracy to murder Joel Silva and the reasonable inference that he agreed to the process of disposing the body. *Cf. United States v. Watchmaker,* 761 F.2d 1459, 1475 (11th Cir. 1985) (defendant perpetrated three separate violations of the attempted murder statute when he shot three officers almost at the same instant and thus committed three separate predicate acts). Therefore, a rational juror could find that Mr. Ranieri agreed to participate in HASC's affairs through a pattern of racketeering in violation of RICO Conspiracy. *See* 18 U.S.C. § 1962(c).[5]

B.     Count Two: VICAR Conspiracy to Commit Murder in aid of Racketeering

The VICAR statute makes it an offense to commit a violent crime in aid of racketeering activity. 18 U.S.C.A. § 1959. Specifically, the statute provides, *inter alia,* that whoever for the purpose of maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual or attempts or conspires so to do, may be punished under the VICAR statute. 18 U.S.C.A. § 1959.

In contrast to RICO conspiracy which requires showing a "pattern of racketeering

---

[5] Like Mr. Foakes, Mr. Ranieri does not raise the "continuity plus relationship" test. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). If he had, the Court would reject any such challenge.

The relationship element is met. The predicate racketeering acts of murder, witness intimidation, obstruction of justice, and arson that took place as a result of the Silva murder meet the relationship test because they shared the common purpose of killing and covering up the murder of Silva.

Open-ended continuity is satisfied because the predicate racketeering acts surrounding the murder of Silva were of types that "project[ ] into the future with a threat of repetition" and reflect a "regular way of doing business." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995). For instance, the witness intimidation of crematory operator Levi Phipps was consistent other acts of witness intimidation by the HASC as well as the general Hells Angels rule of "no snitching." 3163-64 (Verhagen testimony); 2448 245202454-55 (Scheetz testimony). *See also* Ex. 144-A at 170; 6414-15 (Brooke Oliver testimony, trademark lawyer). The obstruction of justice (e.g. burning Silva's body and truck) was also a "regular way of doing business" in Hells Angels. For instance, there was evidence that HASC members brought "go bags" to clean up after anticipated violent events, 1404, and in at least one instance a member was ordered to clean himself up after being assaulted and his phone was erased. 1045-1050. It became clear to Mr. Ranieri that HASC members and associates were readily willing to murder and then obstruct justice and intimidate witnesses; this provides a basis to find that Mr. Ranieri anticipated HASC would commit similar acts in the future.

activity," VICAR under Section 1959 only requires the enterprises engages in "racketeering activity"; it does not require a "pattern" of racketeering necessary under Section 1962 (c). Therefore, a VICAR conviction can stand even without a RICO conspiracy conviction, as long as a defendant commits, or attempts or conspires to commit (1) a single specified violent offense (2) for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.  *See* 18 U.S.C.A. § 1959; *see also United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004) (describing the counts against the codefendants as both RICO and "stand-alone VICAR" offenses).

       1.   <u>Cristopher Ranieri</u>

    Mr. Ranieri mounts several defenses.  First, Mr. Ranieri argues the evidence was insufficient to find beyond a reasonable doubt that he conspired to murder Silva.  Ranieri Mot. at 4.  Second, he argues that the evidence was insufficient to find that the purpose to commit the charged crime was to "maintain or increase" his position in HASC because he was not a member of HASC, nor did he seek to become one.  *Id.* at 4, 19*; see* 18 U.S.C. § 1959(a).

       a.   <u>Conspiracy to Commit Murder</u>

    The evidence establishes that Mr. Ranieri conspired to commit the murder of Silva.  A rational juror could find that Mr. Ranieri conspired to murder Silva for reasons stated in the previous section, including Hardisty's testimony and the corroborative evidence.

       b.   <u>Purpose</u>

    Even as a non-member of HASC, Mr. Ranieri can commit a violent offense for the purpose of maintaining or increasing his position in HASC as an associate of the enterprise.  Formal membership in an enterprise is not necessary to sustain a VICAR conviction.  *Rodriguez*, 971 F.3d at 1011; *see also Fernandez*, 388 F.3d at 1231.

    In *Rodriguez*, a secretary of the Mexican Mafia challenged her VICAR conviction on the grounds that she was not a formal member of the enterprise.  *Id.*  However, because the enterprise charged in the indictment encompassed the organization's "leadership, membership, *and associates*," the Ninth Circuit concluded that official membership was not a prerequisite to a VICAR conviction.  *Id.* (emphasis added).  *Rodriguez* then found that the government presented

29

1    sufficient evidence "to establish that [the defendant] served as [a Mexican Mafia] secretary and

2    facilitated acts of violence as part of that role." *Id.* Specifically, she disseminated "instructions to

3    murder or otherwise inflict violence upon those who threatened [her boss] or the people loyal to

4    him." *Id.*

5           Here, similarly, there was sufficient evidence that Mr. Ranieri was involved in the murder

6    of Silva, who disrespected him and other leaders of HASC.  Just like in *Rodriguez,* here, the

7    Superseding Indictment in this case alleged that the enterprise encompassed HASC's "leadership,

8    members, *and associates*."  Superseding Indictment ¶ 11 (emphasis added).  Thus, while Mr.

9    Ranieri was not a formal HASC member, he could qualify as an HASC "associate" for the purpose

10   of VICAR by virtue of his close association with HASC and his agreement to facilitate their

11   affairs, particularly through the Silva murder.

12          A rational juror could find that Mr. Ranieri's purpose in the murder of Silva was to

13   maintain his status within HASC.  This is similar to the Group One trial, where this Court found

14   that the defendant and Fresno charter member Wendt had a close relationship with HASC (though

15   not a member thereof) and that the jury could infer that his role in carrying out the murder of Silva

16   would improve or maintain his status with HASC.  *See United States v. Nelson,* 2023 WL 4004113

17   at *20-22 (N.D. Cal. 2023).  Similarly, here, Mr. Ranieri close to HASC leaders and had high

18   status among the charter.  His prominent display of "Filthy Few" status and the fact he left the

19   "Filthy Few" patch at the HASC clubhouse after the murder of Silva show his commitment to

20   violence on behalf of the enterprise.  A rational juror could find that Mr. Ranieri preserved his

21   status within HASC by addressing the disrespect that Silva showed to HASC, the Salem Charter

22   through his conduct at Laconia, and Mr. Ranieri's close friend Sweeney whom Silva threatened to

23   kill.  TT 3850.  Mr. Ranieri, Fresno HA members, Hardisty and Wendt, concluded that Silva "had

24   to be killed" and "had to go" after a meeting at Mr. Ranieri's house.  *Id.* at 3854-55.  If Mr.

25   Ranieri had disagreed with the group's firm conclusion, it would have diminished his status in the

26   eyes of HASC and of its leaders.

27          Therefore, there was substantial trial evidence to support a finding of the violent offense

28   and the purpose elements of VICAR sufficient to sustain Mr. Ranieri's VICAR conviction.

United States District Court
Northern District of California

C.      Count Six: VICAR Assault With a Deadly Weapon

       1.      Raymond Foakes

Mr. Foakes argues that the evidence was insufficient to find VICAR assault with a deadly weapon.  Foakes Mot. at 11.  He points to his medical expert who had "No doubt" a first punch could cause Troy Conte's injuries, and the Government's expert who admitted it was possible that the fractures were caused by a fist, not a strike with a gun.  TT 6207-08; Further, no gun was recovered with forensic evidence of Conte or Mr. Foakes' DNA.  Foakes Mot. at 12; TT 4899-4910.  He also points to evidence that the alleged chrome gun that Conte was hit with was not found.  TT 4899-4910.

However, other evidence of the incident was sufficient for a rational juror to find that a firearm was used to beat Troy Conte, and that Mr. Foakes conspired to commit assault with a deadly weapon.  Troy Conte stated that Nelson struck him in the face with a loaded revolver with Mr. Foakes provoking the act.  *Id.* at 5051-53.  *See Katakis,* 800 F.3d at 1028 ("[i]t is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction.").  While the Government's medical expert asserted the possibility that Conte's fractures were caused by a fist, the expert also testified that it was unlikely that a fist could have caused the fracture pattern of the eye socket experienced by Conte, and that the injuries were more consistent with being struck with great force by a blunt object like a firearm.  TT 4215-16; 4097-98.  Given the evidence, a rational juror could have found that Conte was assaulted with a deadly weapon.

D.      Count Eight: Witness Intimidation

       1.      Raymond Foakes

Mr. Foakes argues that no rational jury could find that Michelle Conte was sexually assaulted, an act underlying the alleged witness intimidation.  Foakes Mot. at 13.  However, the evidence supported a finding that Mr. Foakes committed the assault.  There was significant direct evidence and corroborative evidence of the sexual assault.  Michelle Conte directly testified about the sexual assault, numerous times.  TT 5371-76.  Mr. Foakes' DNA was found on her breast, video evidence showed Mr. Foakes returning to the Conte house to attempt a second sexual

assault, and text messages detailed the sexual assault after it occurred.  Troy Conte also testified that Mr. Foakes taunted him after the sexual assault by describing what occurred.  *Id.* at 6058-60, 6063.  Moreover, as discussed in the previous section of RICO conspiracy, the evidence was sufficient to uphold the jury's finding that Mr. Foakes committed witness intimidation against Ms. Conte based on her testimony.

## V.     CONCLUSION

The Court DENIES Mr. Foakes' Motion for Acquittal on Count One: RICO Conspiracy, Count Six, VICAR Assault with a Deadly Weapon, and Count Eight: Witness Intimidation.  The Court DENIES Mr. Ranieri's Motion for Acquittal on Count One: RICO Conspiracy, and Count Two: Conspiracy to Commit Murder in Aid of Racketeering (VICAR).

**IT IS SO ORDERED**.

Dated: January 14, 2024

_____
EDWARD M. CHEN
United States District Judge