ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
LINA PENG (NYBN 5150032)
Assistant United States Attorneys

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6840
      FAX: (415) 436-7234
      Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-00533-EMC |
| Plaintiff, | **UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR NEW TRIAL** |
| v. | **[ECF Nos. 3581, 3583, 3690, 3692]** |
| CHRISTOPHER RANIERI, and RAYMOND FOAKES, et al., | Hearing Date:  March 21, 2023 |
| Defendants. | Hearing Time: 9:30 am |
| | Hon. Edward M. Chen |

GOV. OPP. TO RULE 33 MOTIONS
17-CR-00533-EMC

1

2

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................................................1

II.     LEGAL STANDARDS .........................................................................................................1

III.    DISCUSSION .......................................................................................................................3

        A.      The Court's COVID-Related Masking Procedures Were Justified and Did Not
                Affect the Defendants' Rights (Ranieri Mot. § II)..................................................3

        B.      The Defendants Were Properly Joined and the Court Properly Denied
                Severance (Ranieri Mot. § III)................................................................................4

        C.      J.H.'s Threat to Recant Testimony Implicating Ranieri Cannot Serve as a
                Basis for a New Trial (Ranieri Mot. § IV; Ranieri Supplemental Mot.) .............6

        D.      The Government Did Not Elicit False Testimony at Trial (Ranieri Mot § V) .................10

        E.      There was No Prosecutorial Misconduct in the Government Remarks or
                Conduct at Trial (Response to Ranieri §§ VI, VII)...............................................12

        F.      The Evidence Supports the Jury's Verdict on All Counts (Response to Ranieri
                Mot. §§ VIII, IX; Foakes Mot. § E) ....................................................................17

        G.      There Was No Error Refusing Ranieri's Demand for a Surrebuttal (Ranieri
                Mot. § X).............................................................................................................21

        H.      There Was No Error with Respect to the Jury's Verdict Regarding the Special
                Sentencing Factor Alleged in Count One (Ranieri Mot. § XI).............................22

        I.      There Was No Error Admitting M.J.'s Testimony About Foakes' Sexual
                Assaults (Foakes Mot. § B)...................................................................................22

        J.      There Was No "Gamesmanship" With Respect to the Defenses' Late *Touhy*
                Request Regarding Retired FBI Special Agent Dale Dutton (Foakes Mot. § C) .............25

        K.      The Government's Reference to HASC's "Toy Run Fraud" Cannot Support
                Foakes' Motion for a New Trial (Foakes Mot. § D)............................................26

        L.      There Is No *Brady* Claim Related to J.H.'s Incorrect Belief that Entry into
                WITSEC Was Possible (Foakes' Suppl. Mot.)....................................................28

IV.     CONCLUSION....................................................................................................................33

1

# **TABLE OF AUTHORITIES**

2

3

## **Cases**

4

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) .......................................................... 7

5

*Cauyong v. Gipson*, No. C 12-02606 EJD (PR), 2015 WL 13236625 (N.D. Cal. Oct 2, 2015) ............. 23

6

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009).......................... 32

7

*Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869 (7th Cir. 1997)...................... 23

8

*Greer v. United States*, 141 S. Ct. 2090 (2021) ...................................................... 3

9

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) ....................................................... 32

10

*Jones v. Ryan*, 733 F.3d 825 (9th Cir. 2013) ........................................................ 32

11

*Majoy v. Roe*, 296 F.3d 770 (9th Cir. 2002) ......................................................... 8

12

*Olson v. United States*, 989 F.2d 229 (7th Cir. 1993)................................................ 8

13

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ........................................................ 4

14

*Puckett v. United States*, 556 U.S. 129 (2009)...................................................... 3

15

*Salinas v. United States*, 522 U.S. 52 (1997)................................................... 15, 27

16

*Singh-Kaur v. I.N.S.*, 183 F.3d 1147 (9th Cir. 1999)................................................ 22

17

*Strickler v. Greene*, 527 U.S. 263 (1999) ....................................................... 31, 32

18

*Tak Sun Tan v. Runnels*, 413 F.3d 1101 (9th Cir. 2005)............................................. 13

19

*U.S. ex rel Touhy v. Ragen*, 340 U.S. 462 (1951) ................................................... 25

20

*United States v. Ashton*, 974 F.2d 1206 (9th Cir. 1992) ................................. 2, 19, 24, 28

21

*United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996)............................................ 3

22

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) ............................................. 3

23

*United States v. Barama*, No. 19-CR-00463-RS-2, 2023 WL 2530994 (N.D. Cal. Mar. 14, 2023) ......... 1

24

*United States v. Brown*, 327 F.3d 867 (9th Cir. 2003)............................................... 13

25

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).............................................. 32

26

*United States v. Castro*, 669 F. Supp. 2d 288 (E.D.N.Y. 2009) ...................................... 2

27

*United States v. Cervantes*, 170 F. Supp. 3d 1226 (N.D. Cal. 2016).................................. 16

28

*United States v. Chang*, 16-CR-0047-EJD-1, 2020 WL 5702131 (N.D. Cal., Sept. 24, 2020).............. 2, 3

*United States v. Conti*, 804 F.3d 977 (9th Cir. 2015) ................................................................. 3

*United States v. Davis*, 960 F.2d 820 (9th Cir. 1992)............................................................... 2, 8

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012)........................................... 1

*United States v. Dorsey*, 781 F. App'x 590 (9th Cir. 2019) .................................................... 7

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .......................................... 5, 6, 15

*United States v. Halali*, No. 14-CR-00627-SI-1, 2017 WL 3232566 (N.D. Cal. July 28, 2017) .............. 1

*United States v. Jenkins*, 10-CR-00882-JSW, 2011 WL 5079508 (N.D. Cal., Oct. 25, 2011) ................. 1

*United States v. Kearney*, 682 F.2d 214 (D.C. Cir. 1982) ....................................................... 8

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) ................................................... 20

*United States v. Kohiki*, 232 F. App'x 694 (9th Cir. 2007) .................................................... 2

*United States v. Kulczyk*, 931 F.2d 542 (9th Cir. 1991)...................................................... 2, 8

*United States v. Lillard*, 354 F.3d 850 (9th Cir. 2003) ........................................................ 15

*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998) ....................................................... 1

*United States v. Little*, 753 F.2d 1420 (9th Cir. 1984)......................................................... 5

*United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985)................................................... 1

*United States v. McGee*, 12-CR-0052 EMC, 2013 WL 2645211 (N.D. Cal., June 12, 2013)................... 1

*United States v. Morales*, 746 F.3d 310 (7th Cir. 2014)....................................................... 33

*United States v. Olano*, 507 U.S. 725 (1993)..................................................................... 3

*United States v. Ortiz*, No. C 12–00119 SI, 2013 WL 6842541 (N.D. Cal. Dec, 27, 2013) ................. 27

*United States v. Ramsey*, 761 F.2d 603 (10th Cir. 1985)........................................................ 8

*United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) ...................................................... 16, 27

*United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999) .................................................... 14

*United States v. Smith*, 2020 WL 6536208, (D. Alaska. Nov. 5, 2020) .................................... 23

*United States v. Sogbein*, 12-CR-00054-JSW, 2014 WL 12691533 (N.D. Cal., May 27, 2014)............. 2

*United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir.2005) ............................................ 13

*United States v. Willis*, 257 F.3d 636 (6th Cir. 2001) ............................................................. 7

*United States v. Wong*, 12-CR-0483 EMC, 2014 WL 923347 (N.D. Cal., March 5, 2014) ...................... 1

*United States v. Young*, 470 U.S. 1 (1985) ............................................................ 13

*Williams v. Calderon*, 52 F.3d 1465 (9th Cir. 1995) ............................................... 32

*Zafiro v. United States*, 506 U.S. 534 (1993) ............................................................ 5

1   **I.      INTRODUCTION**

2          The Court should deny Defendants' motions for new trial because the interest of justice requires

3   that the jury's verdicts be upheld, and none of Defendants' arguments have merit.

4   **II.     LEGAL STANDARDS**

5          A district court may "vacate any judgment and grant a new trial if the interest of justice so

6   requires."  Fed. R. Crim. P. 33(a).  However, Rule 33 motions are generally disfavored and should be

7   granted only in exceptional cases.  *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir.

8   2012); *see also United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (overturning a jury's verdict

9   and ordering a new trial is an extraordinary remedy that should be granted only in the most extreme

10  cases); *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (A district court may not "set

11  aside the verdict simply because it feels some other result would be more reasonable.").  Defendants

12  who seek to overturn jury verdicts bear a heavy burden.  *United States v. Barama*, No. 19-CR-00463-

13  RS-2, 2023 WL 2530994, at *2 (N.D. Cal. Mar. 14, 2023) (The defendant "bears the burden of proving

14  that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a

15  district court must find that there is a real concern that an innocent person may have been convicted.");

16  *United States v. Halali*, No. 14-CR-00627-SI-1, 2017 WL 3232566, *2 (N.D. Cal. July 28, 2017)

17  (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (same); *United States v. Jenkins*,

18  10-CR-00882-JSW, 2011 WL 5079508, *2 (N.D. Cal., Oct. 25, 2011) (in assessing a motion for new

19  trial, the court's focus should be on whether failing to grant a new trial would result in "manifest

20  injustice.").

21          Motions for new trial may be based on a variety of grounds, including purported insufficiency

22  of the evidence.  *United States v. Wong*, 12-CR-0483 EMC, ECF Nos. 257, 258, 2014 WL 923347, *8,

23  (N.D. Cal., March 5, 2014).  Like other Rule 33 motions, those based on insufficiency of the evidence

24  are generally disfavored and should only be granted in cases in which the evidence weighs heavily

25  against the verdict.  *Del Toro-Barboza*, 673 F.3d at 1153.  It is not enough that a different jury,

26  presented with the same facts, could have reached a different verdict.  *United States v. McGee*, 12-CR-

27  0052 EMC, 2013 WL 2645211, *4 (N.D. Cal., June 12, 2013).  Rather, a district court properly grants a

28  Rule 33 motion based on insufficiency of the evidence where "the evidence preponderates sufficiently

1  heavily against the verdict that a serious miscarriage of justice may have occurred[.]" *United States v.*

2  *Ashton*, 974 F.2d 1206, 1211-12 (9th Cir. 1992).

3        Discovery of new evidence will not provide grounds for a new trial unless that new evidence

4  suggests that a new trial would probably result in an acquittal. *United States v. Kulczyk*, 931 F.2d 542,

5  548 (9th Cir. 1991); *United States v. Kohiki*, 232 F. App'x 694, 696 (9th Cir. 2007). To prevail on a

6  Rule 33 motion for new trial based on newly discovered evidence, the movant must satisfy a five-part

7  test: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not

8  be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the

9  issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence

10  must indicate that a new trial would probably result in an acquittal. *Kulczyk*, 931 F.2d at 548 (citing

11  *United States v. Lopez*, 803 F.2d 969, 977 (9th Cir. 1986)).

12        As suggested by the fourth element of the *Kulczyk* test, newly discovery impeachment evidence

13  will ordinarily not support a motion for new trial because it will not be material. At most, it will provide

14  the trier of fact with a reason to find a witness' testimony incredible, but that is normally not enough.

15  *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992). New impeachment evidence could be

16  material, and thereby provide a basis for a new trial, only if it were so powerful that, if believed, it could

17  render the witness' testimony totally incredible, *and* that witness' testimony was uncorroborated and

18  provided the only evidence of an essential element of the Government's case. *Id*. An example of such

19  might be "a defendant in a narcotics case [who] has been convicted solely on the uncorroborated

20  testimony of a crooked cop involved in stealing drug money[.]" *Id*.

21        Improper introduction of evidence is a third possible ground for a Rule 33 motion. However, the

22  mere existence of evidentiary errors at trial is an insufficient basis for granting a motion for new trial.

23  *United States v. Chang*, 16-CR-0047-EJD-1, 2020 WL 5702131, at *10 (N.D. Cal., Sept. 24, 2020).

24  Moreover, it is improper to use a Rule 33 motion as a vehicle to simply relitigate every evidentiary

25  ruling with which a defendant disagrees. *United States v. Castro*, 669 F. Supp. 2d 288, 293-95

26  (E.D.N.Y. 2009); *see also United States v. Sogbein*, 12-CR-00054-JSW, 2014 WL 12691533, at *2

27  (N.D. Cal., May 27, 2014) (declining to revisit *en masse* the court's prior evidentiary rulings). Rather,

28  evidentiary errors justify granting a motion for new trial only if, individually or collectively, they

1   "substantially affected the fairness of the trial" and were of "such prejudicial harm as to require a new

2   trial." *Chang*, 2020 WL 5702131, at \*10 (citing *United States v. Medina-Gasca*, 739 F.2d 1451, 1454

3   (9th Cir. 1984)).  If it is more probable than not that the claimed error did not materially affect the

4   verdict, the error should be deemed harmless.  *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir.

5   2012).

6          Regardless of the basis for the motion, if it was not raised at trial, the standard is plain error.  *See*

7   *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015) (jury instructions reviewed for plain error);

8   *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996) (denial of motion for new trial due to

9   alleged prosecutorial misconduct reviewed for plain error).  Under plain error review, the defendants

10  bear the "burden of establishing each of the four requirements for plain-error relief."  *Greer v. United*

11  *States*, 141 S. Ct. 2090, 2097 (2021).  "Meeting all four prongs is difficult, as it should be."  *Puckett v.*

12  *United States*, 556 U.S. 129, 135 (2009).  The four prongs are (1) error; (2) which was plain, meaning

13  clear or obvious; (3) which affected substantial rights, meaning that but for the error, the outcome of the

14  proceeding would have been different; and (4) if the first three elements are met, the Court has

15  discretion to grant relief if it concludes that the error had a serious effect on the fairness, integrity, or

16  public reputation of judicial proceedings.  *Greer*, 141 S. Ct. at 2096-97; *United States v. Olano*, 507

17  U.S. 725, 734 (1993).

18  **III.    DISCUSSION**

19         **A.    The Court's COVID-Related Masking Procedures Were Justified and Did Not**

20                 **Affect the Defendants' Rights (Ranieri Mot. § II)**

21         Ranieri argues that the defendants' Fifth and Sixth Amendment rights were violated by COVID-

22  related trial conditions.  ECF 3583 at 11-16.  Specifically, he asserts that the masking of trial participants

23  and members of the audience deprived him of a fair trial because it "imposed negative implications as to

24  how the jury perceived Mr. Ranieri and his co-defendants, their counsel, and their supporters in the

25  courtroom." *Id.* at 12.  Defendant Ranieri provides no legal authority to support this claim.

26         Because of the unprecedented nature of the COVID pandemic and its potential effect on the trial

27  through isolation for those who test positive and resultant delays, the Court required that everyone in the

28  courtroom be masked.  That included government attorneys, staff, and case agents; defense counsel;

1  defendants; court staff; court security officers and Marshals; and observers in the public area.  The only

2  exceptions were for those actively speaking, such as counsel addressing witnesses, the Court, or the jury,

3  and witnesses during their examinations.

4       Because the Defendants did not object to these procedures below, they should be reviewed for

5  plain error.  Moreover, Ranieri makes no showing how the masking requirement actually impacted the

6  his right to a fair trial.  Instead, he simply asserts that he was negatively affected because the jury could

7  not see his emotional reactions to the testimony.  ECF 3583 at 16.  The defense has identified no legal

8  authority supporting a defendant's right to be seen by the jurors during the trial.  The Sixth Amendment

9  pertains to the defendant's ability to face those witnesses giving testimony against him.  "The

10  Confrontation Clause provides two types of protections for a criminal defendant: the right physically to

11  face those who testify against him, and the right to conduct cross-examination."  *Pennsylvania v.*

12  *Ritchie*, 480 U.S. 39, 51 (1987).  It says nothing about a defendant's right to be confronted by the jury so

13  they can read his facial expressions.

14       Additionally, the conditions imposed here affected both parties equally in terms of what jury

15  members were able to perceive and experience at trial.  In fact, jury members were able to see the faces

16  of witnesses on the stand and thus were unhindered in their ability to assess their credibility.  The Court

17  had broad discretion and authority on what procedures to employ in the courtroom and during trial, and

18  its procedures on juror seating and masking fell well within that discretion and were fully justified by

19  health-related concerns stemming from the COVID pandemic.

20  **B.    The Defendants Were Properly Joined and the Court Properly Denied Severance (Ranieri Mot. § III)**

21

22       Ranieri claims that the Court erred by trying him with his co-defendants Foakes and Burke.  ECF

23  3583 at 16.  All three defendants were properly joined in the indictment because they were co-

24  conspirators in a single RICO enterprise, and the Court correctly rejected efforts to sever them prior to

25  the trial.  ECF No. 3128 at 6-8 (January 25, 2023 Order . . . Denying Defendants' Motions to Sever).

26  The Court discussed at length that the allegations in the indictment properly linked Ranieri to his co-

27  defendants.  "Ranieri fails to explain why these allegations are insufficient to plead his affiliation with

28  the HASC enterprise, especially given that the RICO Act defines an 'enterprise' as encompassing 'any

1  union or group of individuals associated in fact' and contains no formal membership requirement." *Id.*

2  at 7.  The Court further explained that evidence of acts in which Ranieri did not participate could only be

3  used for the limited purpose of establishing the existence of the HASC RICO enterprise.  *Id.*

4  The federal system prefers joint trials of defendants who were indicted together because joint

5  trials "play a vital role in the criminal justice system" by promoting efficiency and avoiding the "scandal

6  and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal

7  citations omitted).  Nonetheless, defendants charged in a single indictment may be severed from one

8  another for trial "if the joinder . . . or consolidation for trial appears to prejudice a defendant or the

9  Government[.]"  Fed. R. Crim. P. 14(a).  District courts enjoy discretion in deciding whether to grant or

10  deny severance motions.  *United States v. Little*, 753 F.2d 1420, 1446 (9th Cir. 1984).  Even in cases in

11  which defendants can demonstrate some prejudice, Rule 14 leaves to district courts the tailoring of

12  relief, if any, appropriate to the specific case.  *Zafiro*, 506 U.S. at 539 (citing *United States v. Lane*, 474

13  U.S. 438, 449, n.12 (1986)).

14  A district court only abuses its discretion in denying a motion to sever when manifest prejudice

15  results.  *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004).  Inquiry into the prejudicial

16  effect of a joint trial requires consideration of factors including (1) whether the jury may reasonably be

17  expected to evaluate the evidence against each defendant; (2) the judge's diligence in instructing the jury

18  on limited purpose evidence; (3) whether the nature of the evidence and legal concepts involved are

19  within the competence of the ordinary juror, and (4) whether the defendants can show with particularly a

20  risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury

21  from making a reliable judgment about guilt or innocence.  *Id.*  Neither a better chance of acquittal in a

22  separate trial nor a joint trial with a more culpable defendant will satisfy the fourth factor.  *Id.*

23  Consistent with the order denying Ranieri's severance motion, the Court repeatedly instructed

24  the jury that enterprise evidence could be used only for that limited purpose.  The Court re-adopted the

25  limiting instruction it used in the Group One trial:

26        To the extent you have heard and will hear about incidents which do not involve any of

27        the three defendants, this evidence is admitted for the limited purpose of establishing the
        existence, nature, and purpose of the HASC enterprise.

28

1    RT 951.  Defendant Ranieri agreed with this instruction, but he wanted some additional language: "and

2    therefore, you must consider it only for that limited purpose and not for any other purpose."  RT 951.

3    The Court declined to add this additional phrase, but it agreed with the defense request to provide this

4    instruction frequently.  RT 951-92.

5        Contrary to Ranieri's assertion in his Rule 33 motion that "the Court infrequency instructed the

6    jury about evidence that was admissible against him for only limited purposes," ECF 3583 at 17, the

7    Court provided this instruction on many occasions during the trial.  *See, e.g.*, RT 930, 933 (Preliminary

8    Jury Instructions); RT 1059, 1238, 2203, 2253, 3790, 4391 (during trial); and RT 6583 (Final Jury

9    Instructions).  There was no error in keeping Ranieri in the same trial as his co-conspirators, and there

10   was no failure to adequately instruct the jury, much less the type of "manifest prejudice" such that a new

11   trial would be warranted.  *See Fernandez*, 388 F.3d at 1241.

12   **C.    J.H.'s Threat to Recant Testimony Implicating Ranieri Cannot Serve as a Basis for
         a New Trial (Ranieri Mot. § IV; Ranieri Supplemental Mot.)**

13

14       In August 2023, J.H. sent texts to SA Kassandra Lane demanding benefits to which he believed

15   he was entitled.  If he did not receive those benefits, he threatened to contact counsel for Ranieri and tell

16   them that Ranieri was not involved in the events about which he testified and that he was coerced by the

17   government to implicate Ranieri.  In Ranieri's view, this means he is entitled to a new trial because he

18   was convicted based on false testimony.  Ranieri's argument is based on the premise that J.H. recanted

19   and that the Court should believe the recantation—as opposed to the testimony J.H. provided under

20   oath—and that a subsequent jury would do the same.  This is factually and legally inaccurate.

21       To begin, the texts do not constitute a recantation.  Instead, J.H. *threatened* to contact the defense

22   and recant, and this threat was made in the context of his frustration with the government for not

23   providing benefits.  This is evident from the texts themselves.   Roughly two weeks after he sent the

24   recantation threat, J.H. cooled down and apologized in another text, explaining that the threat was

25   caused by stress and a desire to blame others for his situation.

26       I'm sorry for saying stupid things.  I really don't have much time left, and it's something
         I had to [accept] and stress has been a major [toll] and i blamed everybody except myself

27       and i did it to myself.  I just want my last few years in peace.  Sorry again i'm sure you
         won't hear from me again.

28

HA-00150109.[1]  Thus, there was no recantation of his testimony regarding Ranieri, and the Court can consider J.H.'s credibility based on its perception of what he recounted during two separate trials.  *See United States v. Dorsey*, 781 F. App'x 590, 592 (9th Cir. 2019) ("Finally, the district court presided over the trial and noted it had the opportunity to assess the witnesses' credibility at the time and it did not need to hear the witnesses recant in a hearing to decide their recantations were not more credible than their trial testimony.

Prior to these texts, the Court was aware that J.H. previously made threats to contact defense counsel and to change his testimony regarding Ranieri because there was testimony directly about this during the Group Two trial.  FBI Special Agent Kassandra Lane has been the case agent for the investigation in this case and the person responsible for communication with J.H. since January 2022.  The Group Two defense called SA Lane as the first witness in their case for the purpose of asking her about demands for government assistance that J.H. made and about the government's response to them.  *See* RT 5514 ff.  Defense counsel specifically asked SA Lane whether J.H. threatened that he would contact the defense; that he would change his testimony; and that Ranieri would be acquitted as a result.  SA Lane testified that he made precisely these threats.

> Q.  [MR. BORO] And he – during the course of this, he would tell you things like "I'm flipping back and forth" or "I don't care if Rainman and Ray Ray walk."  Wouldn't he make threats like that to you?
> A.  He would say that, yeah.
> Q.  That if he didn't get what he wanted, well, he'll just change his testimony.  He'll call the Defense, then, instead.  Didn't he make statements like that to you?
> A.  He did, yeah.

RT 5559 (SA Lane testimony).

Second, case law instructs that post-trial recantations are to be viewed with "extreme suspicion," and rarely can constitute newly discovered evidence sufficient to grant a new trial.  *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001).  *See also Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005)

---

[1] The texts at issue have been filed previously, including in an under seal declaration in connection with the government's September 29, 2023 objection to the defense motion to continue the October 5, 2023 hearing on the Group One Rule 33 motions, which is likely ECF 3585.

("Kenneth Allen's later recantation of his trial testimony does not render his earlier testimony false.");

*Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002) (describing recantation as "the familiar, untrustworthy, and unreliable about-face by a self-interested criminal"); *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982) ("Recanting affidavits and witnesses are looked upon with 'the utmost suspicion' by the court.").  The reason for this is that the witness' testimony has been tested through the process of trial, especially cross examination.  And J.H. was cross examined six separate times in two different trials.  He was further cross examined on the August 2023 texts themselves, as discussed below.

Further, through cross examination at trial, the defense had ample opportunities to draw out inconsistencies, and a recantation is just another similar inconsistency.  *United States v. Ramsey*, 761 F.2d 603, 604 (10th Cir. 1985) ("Since the issue of Mr. Jackson's vacillation had been before the jury in the trial, his recanted recantation was not new evidence and in any event did not justify a new trial."); *Olson v. United States*, 989 F.2d 229, 233 (7th Cir. 1993) ("As noted earlier, if the court were to accept the recantations any newly impaneled jury would face the same question as the last jury as far as LaRock and Peters are concerned: Which version of their stories do you believe?").

In fact, through SA Lane's testimony, the Group Two jury heard testimony that J.H. made similar threats to contact the defense and change his testimony, but they still returned guilty verdicts. *See* RT 5559; ECF 3493.  Thus, there is no basis to claim that if the jury were presented with the August 2023 texts, they probably would acquit, which is the standard for new trial motions based on newly discovered evidence like the text messages. *Kulczyk*, 931 at 548.  This particularly the case where, as here, the newly discovered evidence would take the form of impeachment.

Newly discovery impeachment evidence will ordinarily not support a motion for new trial because it will not be material; at most, it will provide the trier of fact with a reason to find a witness' testimony incredible.  *Davis*, 960 F.2d at 825.  New impeachment evidence could be material, and thereby provide a basis for a new trial, only if it were so powerful that, if believed, it could render the witness' testimony totally incredible, and that witness' testimony was uncorroborated and provided the only evidence of an essential element of the Government's case.  *Id.*  An example of such might be "a defendant in a narcotics case [who] has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money[.]"  *Id.*

1    Most significantly, however, is the fact that on November 27, 2023, the Court held an

2  evidentiary hearing regarding the August 2023 texts, and J.H. answered questions about them, including

3  questions from all five defense teams.  *See* ECF 3641 (Transcript of November 27, 2023 hearing).  He

4  repeatedly indicated that he testified truthfully under oath at trial and that he didn't mean what he said in

5  the August 2023 threats to recant.

6         A.  . . . This trial was to get my karma right.  I told the truth in this the trial.  This [the text
           message] is bullshit.
7                 When I was under oath I told the truth.  When I sent the text messages, I wasn't.
8         Q.  Now, the Ranieri text, as you stated, Mr. Ranieri wasn't involved.  Were you at all
           concerned that – when you sent this text to Agent Lane, that you could be charged with
9          misleading or lying to a law enforcement officer?

10        A.  No.  I was just angry and I sent a stupid text message.
          Q.  You were angry at the Government?
11        A.  Yes.

12
          ECF 3641 at 98 (J.H. cross examination).
13
          Q.  That meant that you were going to tell information that demonstrated that Rainman
14         wasn't involved, that one of the central guys in this alleged conspiracy, that the guys are
           going to go free that were convicted if you told the truth, and you would get convicted
15         yourself; correct?
          A.  That's taking a lot of from this text message.
16        Q.  Well, is it true?
17        A.  No.
          Q.  What did you mean then?
18        A.  Shit.  I just was mad.  I didn't mean anything, because it's bullshit.
19        Q.  Okay.
          A.  I told the truth when I was under oath.  If she [SA Lane] wants to – if they want to
20         convict me for lying in this [text message], I'll take it, because this was lies.  But I'm not
21         going to say that I lied in court, because I didn't.
          Q.  Okay.  Well, when you said in the text earlier, after you threatened the Government,
22         that you'll contact the Defense lawyers and tell them Rainman wasn't involved you say,
23         "I can't say he was."
          A.  Like I said, these are lies.
24        Q.  You said –
25        A.  This was – I'm angry.  If they want to charge me with it, then charge me with it.  But
           I didn't lie on the stand and I'm not going to lie today because I'm under oath.
26        Q.  You had testified under oath that Rainman was involved –
27        A.  Correct, and he was.
28

1  *Id.* at 119-20 (same).  In effect, Ranieri urges the Court to (1) take J.H.'s August 2023 threat to recant as

2  an actual recantation; (2) accept that recantation as true; (3) disbelieve every statement that J.H. made in

3  his sworn testimony in two trials and in an evidentiary hearing about the August 2023 texts; and (4)

4  grant him a new trial because inclusion of the texts in a new will likely lead to an acquittal.  This

5  approach is contrary to the facts of this case and the law regarding new trials under Rule 33.

6        **D.**    **The Government Did Not Elicit False Testimony at Trial (Ranieri Mot § V)**

7        Ranieri next claims that he was denied a fair trial because the government knowingly introduced

8  false testimony and then failed to correct it.  Specifically, he asserts that J.H. lied when he testified that

9  J.H. was present at Ranieri's house in June 2014 when Ranieri and Wendt announced that Silva "had to

10  go" – that is, Silva had to be killed because of his threat to kill Boston Hells Angel Sweeney.  ECF 3583

11  at 21 ff; RT 3854-55 (J.H. testimony).  In Ranieri's view, J.H.'s testimony is false because the

12  government's cellsite location evidence is inconsistent with this account.

13        With respect to the meeting at Ranieri's house and the events that led up to it, J.H. testified that

14  during the Summer of 2014, he, Silva, and Fresno Hells Angels Brian Wendt, Robbie Huff, and Tiofilo

15  Bueno went to Laconia, New Hampshire for a motorcycle run.  RT 3848-49.  While there, Silva became

16  upset at a Boston member named Sweeney, and Silva threatened to kill him.  RT 3850.  Among the

17  "many other reasons" for Silva to be angry at Sweeney, there was some dispute about an "81" pendant

18  and chain that Sweeney had given to Silva and had taken back at some point.  RT 3897-98, 3903 (J.H.

19  testimony).  J.H. described the threat to kill Sweeney as a violation of Hells Angels rules and a "big

20  problem" for Silva, "[b]ecause Sweeney is Rainman's best friend"; the two were "very, very close."  RT

21  3850-51 (same).  Silva told Hardisty and Huff that he wanted to kill Sweeney, and they reported this to

22  Wendt, which made Wendt "very upset."  RT 3851, 3922-23 (same).

23        At the time, they were all near the Laconia clubhouse, and after Silva's threat, the Fresno group

24  left Silva there.  RT 3852 (J.H. testimony).  When leaving, they posed a choice to J.H.—he could either

25  leave with them or he could stay with Silva.  RT 3852-53 (same).  J.H. chose to leave with Fresno,

26  because they were "more powerful," and he did not want to stay with Silva and "face the same fate as

27  him."  RT 3852-53 (same).

28

1     The Fresno group and Hardisty then went to Ranieri's house, where Ranieri and Wendt privately

2 met, likely in the garage in the rear of the residence.  RT 3853-54, 3919, 3928 (J.H. testimony).  After

3 that meeting, Wendt and Ranieri talked with the group, and they discussed the fact that Silva had to be

4 killed.  RT 3855, 3929-31, 3962-63, 3966 (same).

5     As the Court saw during both the Group One and the Group Two trials, the government's cellsite

6 analysis, or CAST, evidence, provided strong corroboration of virtually aspect of J.H.'s testimony, not

7 only the activity in Laconia and Boston, but also the specifics of the planning to kill Silva in the Bay

8 Area and its completion in Fresno.  But what Ranieri focuses on is the lack of cellsite location

9 information specifically for the meeting at Ranieri's residence.

10     The government's CAST presentation was admitted as Exhibit 127.  Pages 73, 75, and 76 of that

11 exhibit show Brian Wendt's phone travelling on June 16, 2014, from the Laconia area to the Boston /

12 Lynn area, and then to Logan airport.  Page 73 has Wendt's phone hitting off a cell tower near the Salem

13 Hells Angels clubhouse as late as 4:12 pm, and p. 75 shows the next contact with a tower near Boston

14 Logan airport at 6:16 pm.  *Id.*  As Ranieri points out, there is no indication of Wendt's phone using cell

15 towers closer to Ranieri's residence on June 16, 2014.  In Ranieri's view, this means there was no

16 meeting at Ranieri's house when J.H. testified that Ranieri and Wendt privately met and then announced

17 to J.H. that Silva had to be killed.

18     However, the government's CAST expert, FBI Special Agent Meredith Stanger, testified that

19 phones only generate location information when they are engaged with the network, such as when a call

20 is placed or received, or when a text message is sent or received.  RT 3431, 3436, 3494 (SA Stanger

21 testimony).  If the phone is not engaging with the network, no cell site information is generated, and

22 thus, the location cannot be determined.  RT 3538.  If there is no connectivity with the network, CAST

23 analysis cannot determine where the phone is at a particular time.  RT 3501.  The two-hour window

24 between the time when Wendt's phone connected with a phone near the Salem clubhouse and when it

25 connected with a tower in the vicinity of Boston Logan airport simply means that the phone was not in

26 use.  During that time, if the phone travelled to the Ranieri residence when it was not connecting to the

27 network, there would be no location information.

28

                              11

1   Further, Ranieri's own witness, Salem Hells Angel John Kinyone, testified that the Salem

2   clubhouse was close to Ranieri's residence, "I believe maybe two miles." RT 5750 (Kinyone

3   testimony). There was plenty of time for Wendt and others to go from the Salem clubhouse to Ranieri's

4   residence and then to the airport during that two hour window.

5   Ranieri made this same point to the jury—CAST evidence contradicted J.H.'s testimony about

6   the meeting after Laconia—and they rejected it. *See* RT 6763-67 (Ranieri closing argument).

7   According to the Ranieri defense, however, the government somehow had an obligation to make these

8   same arguments, and to do so more effectively than they were able to.

9   > Although Mr. Ranieri successfully introduced evidence indicating the falsity of the
   > Government's proof in this regard, the jury could not have clearly understood that Mr.
10  > Hardisty lied to us because the Government failed to correct his testimony which it knew
   > to be false.
11

12  > Fourth, also, juries frequently listen to defense counsel with skepticism. *United States v.*
   > *LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). Such skepticism coupled with the
13  > Government's failure to correct Mr. Hardisty's falsehoods, of which it was aware, made
   > it impossible for the jurors to see the truth.
14

15

16  ECF 3583 at 26-27. The government presented J.H.'s testimony; it presented SA Stanger's testimony;

17  and it introduced Exhibit 127 into evidence. The defense attempted to highlight a purported

18  inconsistency between this evidence, but the jury resolved that in favor of a guilty verdict. There is

19  nothing in the presentation of this evidence or in the failure of the government to parrot a defense

20  argument that comes close to knowingly presenting false testimony or government misconduct, and it

21  provides no basis for a new trial.

22  **E.    There was No Prosecutorial Misconduct in the Government Remarks or Conduct at
        Trial (Response to Ranieri §§ VI, VII)**

23  Ranieri raises several prosecutorial misconduct claims regarding statements during the

24  government's rebuttal argument and the government's eliciting testimony that witnesses were afraid to

25  testify. None of these constitute misconduct, and none, either individually or collectively, provide any

26  basis to grant a new trial.

27

28

US OPP. TO RULE 33 MOTIONS                          12
17-CR-00533-EMC

1    In assessing a claim of prosecutorial misconduct based on the prosecutor's remarks, a court looks

2    to several factors, which include not only the impact of the remarks, but also Defense counsel's opening

3    salvo. *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir.2005); *see also United States v.*

4    *Young*, 470 U.S. 1, 12-13 (1985).  If the prosecutor's remarks were "invited," and did no more than

5    respond substantially in order to "right the scale," such comments would not warrant reversing a

6    conviction.  *Young*, 470 U.S. at 12-13.  The substance of any curative instruction and the closeness of

7    the case may also be a factor in considering a claim of prosecutorial misconduct.  *United States v.*

8    *Brown*, 327 F.3d 867, 871 (9th Cir. 2003).  In evaluating such allegations, it is not enough that the

9    prosecutor's remarks were undesirable or even universally condemned.  *Tak Sun Tan v. Runnels*, 413

10   F.3d 1101, 1112 (9th Cir. 2005).  Another factor is the strength of the case against a defendant.

11   *Weatherspoon*, 410 F.3d at 1151.  When the case is particularly strong, the likelihood that prosecutorial

12   misconduct will affect the defendant's substantial rights is lessened because the jury's deliberations are

13   less apt to be influenced.  *Id*.  But as the case becomes progressively weaker, the possibility of

14   prejudicial effect grows correspondingly.  *Id*.

15       **1) The Government did not vouch for J.H.**

16       Defendant Foakes chose to call retired FBI Special Agent John O'Brien as a defense witness.

17   SA O'Brien interviewed J.H. in custody in 2016 and asked him questions about a shooting at a PG&E

18   substation that he was investigating.  Just prior to O'Brien's 2016 interview with J.H., J.H. was

19   interviewed by two local investigators, and during that interview, he provided previously unknown

20   details about the Silva killing.  As a result. SA O'Brien brought J.H. to the attention of the case agent

21   investigating HASC and the disappearance of Joel Silva, SA Mac Crumrine.

22       When it was his turn on direct examination, counsel for Ranieri asked SA O'Brien about J.H.'s

23   assault case in Contra Costa County and the fact that it was repeatedly continued as a result of J.H.'s

24   work with the HASC case agent.  Specifically, defense counsel asked how SA O'Brien got the HASC

25   agent involved with J.H.

26       Q.  And he [SA Crumrine] was – how did you get him involved?
         A.  After interviewing Jo Jo and feeling that he was forthright with me but that he was
27       cooperating on another investigation, a gang investigation, I had learned that the DA
         investigator that was working on that case had kind of lost contact with Jo Jo.  And I was

28

stationed out of the San Jose resident agency office of the FBI; and I wasn't working
those kind of gang cases, but I had worked on a search warrant or something with Agent
Crumrine before, and a friend of mine was very good friends with him, as they were both
SWAT team members, and I thought that it might be an opportunity for Agent Crumrine
to further that investigation, that – and that gang case.

RT 5951 (SA O'Brien testimony).  During the government's cross examination of SA O'Brien,

government counsel followed up on this point.

> Q.  And did you describe him on direct as being forthright and cooperative?
> MR. SHEKETOFF:  Objection, Your Honor.
> THE COURT:  Overruled.
> THE WITNESS:  I did.

RT 5955-56 (same).

In its rebuttal, the government reminded the jury of this testimony—testimony that was

introduced into evidence through a defense witness under defense questioning.

> And you heard Special Agent O'Brien say: I was working on a PG&E shooting
> investigation.  I interviewed [J.H.]; I found him – what was the phrase? – I found him
> forthright and cooperative.  Again, your memory of what he said controls, but something
> along those lines.

RT 6973 (Government rebuttal argument).

This does not constitute vouching.  "It is improper vouching for the prosecutor to offer personal

assurances of the veracity of government witnesses or to suggest that their testimony is supported by

information not introduced as evidence."  *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999).

The rebuttal argument did not offer any personal view by the prosecutor about J.H.; it simply repeated

what a defense witness said under oath.  The argument did not suggest support for J.H.'s credibility

information outside the evidence; it reminded the jury of information that was admitted into evidence in

the defense case.

**2)  There was no misconduct in the rebuttal argument regarding the lack of evidence and
reasonable doubt.**

Ranieri argues that the government committed misconduct in rebuttal by telling the jury that they

could not base reasonable doubt on a lack of evidence.  In support, they cite a portion of the rebuttal

1    where the government addressed arguments made in the defense closings.  The government cited those

2    arguments which invited the jury to speculate about what absent witnesses might have said; what

3    unconducted DNA testing may have revealed; and what records not presented in evidence might have

4    shown.  ECF 3583 at 33 (quoting RT 6966).  The portion of the rebuttal cited by Ranieri did not address

5    lack of evidence and reasonable doubt.  Instead, it addressed the instruction that reasonable doubt cannot

6    be based on speculation, and it presented examples of invitation to speculate.

7        In a different section of the rebuttal, however, the government did address a lack of evidence and

8    reasonable doubt, but Ranieri completely ignores it.  That argument goes unmentioned because it

9    directly contradicts his claim.  Government counsel said, "you can say, well, there's a lack of evidence

10   and therefore, there is reasonable doubt, but you also have to consider the evidence[.]"  RT 7022

11   (Government rebuttal argument).

12   **3)  There was no misconduct in arguing that evidence of a completed act is evidence of a**
     **conspiracy to commit that act.**

13

14       In its rebuttal, the government stated the obvious principle that evidence of a completed act can

15   serve as evidence that there was an agreement to commit that act.  RT 6664 (Government rebuttal

16   argument).  In Ranieri's view, this is not only incorrect, but misconduct warranting a new trial.  He

17   offers no authority for this position, however, possibly because case law supports the government's

18   position.  *See Salinas v. United States*, 522 U.S. 52, 66 (1997) (evidence that a conspirator accepted

19   bribes is evidence of conspiracy to participate in a RICO conspiracy); *United States v. Lillard*, 354 F.3d

20   850, 854 (9th Cir. 2003) (stealing 8kg of cocaine from a shipment is evidence of a conspiracy to possess

21   with intent to distribute cocaine).  Indeed, virtually every RICO conspiracy prosecution involves

22   evidence of completed acts that constitute racketeering conduct.  "[C]ommon sense suggests that the

23   existence of an association-in-fact is often-times more readily proven by what it *does*, rather than by

24   abstract analysis of its structure."  *Fernandez*, 388 F.3d at 1224 (emphasis in *Fernandez*) (citation

25   omitted).  Courts overseeing RICO conspiracy prosecution admit completed racketeering acts as

26   evidence of conspiracy to conduct the affairs of an enterprise through a pattern of racketing activity

27   because those completed acts are within the scope of the conspiracy.  *See United States v. Cervantes*,

28

170 F. Supp. 3d 1226, 1234 (N.D. Cal. 2016); *United States v. Rizk*, 660 F.3d 1125, 1131-32 (9th Cir. 2011).

**4)  There was no misconduct linking evidence of RICO conspiracy to Ranieri when rebutting Foakes closing's argument.**

Ranieri alleges misconduct where the rebuttal argument indicated that the assessment of the evidence regarding RICO conspiracy as to Defendant Foakes also applied to Defendant Ranieri, who was also charged with that offense.

> So my – as I indicated, my remarks on Count 1 are going to focus more on Mr. Foakes, but you can also consider them in assessing the evidence of whether Christopher Ranieri is guilty of Count 1 as well.

RT 6984 (Government rebuttal argument).  Those remarks regarding Count One, the RICO conspiracy count, referred to the government's need to prove beyond a reasonable doubt all of the elements of RICO, including the existence of an association in fact enterprise, a pattern of racketeering, etc.  Those proof requirements applied both to Foakes' and Ranieri's liability for Count One.

Further, it is misleading to take individual statements on their own; they must be considered in the context of the argument as a whole.  The quote above demonstrates this, as it references an earlier statement regarding Ranieri and the RICO conspiracy charge in the rebuttal.  When first mentioning Ranieri and Count One, government counsel said the following:

> With respect to Mr. Ranieri's arguments, through Mr. Sheketoff, who went first, some of you may notice that he didn't mention Count 1 at all.  He doesn't have to.
>
> As we indicated, the burden of proof is on the Government.  The burden of proof was on the Government to produce evidence that Mr. Ranieri is guilty of RICO conspiracy.  The burden of proof existed at the end of the case, when Mr. Sheketoff got up, and the burden of proof still exists now.  So they don't have to challenge the evidence at all.
>
> But, I submit to you, you should look at that evidence.  Remember Ms. Peng's arguments and how she framed it, and the things you have to look for, and how the evidence we presented to you shows that Mr. Ranieri is guilty of association with Sonoma County.

RT 6969 (Government rebuttal argument).  Thus, contrary to the claim that the government's argument "substantially deprived Mr. Ranieri of his right to a fair trial because it prevented the jury from making

1  an individualized, reliable judgment of his guilt or innocence," the rebuttal not only instructed the jury to

2  consider the evidence presented specifically against Ranieri; it also emphasized the government's

3  burden of proof.

4      **5) There was no misconduct in following the Court's pretrial Order authorizing the
        government to ask witnesses about being subpoenaed.**

5

6      Ranieri argues the government's questioning of witnesses whether they had been subpoenaed

7  and were afraid to testify constitutes prosecutorial misconduct.  Eliciting testimony from witnesses that

8  they were afraid and/or were only testifying because they had been subpoenaed was explicitly

9  authorized by the Court.

10     The Court previously concluded that "[w]itnesses may testify about their fear, if any[,]"
       because it "is relevant to witness credibility and motive." Group One MIL Order at 29
11     (citing *United States v. Santiago*, 46 F.3d 885, 889–90 (9th Cir. 1995)).

12          The Court abides by its prior ruling and DENIES Mr. Foakes' motion.."  ECF No.
       2513 at 29. (Order Re Parties' Motions In Limine [Trial Group One]).
13

14  ECF No. 3225 (under seal) (Order on Trial Group Two Trial Motions in Limine).  This issue was briefed

15  and argued in pretrial litigation, and the Court approved inquiry into this subject during witness

16  testimony.  *Id.*  Despite this clear ruling, during the testimony of Eban Hale, Defendant Foakes moved

17  for a mistrial based on questions related to why Hale wanted it to be known that he was only testifying

18  under subpoena.  RT 2153 ("The witness said that they were here because they fear retaliation.  It's

19  highly prejudicial.") (Foakes's counsel colloquy with the Court).  The Court denied Foakes' motion.

20     Ranieri offers no authority for the proposition that a prosecutor who follows a court's clear order

21  on an evidentiary issue when examining a witness commits prosecutorial misconduct.  Similarly, Ranieri

22  offers no reason that the Court's decision to permit such testimony was incorrect, and so plainly

23  incorrect as to merit a new trial.

24      **F.    The Evidence Supports the Jury's Verdict on All Counts (Response to Ranieri Mot.
               §§ VIII, IX; Foakes Mot. § E)**

25

26     Both Defendants assert that the Court should grant them a new trial because the evidence was

27  insufficient to support their convictions.  The Court rejected these arguments when it denied their

28  motions under Rule 29.  ECF 3673.  Defendant's Foakes' Rule 33 argument for a new trial on this basis

1    is confined to a single sentence, arguing that if the Court decides not to issue a judgment of acquittal, it

2    should instead grant a new trial.  ECF 3581 at 13.  He offers nothing more, and he fails to address the

3    Rule 33 standards.  For this reason, the Court's reasoning in denying his Rule 29 motion applies with the

4    same force here.

5        Defendant Ranieri spends more time on the issue of insufficiency of the evidence, but his

6    argument fares no better.  He first argues that there was insufficient evidence to support his conspiracy

7    to commit VICAR murder because with respect to HASC, "there was no evidence that he [Ranieri] was

8    a member of or had a position in that charged enterprise," and there was no evidence "that Mr. Ranieri

9    aspired to enter the charged enterprise for any purpose."  ECF 3583 at 43.  Ranieri argues that for him to

10   be liable for VICAR crimes, he needed to be a member or wanted to become a member of HASC.  This

11   ignores, however, that the definition of enterprise encompasses "a group of individuals associated in fact

12   although not a legal entity."  18 U.S.C. § 1961(4).  Those individuals who closely associated with HASC

13   knowing what it was and agreeing that it would commit acts of racketeering could be members of the

14   HASC criminal enterprise for purposes of RICO and VICAR even if they did not—or could not—have

15   the formal status within the club such as full patch members enjoyed.  The Court made this very point in

16   denying Ranieri's Rule 29 motion.

17       Even as a non-member of HASC, Mr. Ranieri can commit a violent offense for the
18       purpose of maintaining or increasing his position in HASC as an associate of the
         enterprise.  Formal membership in an enterprise is not necessary to sustain a VICAR
19       conviction.  *Rodriguez*, 971 F.3d at 1011; *see also Fernandez*, 388 F.3d at 1231.

20   ECF 3673 at 29.  In moving for a new trial, Ranieri offers nothing to disturb this holding.

21       Second, Ranieri repeats his Rule 29 arguments that the jury should not have credited J.H.'s

22   testimony regarding Ranieri's role in the conspiracy to murder Joel Silva.  The Court addressed those

23   arguments in denying the motion for judgment of acquittal.  *See* ECF 3673.  As Ranieri correctly

24   observes, however, the Rule 33 context is slightly different from Rule 29 because the Court is not

25   required to view the evidence in the light most favorable to the government, and it can conduct its own

26   assessment of the credibility of witnesses and independently weigh the evidence.  ECF 3583 at 40.

27

28

1    At the same time, the Rule's directive is to grant a new trial is limited only to the rare case where

2    a serious miscarriage of justice has occurred—where an innocent person was convicted, and where a

3    new trial will correct this wrong.  Defendant's main authority, *United States v. Ashton*, 974 F.2d 1206

4    (9th Cir. 1992), stands for this proposition.  "We are confronted, therefore, with a question of law:

5    Assuming that the jury had found the facts as the district court believed it should have, would that have

6    led to a judgment of acquittal?"  *Id.* at 1213.  Thus, when deciding a Rule 33 motion, the Court cannot

7    simply weigh the evidence and assess the witnesses and determine that it would have reached a different

8    result than the jury.  Rather, in order to grant a new trial, the evidence must "preponderate[] sufficiently

9    heavily against the verdict that a serious miscarriage of justice may have occurred."  *Id.*, at 1211-12.

10    The rarity of grants of new trials is demonstrated by the two cases cited by Ranieri in which the

11    Ninth Circuit agreed with decisions to grant new trials.  *Ashton* involved a complicated antitrust lawsuit

12    against three dentists who organized others to successfully demand higher fee amounts to be paid by

13    prepaid dental plans in Tucson, Arizona.  *Id.* at 1207-08 ("Some Tucson dentists were failing to break

14    even on the most commonly performed services, such as porcelain crowning.  Several Tucson dentists

15    had individually approached the plans about increasing the fee schedule; their efforts proved

16    unsuccessful.").  As a result, the government brought a criminal antitrust case against the defendants,

17    although such issues were "normally handled as a civil enforcement matter."  *Id.* at 1214 ("Finally, we

18    are told that this is the first criminal antitrust prosecution of health care professionals in half a

19    century.").  The Ninth Circuit also noted the complexity of determining criminal intent for price fixing

20    in a complex relationship between providers, health care plans, and consumers, an arena different from

21    "normal, competitive markets."  *Id.*

22        But health care providers who must deal with consumers indirectly through plans such as
23        the one in this case face an unusual situation that may legitimate certain collective
         actions. . . . Uniform fee schedules—anathema in a normal, competitive market—are
24        standard operating procedure when medical plans are involved.

25    *Id.*  The court noted that while the jury instructions the district court provided were technically correct, it

26    suggested that instructions more suited to the "subtlety and complexity" of the market at issue would be

27    more appropriate.  *Id.* at 1214-15.

28

1    Defendant's other authority, *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000), was

2    likewise an unusual and complicated case.  That case involved the prosecution of a civil attorney whose

3    client turned out to be a wanted fugitive.  When the client was arrested, the civil attorney met with him

4    in jail, and he knowingly passed on instructions from the client to one of the client's employees to take

5    cash from his residence and burn various envelopes, among other actions.  The government then

6    prosecuted him and his client for obstruction of justice.

7    At trial, the issue of legal ethics was central to the defense because the defendant introduced

8    expert testimony that the lawyer's conduct was protected under duties of loyalty and that the requests

9    made by the client would not raise the same red flags to a civil practitioner that they would to one with

10   criminal experience.  *Id.* at 1090.  Although the district court allowed this expert testimony and

11   competing testimony from the government, it "precluded the lawyers from making any 'ethics type of

12   argument' in their closings, and immediately after the expert testimony, the court instructed the jury that

13   the expert testimony was simply 'background' information."  *Id.* at 1090.  The Ninth Circuit held that

14   this was error; that ethics testimony is relevant to establish the lawyer's state of mind; that these errors

15   significantly hampered the defendant's right under the Sixth Amendment; and that it had "no confidence

16   that the jury gave due regard to the ethics evidence in assessing the government's largely circumstantial

17   case against [the defendant] on the question of criminal intent."  *Id.* at 1100-01.

18   By contrast to the limits placed on the defense in *Kellington*, the Ranieri defense attacked J.H.

19   with vigor in its closing.  "Who takes their brother, their friend . . . who can take that person for one

20   month and lure him to his death?  What kind of human being does that?  And I suggest to you the kind

21   of human being who's a sociopath."  RT 6741 (Ranieri closing argument).  "I'm not going to talk about

22   every pathological lie that Mr. Hardisty told.  I'm going to focus on what I call the four whoppers."  RT

23   6750 (same).  ". . . [A]ll he is is a really, really good liar and a sociopath that set up his friend."  RT

24   6756 (same).  "That's a sociopath that you saw on the witness stand.  That's a sociopath.  You challenge

25   me?  I can always make up another lie.  Always.  You'll never get the truth out of him in a million years,

26   whether you're them, yourselves, me, or anyone else in this courtroom.  It's never going to happen."  RT

27   6767 (same).

28

1    The Ranieri defense told the jury during trial that they could not rely on J.H.'s testimony to

2    convict, but the jury rejected this message by returning a guilty verdict in little time.  *See* RT 6872, 7039

3    (jury began deliberation on Friday, May 12, 2023 shortly after 2:00 pm); RT 7065-66 (verdict returned

4    on Wednesday May 17, 2023 shortly after 9:47 am).  In his Rule 29 argument, Ranieri urged the Court

5    to acquit him notwithstanding the verdict because of issues with J.H.'s testimony, but the Court rejected

6    those arguments in denying that motion.  ECF 3673.  Because Ranieri adds nothing new, and because he

7    fails to address the Rule 33 standards and fails to establish a serious miscarriage of justice, the Court

8    should reject them once again.

### G.    There Was No Error Refusing Ranieri's Demand for a Surrebuttal (Ranieri Mot. § X)

11    Just prior to the government's rebuttal argument, Defendant Ranieri moved the Court to permit

12    the defense to have a surrebuttal.  ECF 3449.  There was no legal basis for this request, apart from a

13    claim that due process requires it when any defendant is facing imprisonment.

> THE COURT:  So let me ask you:  Your due process argument – and I'm very well
> familiar with Mathews versus Eldridge [424 U.S. 319 (1976)], why doesn't that apply to
> every criminal case?
> MR. WALSH:  I think it should.

17    RT 6879.  Contrary to Ranieri's position, the Federal Rules of Criminal Procedure govern closing

18    arguments, and they are clear what the procedure should be: "Closing arguments proceed in the

19    following order: (a) the government argues; (b) the defense argues; and (c) the government rebuts."

20    Fed. R. Crim P. 29.1.  As the 1974 Advisory Committee Notes to Rule 29.1 indicate, "This rule is

21    designed to control the order of closing argument.  It reflects the Advisory Committee's view that it is

22    desirable to have a uniform federal practice."  During trial, Defendant Ranieri offered no reason for the

23    Court to set aside this Rule—assuming the Court had the power to do so—and he offers no reason now,

24    let alone any argument that a surrebuttal would probably have altered the outcome of the trial such that a

25    new trial is warranted.

1

2

## H.    There Was No Error with Respect to the Jury's Verdict Regarding the Special Sentencing Factor Alleged in Count One (Ranieri Mot. § XI)

Ranieri's final argument is that the Court should grant him a new trial regarding the special sentencing factor in Count One.  That sentencing factor required the jury to indicate whether the government proved that Defendants Foakes or Ranieri knew that murder was one of the contemplated racketeering acts to which they agreed in committing the crime of RICO conspiracy.  "As to each defendant below, has the government further proven beyond a reasonable doubt that the defendant knowingly and intentionally agreed to join a conspiracy to commit deliberate and premeditated murder within the essential nature and scope of the HASC enterprise?"  ECF 3493 at 2 (Verdict Form).  The Verdict Form then provided places for the jury to indicate "Yes" or "No" for Defendant Foakes and Defendant Ranieri.  *Id.*

The jury carefully considered this question, as shown by their "No" with respect to Foakes and their "Yes" as to Ranieri.  *Id.*  The jury's determination that Ranieri agreed to join a conspiracy to commit murder within the HASC enterprise is not surprising in light of their determination that he is liable for conspiring to commit the VICAR murder of Joel Silva.  *Id.*

## I.    There Was No Error Admitting M.J.'s Testimony About Foakes' Sexual Assaults (Foakes Mot. § B)

In its pretrial Order, the Court granted the government's motion to admit the testimony of M.J. about sexual assaults Defendant Foakes committed against her.  ECF 3225 at 3.  "Unlike the Group One trial, the Government now seeks to present M.J.'s testimony directly against Mr. Foakes, a Group Two defendant.  As such, M.J.'s testimony is "relevant not only to establish the enterprise, but also [Mr. Foakes'] direct participation by engaging in specific acts sanctioned by and pursuant to the enterprise."  *Id.* (citing the Group One Trial Pretrial Order, ECF 2513 at 8, n.2).  Foakes offers no legal challenge to the validity of this order.  Instead, he cites to M.J.'s testimony and asserts that it the limited nature of her testimony did not support the government's arguments for its admission.

During the Group Two trial, M.J. was forced to face the man who repeatedly raped her.  She was forced to recount the worst things that ever happened to her, to do so with the perpetrator of those acts sitting mere yards away, knowing that his lawyer was soon to attack her on the stand.  "Certainly most

witnesses are uncomfortable and nervous when being cross-examined and, perhaps, when being questioned by a judge." *Singh-Kaur v. I.N.S.*, 183 F.3d 1147, 1151 (9th Cir. 1999). This is particularly the case where the witnesses have been victims of violence. "The Court expects that victim-impact witnesses will find testifying about the loss of their family member or close friend to be a difficult experience that 'may generate powerful emotions.'" *United States v. Smith*, 2020 WL 6536208, at *3 (D. Alaska. Nov. 5, 2020) (citing *United States v. Milburn*, Case No. CR 05-00167 WHA, 2008 WL 2557975, at *3 (N.D. Cal. June 24, 2008)). And it is even more of a concern when that violence has been sexual in nature. "Rather, the victims' testimonies revealed that the process of disclosing the molestation and testifying at trial was a difficult and traumatic experience, which bolsters their credibility." *Cauyong v. Gipson*, No. C 12-02606 EJD (PR), 2015 WL 13236625, at *13 (N.D. Cal. Oct 2, 2015). The characteristics of sexual assault have led courts to allow rape victims to proceed anonymously in civil cases against their attackers. *See, e.g.*, *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). These findings by judges have been echoed in legal scholarship. "Existing research shows that IPV [intimate partner violence] survivors who interact with the court system feel traumatized by the process and the legal system itself. The same has been found of survivors of sexual assault, a sometimes overlapping population." Negar Katirai, *Retraumatized in Court*, Arizona Law Review, Vol. 62:81 2020, at 89 (footnotes omitted).

> Testifying, confronting one's abuser, and the presence of spectators—known and unknown—adds significantly to the psychological stress survivors feel during legal proceedings. This is particularly challenging for survivors with PTSD or those who have repressed traumatic events as a coping mechanism. Moreover, survivors must endure questioning by their abuser or the abuser's attorney that is designed to undermine the survivor's credibility.

*Id.* at 102 (footnotes omitted)

Facing her attacker was unquestionably traumatic for M.J., and her testimony was significantly less fulsome than it was in the Group One trial. In Foakes' view, this means that the Court should never have allowed her testimony in the first place. Foakes argues that the real purpose of introducing M.J.'s testimony was "painting an unfairly prejudicial picture of Mr. Foakes and HASC as misogynistic and inflaming the jury." ECF 3581 at 5. This is not the case.

As the Court saw for itself, M.J. testified in the Group One trial about the roles of women who associated with HASC and the sexual politics within the enterprise; she discussed her relationship with Foakes and his control over her; she testified that she could not say "no" to any of his directives or he would punish her; she stated that other HASC members were aware of the fact that Foakes was punishing her but that they failed to help her; she testified that he attempted to leave him but that an associate of Foakes came to her brother's house where she was staying and took her to Lyles' marijuana grow in Willits; she testified that he ordered her to work at a fraudulent mortgage operation that was connected to HASC; she testified regarding her efforts to escape Foakes after law enforcement's raid on Lyles' marijuana operation in 2008 and that Foakes had people show up at the place she worked in Ukiah; she testified that she assaulted other women who disrespected Foakes in the presence of other HASC members; she discussed assaults by Foakes and other HASC member on members of the public; she discussed how Foakes disciplined her when she got into trouble, including by confining her to the HASC clubhouse; and she stated that other HASC-associated women would assault other women in the presence of HASC members as well. RT Trial One 1759-63, 1810-11; 1768-72, 1781-1804; 1772-76; 1776-80; 1804-10, 1825-27; 1811-15; 1816; 1820; 1827-28 (M.J. testimony). Because she was so upset during the Group Two trial, M.J. was not able to repeat many of these facts. However, based on M.J.'s prior testimony, the Court was well justified in its finding that the government was permitted to elicit from her that the punishment she faced for disobeying or disrespecting Foakes included the possibility of sexual assault, and that on several occasions, that potential became reality.

Moreover, to grant Foakes' motion for a new trial on the basis of the purportedly improper admission of M.J.'s testimony that Foakes repeatedly sexually assaulted her, the Court would have to conclude, in effect, that the jury set aside the overwhelming evidence of Foakes role in HASC and his participation in the HASC enterprise knowing that it committed a pattern of racketeering acts and convicted him only because M.J. testified that he raped her. And further, a new trial without M.J.'s testimony about the sexual assaults would probably lead to an acquittal. *See Ashton*, 974 F.2d at 1213. Foakes cannot meet this burden.

1

2

### J.      There Was No "Gamesmanship" With Respect to the Defenses' Late *Touhy* Request Regarding Retired FBI Special Agent Dale Dutton (Foakes Mot. § C)

It is not clear from the briefing what the alleged impropriety was with respect to the government's response to defense's request to call retired SA Dale Dutton as a defense witness.  The defense sought to have SA Dutton testify that in a 2011 meeting with M.J., M.J. did not indicate that she had been sexually assaulted by Defendant Foakes during her earlier relationship with him.  To clarify the issue, the procedural history is important.

On October 7, 2022, the Court ordered the defense to disclose its witness list by February 3, 2023.  ECF 2977 at 4.  SA Dutton was not disclosed as a witness at that time.  On February 10, 2023, the government indicated that if a defendant elected to call any government agents as defense witnesses, the defense had to comply with the requirements of *U.S. ex rel Touhy v. Ragen*, 340 U.S. 462 (1951).  ECF 3173 at 5.  The Court reaffirmed this in its March 6, 2023 Order on the motions in limine.  ECF 3225 at 7 ("There is no dispute that Group Two Defendants must comply with *Touhy* if they seek to call employees of the federal government.").  The defense made no such request in the wake of that Order.

Witness M.J. testified on March 21, 2023, as one of the first government witnesses in trial, and she concluded her testimony that same day.  RT 1073 (Witness index).  During her testimony, the defense chose not to ask her any questions about when she first reported being sexually assaulted by Defendant Foakes.  To the extent the defense claims that SA Dutton's testimony only became necessary to impeach M.J. by having him testify that M.J. did not mention any sexual assaults when SA Dutton interviewed her about Foakes' mortgage fraud in 2011, the defense did nothing for five weeks.

Close to midnight on April 19, 2023, and for the first time, the defense made a *Touhy* request for the testimony of SA Dutton.   The next business day, the government forwarded the request to FBI counsel.  *See also* RT at 5679 ("We floated it up the chain. We don't have a response yet . . .") (Government colloquy with the Court).  The April 19 defense request contained an amended specification of the testimony of other FBI Special Agents and Task Force Officers that agency counsel was already considering.  That earlier request was dated April 13, 2023.  The April 19 *Touhy* request for SA Dutton's testimony was new, however.

On April 27, 2023, the government provided the defense with its response to the April 13, 2023 *Touhy* request, as partially amended on April 19. As the Dutton request was new, the April 27 response did not address SA Dutton's testimony.

On May 1, 2023, FBI counsel notified the government that they were not successful in locating SA Dutton, as he is retired and they have limited contact information for him. Independently, the case agent emailed SA Dutton and received an automated message indicated that he was out of the office beginning on April 22, 2023, though the second week of May 2023. The government disclosed this to the Court and to the defense on May 2, 2023. RT 5921-22. In the wake of that information, Foakes moved to strike M.J.'s testimony, to postpone trial until SA Dutton became available, or to grant a mistrail. The Court rejected that effort.

> Well, I mean, the Government's point is that this was late. I mean, you can't sort of take advantage of a last-minute attempt to subpoena and then the person's not available, and then you want to strike testimony which you claim would have been impeached by that testimony for a witness that wasn't timely subpoenaed.
>
> It was – you knew what she was going to testify. She testified in the first trial. You've had a year's notice; and if you were going to impeach her with the theory that she didn't report this earlier, I mean, there was no surprise. So the idea that we would, number one, postpone trial or grant a mistrial because of the unavailability of a witness that was just subpoenaed, you know, weeks into this trial, that's a tough one to me.

RT 5924-25 (the Court).

> So I don't understand why, if Mr. Dutton was going to be key to impeaching Meghan Jaynes, he wasn't subpoenaed earlier so at least, you know, if he doesn't respond to a subpoena, then we can take steps or whatever, but –

RT 5926 (same). Based on the record, it is impossible to assert any misconduct on the part of the government with respect to the late effort by the defense to call SA Dutton as a witness, let alone misconduct that created a serious miscarriage of justice.

### K.    The Government's Reference to HASC's "Toy Run Fraud" Cannot Support Foakes' Motion for a New Trial (Foakes Mot. § D)

Foakes also argues that the government improperly referenced HASC's committing fraud with respect to its "toy runs" as a basis for conviction. In trial, former full patch HASC member Troy Conte

testified that the HASC toy runs involved fraud, in that some of the money generated was diverted to HASC.

> Q. So early in your tenure as a Hells Angel, for the fundraising aspect of these toy runs, where did the money go?
> A. To the kids.
> Q. Was there a change over time with respect to where the fundraising money went for these runs?
> A. Yeah. They didn't – they didn't go a hundred percent to the kids.
> Q. And where did it go?
> A. To the – some went to the charter.

RT 4993 (Troy Conte testimony). It its rebuttal argument, the government reminded the jury of this testimony.

> Then there is some racketeering activity that transcends the eras that we can't pin a certain time on it based on the evidence, and that would be the toy run fraud.
>
> So Mr. Conte testified that, over time, toy drive fundraising money was diverted to the club. Again, the toys still went to the kids, but additional funds that were raised weren't used to buy more toys; they went to the Sonoma County Hells Angels.

RT 7005 (Government rebuttal argument). That is the extent of the references to fraud with respect to the toy runs through the two months and 7200 transcript pages of evidence and argument to the jury.

In Foakes' view, this reference was improper because the toy run fraud was not among the overt acts listed in the Superseding Indictment and because generic "fraud" is not a racketeering act—only wire fraud and bank fraud are defined as racketeering acts under 18 U.S.C. § 1961. ECF 3455 at 3-4. Turning to the first point, the government does not have to allege any overt acts in the indictment, and there is no requirement to prove that any overt act was committed. *Salinas*, 522 U.S. at 476-77; *Rizk*, 660 F.3d at 1131 ("The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment."); *United States v. Ortiz*, No. C 12–00119 SI, 2013 WL 6842541, at *2 (N.D. Cal. Dec, 27, 2013).

With respect to the second point, Foakes is partially correct. The definition of "racketeering acts" in 18 U.S.C. § 1961(1) includes various specific forms of fraud—fraud and related activity in

connection with identification documents; fraud in connection with access devices; fraud relating to the transmission of gambling information; mail fraud; wire fraud; financial institution fraud; fraud in foreign labor contracting; fraud and misuse of visas, permits, and other documents; securities fraud; and fraud relating to controlled substances.  *Id.*  Troy Conte's testimony referred only to fraud in general, and it lacked the elements of the specified types of fraud listed in Section 1961(d).  But there is no basis to argue that removal of the single sentence in the government's rebuttal describing the HASC toy run as a racketeering act would probably lead to an acquittal, as Rule 33 demands.  *See Ashton*, 974 F.2d at 1213.

**L.     There Is No *Brady* Claim Related to J.H.'s Incorrect Belief that Entry into WITSEC Was Possible (Foakes' Suppl. Mot.)**

In his supplemental Rule 33 motion, Foakes argues that J.H.'s post-trial texts and testimony at the November 27, 2023 hearing demonstrate that he was promised entry into the WITSEC program and that the government's failure to disclose this benefit is a *Brady* violation.  ECF 3690 at 4-5.  This is not the case.

After his testimony in the Group Two trial, J.H. was "shook up," and for the very first time, asked the FBI, through SA Lane, for information about "witness protection."  November 17, 2023 Hearing Transcript ("11/27 RT") 120-21 (SA Lane testimony); November 17, 2023 Hearing Exhibit 2 ("Hearing Ex.") at HA-00150116-17.  That was on May 8, 2023, three weeks after J.H. testified in the Group Two trial.  Hearing Ex. 3 at HA-00150117; RT 3814 (April 14, 2023 witness index).  The next day, J.H. texted SA Lane, "So i just say i want to do it and you guys come get me Kassandra".  Hearing Ex. 2 at HA-00150117.  With that text, SA Lane interpreted J.H. to be making a reference to the WITSEC program operated by the U.S. Marshalls (USMS), and she asked if that was what he meant.  *Id.*  She then indicated that it is a program run by USMS and that there is a selection process, and she told J.H. that she would ask about it.  *Id.*  In response, J.H. texted,

> Wow a process for selection like i wont fit that. No help no reimbursement and been offered that since the beginning now i need to go through a selection that i feel im in danger

*Id.* SA Lane admitted that she was not familiar with the process but confirmed that she would get information on it. *Id.* J.H. then responded, "I mean that's something that was always on the table from what I understood". *Id.*

When he testified at the November 17, 2023 evidentiary hearing, J.H. explained that the reason he believed that WITSEC was "on the table" was because of a discussion he had with the trial team and his lawyer. The discussion of "witness protection" was general, and it was part of a variety of potential options to keep J.H. safe.

> Q. Now, was there – did you and your lawyer ask about different possibilities to keep you safe because you're going to testify?
> A. Yeah, I think so.
> Q. And was the marshals' witness protection program among those possibilities during that conversation?
> A. Yes, witness protection was.

11/27 RT 127-28. J.H. was vague about the details about the meeting and the discussion.

> Q. Mr. Hardisty, the discussion you just mentioned, or the conversation, meeting that was had, you just mentioned, with Mr. Barry that was around the conference room table, was that in your attorney's office?
> A. Yes.
> Q. And when did that occur?
> A. I don't remember the exact date.
> Q. Was that before the first trial?
> A. It's possible.
> Q. Or was it between the first and second trial; do you remember?
> A. I don't.

11/27 RT 132. To the extent WITSEC was part of the discussion, J.H. received no details about the program.

> Q. And your understanding of the promise – and just so we're clear, your understanding of that conversation was a promise was made to you in front of your attorney that if you chose witness protection, then it would be available; is that your understanding of the promise that was made?
> A. Yes.
> Q. And in that conversation, there was no discussion of the finer points of whether or not that's through the U.S. Marshals or the FBI or the U.S. Attorney's Office; isn't that true?
> A. Not that I remember.

Q.  And your understanding, though, was this would be something that would be done after the trials were done, if you chose it?

A.  I didn't know how it worked.

11/27 RT 132-33.

The meeting during which the supposed promise of witness protection was made took place on March 22, 2022.  Like J.H., SA Lane was unsure on the stand about the timing of the meeting, and she testified that it was "maybe in April of 2022."  11/27 RT 61.  She did specify, however that there was only one in-person meeting with J.H. and his counsel.  11/27 RT 62.  In fact, after the meeting, SA Lane wrote a detailed report about it, and that report contains the date it took place.  *See* HA-000141932-34.[2] That report does not reflect any promises by the government, because no promises were made regarding WITSEC or anything else.

Q.  First of all, do you know . . .  whether there was a promise that you are aware of that was made to [J.H.] in his lawyer's presence while you were there?

A.  I don't recall promises being made.  I do know that [J.H.] had a lot of confusion over what "witness protection" referred to.  Did that refer to relocation?  Did that refer to getting him funding for a security camera for his house?  Or did that refer to the U.S. Marshals' witness protection program?  So I can't interpret what he meant by that promise or that "witness protection" specifically.  I think he would have to answer that.

11/27 RT 40-41 (SA Lane testimony).  SA Lane testified that she made inquiries regarding WITSEC after J.H. referred to the program on May 8-9, 2023.  *See* 11/27 Hearing Ex. 2 at HA-00150117. The report of the March 22, 2022 meeting with J.H. and his lawyer does not reflect a discussion of possibilities with respect to J.H.'s safety because providing for his security was not a new or notable fact.  It was an ongoing process, beginning with the $25,900 paid for his relocation and for additional requests related to his protection.

Q.  But having received that [May 8, 2023] message, did you ever seek to make for any further inquiry of whether a representation was made to [J.H.] in front of his lawyer at any time about some aspect of witness protection?

A.  I don't recall any promise being made.  I don't know, sitting here today.  I know I've attempted to get him, you know, funding for, again, like security type needs over the

_____

[2]  The government produced this report to all counsel on April 5, 2022, and the government can lodge it with the Court if the Court would find review of the report to be helpful.

1    years, and so I do know that.  I have inquired about the witness protection program for

2    him.

3    11/27 RT 41 (same).  An October 2022 text message the Wendt defense introduced at the November 17,

4    2023 hearing as Exhibit 1 reflects this reality, as SA Lane texted J.H., "we can still help with security or

5    relocation expenses.  Just need a breakdown of what you're looking for."

6         With respect to benefits given to J.H., all the funds provided for his protection were disclosed to

7    the defense.  On March 9, 2022, the government disclosed $25,920 in payments to J.H. and specified the

8    date of each payment.  On March 9, 2023, exactly a year later, the government disclosed that J.H. had

9    received no additional benefits.  On March 23, 2023, the government disclosed to the defense benefits

10   that J.H. had requested but had not received.

11        The record shows that once J.H. specifically asked about the WITSEC program, he and the agent

12   and an AUSA had a discussion about it, and he decided not to consider it because of its requirements.

13   11/27 RT 105, 126-28.  The record also shows that this was the first time that any WITSEC details had

14   ever been discussed.  11/27 RT 127-28.  The fact that J.H. knew nothing about the details of WITSEC

15   and the fact that the agent herself had to make inquiries once J.H. brought it up after the Group Two trial

16   support the testimony that no promise about WITSEC had ever been made.  Further, the FBI was in no

17   position to make any promises about WITSEC because it is not their program, and they have no say

18   about who might get accepted.  11/27 RT 70-71.  There was no *Brady* violation.

19        In order to prevail on a *Brady* claim, the defendant must establish three criteria: "[t]he evidence

20   at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

21   that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

22   must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The defense's assertion that non-

23   disclosure of J.H.'s belief that he was promised entry into WITSEC constitutes a *Brady* violation fails all

24   three requirements.

25        First, J.H.'s subjective belief about WITSEC is not favorable to the defense because it is not

26   impeaching.  J.H. testified that he believed that "witness protection" was "on the table," or that he had

27   been promised entry into USMS WITSEC, but there is no evidence to support that belief.  The issue of

28   J.H.'s protection and his safety as a witness was a topic of frequent discussion, and J.H. repeatedly

US OPP. TO RULE 33 MOTIONS                    31
17-CR-00533-EMC

1   expressed his frustration at not being provided the assistance he believed was necessary to keep him

2   safe, such as funds to purchase a house in another country.  "Moving to [another country] literally would

3   cost like 400,000$ . . . its not fair because everything i did to bring so much down and risk everything i

4   dont think a house in another country is unreasonable to ask for."  11/27 Hearing Ex. 1 at p.2 of .pdf.

5   The texts in which J.H. expressed the belief that this was a reasonable benefit were produced in January

6   and February of 2023 to all counsel.

7          Keeping J.H. safe and protected is an issue that has always been "on the table," as demonstrated

8   by the communications with J.H. that have been produced and by the March 2022 disclosure of $25,900

9   in relocation expenses paid to J.H.  Entry into WITSEC was not.  In fact, at no point prior to the

10  conclusion of the Group Two trial did J.H. indicate that he believed that he was promised entry into this

11  program.  It is apparent from J.H.'s testimony that he has a subjective belief that it was, but his belief is

12  unfounded.  When there is no promise or deal, a witness's subjective belief that he will receive some

13  benefit cannot support a *Brady* claim.  *Hovey v. Ayers*, 458 F.3d 892, 917 (9th Cir. 2006); *Williams v.*

14  *Calderon*, 52 F.3d 1465, 1475 (9th Cir. 1995).

15         Second, evidence is only "suppressed" where it is known to the State and not disclosed to the

16  defendant.  *Strickler*, 527 U.S. at 282.  No one was aware that J.H. had a subjective belief that entry into

17  WITSEC was somehow a "promise" until May 18, 2023, the day after the Group Two verdict was

18  returned and a month after he testified.  *See* 11/27 Hearing Ex. 3 at HA-00150119.  "Under both *Brady*

19  and Rule 16, the government 'has no obligation to produce information which it does not possess or of

20  which it is unaware.'"  *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (quoting *Sanchez v.*

21  *United States*, 50 F.3d 1448, 1453 (9th Cir. 1995)); cf. *Dist. Attorney's Off. for Third Jud. Dist. v.*

22  *Osborne*, 557 U.S. 52, 68-69 (2009) (limiting the Government's post-trial *Brady* obligations); *Jones v.*

23  *Ryan*, 733 F.3d 825 (9th Cir. 2013).  Thus, even if J.H.'s incorrect subjective belief were somehow

24  impeaching, it was not suppressed.

25         Finally, the information was not material.  There is no chance that informing the jury that J.H.

26  mistakenly thought that he was guaranteed entry into WITSEC would affect the jury's assessment of his

27  credibility, let alone that it would undermine confidence in the verdict, which is the standard under

28  *Brady*.  *Strickler*, 527 U.S. at 289-90.  The jury was aware of critical impeachment—J.H. had lied about

a central issue in the case: his own location at the time Silva was murdered.  Trial One RT 2930 ("Q: But exactly what was the lie? A: That I was at the clubhouse on the outside."); *see also* Trial Two RT 3868, 3890, 3946-47.  Hardisty was cross-examined on that point and admitted on the stand lying to the FBI about it.  Trial One RT 2930-31; Trial Two RT 3890, 3946-47.  *See United States v. Morales*, 746 F.3d 310, 316 (7th Cir. 2014) (The effect that a piece of evidence "is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial.").

J.H.'s credibility was also attacked for a host of other reasons: he was cross-examined about his motivations for wanting to see the defendants "go down" for the Silva murder, Trial One RT 2946; about whether he believed that he would get a free pass from prosecution despite his involvement in the Silva conspiracy and his lies to the FBI, Trial One RT 3018; and about his repeated requests to the federal government for assistance, financial and otherwise, Trial One RT 2948-49.  Given this significant cross-examination, there is no reasonable probability that the jury would reach a different conclusion if it determined that J.H. also had a mistaken belief about a potential benefit that was never offered to him and which he rejected once he learned what it would entail.

## IV.   CONCLUSION

For all the reasons set forth above and in other post-trial briefing, the Court should preserve the jury's verdict and deny Defendants' motions for a new trial.

DATED:  February 29, 2024                                   Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/

_____
KEVIN J. BARRY
LINA PENG
Assistant United States Attorneys