1
2
3
4                UNITED STATES DISTRICT COURT
5             NORTHERN DISTRICT OF CALIFORNIA
6

7 UNITED STATES OF AMERICA,         Case No.  17-cr-00533-EMC-1

8          Plaintiffs,

9    v.                  **ORDER DENYING GROUP TWO DEFENDANTS' RULE 33 MOTION FOR NEW TRIAL**

10 JONATHAN JOSEPH NELSON,

11         Defendants.         Docket No. 3581, 3583

12
13           **I.**      **INTRODUCTION**

14      On May 17, 2023, in the second trial of members and associations of the Hells Angels of

15 Sonoma County ("HASC"),[1]  a jury convicted the Defendants Raymond Michael Foakes and

16 Christopher Ranieri of conspiracy in violation of the Racketeer Influenced and Corrupt

17 Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One).  In addition, Raymond Foakes

18 was convicted of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C.

19 § 1959(a)(3) (Count Six) and tampering with a witness in violation of 18 U.S.C. § 1512(b)(1)

20 (Count Eight).  *Id*.  Mr. Ranieri was convicted of conspiracy to commit murder in violation of the

21 Violent Crimes in Aid of Racketeering Activity ("VICAR"), 18 U.S.C. § 1959(a)(5) (Count Two).

22 *See* Docket No. 3493 ("Jury Verdict").  On January 14, 2024, the Court denied Mr. Foakes and

23 Mr. Ranieri's motions for acquittal.  Docket No. 3673.

24      Now pending are Defendants' motions for new trial pursuant to Federal Rule of Criminal

25
26 [1] This case originally involved 11 defendants.  *See* Superseding Indictment.  The Court opted to try the case in groups due in part to difficulties caused by the COVID-19 pandemic.  *See* Docket No. 1110.  Group One consisted of Russel Ott, Brian Wendt, and Jonathan Nelson.  *Id.*  Group
27 Two consisted of Raymond Foakes, Christopher Ranieri, and Brian Burke.  Brian Burke was found not guilty of tampering with a witness in violation of 18 U.S.C. § 1512(b)(1) (Count Eight).
28 *See* Jury Verdict.  Other defendants pled.

United States District Court
Northern District of California

Procedure 33.  *See* Docket No. 3581 (Foakes Motion), Docket No. 3583 (Ranieri Motion).  For the following reasons, the Court **DENIES** Mr. Foakes and Mr. Ranieri's motions.

## II.   <u>LEGAL STANDARD</u>

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal[.]"  *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009) (quoting *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992)).  Accordingly, a district court "'need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'"  *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting *Alston*, 974 F.2d at 1211).  While not as rigorous as the showing needed to satisfy Federal Rule of Criminal Procedure 29, it is a demanding standard nonetheless, and such motions may be granted only "in exceptional circumstances in which the evidence weighs heavily against the verdict."  *See United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012).

If, after evaluating the evidence, the Court determines that "a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992).

## III.   <u>FACTS AND BACKGROUND</u>

The following are the facts presented at trial and, in the Court's view, are supported by substantial and credible evidence.

A.   <u>The Hells Angels Motorcycle Club and Hells Angels Sonoma County</u>

The Hells Angels Motorcycle Club ("Hells Angels") is what the Government refers to as an Outlaw Motorcycle Gang ("OMG").  *See* Trial Transcript (TT) 2429.  Hells Angels is a global organization.  *Id.* at 2605.  Within the United States, Hells Angels are one of 14 dominant OMGs, also known as "One Percent" clubs.  *Id.* at 2697.  A One Percent club refers to "the one percent of bikers that don't follow the rules. They don't follow laws.  They don't answer to anybody."  *Id.* at 1252-53 (Verhagen testimony).

Hells Angels chapters are called charters and are organized regionally. *Id.* at 2441. In the United States, charters are organized into West Coast and East Coast regions. *Id*. at 2442. Each charter acts semi-autonomously with its own set of rules; however, charters are still required to adhere to Hells Angels "world rules." *Id.* at 2448-49; 2457. With some variation, the world rules govern how an individual can become a member of a particular Hells Angels charter. *Id.* at 3421. Individuals begin as "hang-arounds" and are then required to "prospect" for a minimum of 12 months before they can become "full-patch" members. *Id.* at 1087-88, 3421. A "full-patch" member is a full member of the club, and refers to the three-piece patch on members' vests. *Id.* at 1065, 1086. The top piece, or "top rocker," states the name "Hells Angels." The center piece has the Death Head logo of a skull with its mouth stitched shut. Below that is the "bottom rocker" that denotes the state the member is from. *Id.* at 2475-76; 2477. Only full-patch members are permitted to wear something that displays the Hells Angels name or the Death Head. *Id.* at 2476. Members can also earn tags that they wear on the front of their vests. Among these is the "Filthy Few" tag, which the Government asserted members earn by committing a violent act in furtherance of the club. *Id.* at 2501-02.

Charter leadership structure consists of a president, vice president, secretary, treasurer, and a sergeant-at-arms. *Id.* at 2445. Charters hold weekly meetings referred to as "church." *Id.* at 2473. Only full-patch members are permitted to attend. At church, members discuss charter business and vote on significant charter issues. *Id.* at 2557-58. Most charter decisions adhere to a "one man, one vote" rule. *Id.* at 2557.

Hells Angels Sonoma County ("HASC") is a charter that operates in Sonoma County. As the next section demonstrates, HASC has exhibited two purposes relevant to this trial. First, HASC seeks to promote their reputation through violence. *Id.* at 1346. This purpose involves, *inter alia*, violence toward rival OMGs, *e.g.*, *id.* at 1812-13, violence toward members who "disrespect" other Hells Angels, *e.g.*, *id.* at 1028-1050, and violence toward anyone who disrespects the patch in public. *Id.* at 1203-06; 1376; 1396-1403; 4980-81. Second, HASC seeks to evade law enforcement scrutiny. *See id.* at 2495. This purpose involves, *inter alia*, assaults on members of law enforcement and globally enforced "no snitching" rules. *Id.* at 2506; 2477. The

3

1  stitched shut mouth of the Death Head logo reflects the no snitching rules.  *Id.* at 6414.

2       Defendant Raymond Foakes was a former president of HASC and a former sergeant-at-

3  arms.  *Id.* at 1882; 3715.  He had a reputation for being a "badass," a "rock star," and "Mr. Hells

4  Angel," which in part was due to his ability to be violent.  *Id.* at 1248-49.  Defendant Christopher

5  Ranieri was a president of the Boston Hells Angels charter.  *Id.* at 3672-73.  He had close

6  connections to the HASC and Fresno charters.  *Id.* at 1370; 2332.  For example, celebrations were

7  held for Mr. Ranieri when he visited the HASC clubhouse.  *Id.* at 2332.  An HASC member,

8  Russell Lyles, visited Mr. Ranieri in Massachusetts "pretty often," and even wanted to name his

9  son after Mr. Ranieri.  *Id.* at 2333-34.  The Government also presented numerous photos of Mr.

10  Ranieri with HASC and Fresno members.  *See*, *e.g.*, Ex. 811.  Mr. Ranieri also wore a Sonoma tag

11  and sleeve tattoo, designating his affiliation with the HASC.  TT 1391; 2498; Ex. 843.

12       Other Hells Angels members relevant to this case are as follows.  Russel Ott was the

13  president of HASC before Mr. Foakes.  TT 4956.  Jonathan Nelson was the most recent president

14  of HASC.  *Id.* at 3666.  Russell Lyles was the sergeant-at-arms of HASC.  *Id.* at 1327.  Brian

15  Wendt was the president of the Hells Angels Fresno charter, and was close with Nelson.  *Id.* at

16  4620-21; 1374-75.

17       A murder victim in this case, Joel Silva, was also an HASC member.  *Id.* at 2361.  Silva

18  had a reputation for being a bully and reportedly created problems at the HASC, Fresno, and New

19  Hampshire clubhouses.  *Id.* at 2402.  In the first trial of HASC members and association in this

20  case, Ott, Nelson, and Wendt were convicted for conspiring to murder him.  *See* Jury Verdict

21  Docket No. 2886.

22  B.    <u>Overt Acts, Predicate Acts, and Uncharged Conduct</u>

23      1.    <u>Assaults</u>

24       The Government presented evidence of HASC members' involvement in at least three

25  assaults: the assault of Troy Conte, the assault of Javad Trew, and the assault of Mariano

26  Malvino.[2]

27  

28  [2] While assaults do not qualify as racketeering acts, *see* 18 U.S.C. § 1961(1), they can be
considered as enterprise evidence and serve, in part, as a basis for the inference that a defendant

United States District Court
Northern District of California

United States District Court
Northern District of California

a.     Troy Conte

Former member Troy Conte was assaulted and kicked out of HASC for sleeping with the girlfriend of Mr. Foakes.  TT 5040-5041.  In November 2016, Conte received a text message that all HASC members needed to come to the clubhouse for a meeting.  *Id.* at 5035.  After Conte arrived, Mr. Foakes walked in and struck Conte in the face.  *Id.* at 5039.  Conte attempted to leave, but Mr. Lyles and Mr. Foakes dragged him back inside and proceeded to beat him.  *Id.* at 5040.  Conte admitted to sleeping with Mr. Foakes' partner, Desiree Maclean.  *Id.* at 5040.  Eventually, the assault was paused so the members could vote on Conte's membership.  *Id.* at 5041.  All voted to revoke Conte's membership.  *Id.* at 5041.  Conte was then beaten, including hit with a baseball bat, bullwhipped, and pistol-whipped for four-and-a-half hours.  *Id.* at 5041.  Conte was also held down so Mr. Foakes could run a tattoo gun across his face and over his torso.  *Id.* at 5044-5045.

As a result of the assault, Conte had to stay at a hospital overnight.  *Id.* at 6192-93.  Medical records showed that he suffered facial fractures, including to the orbital walls of his left eye.  *Id.* at 6170-90.  He also had to have plastic surgery to remove the tattoos on his forehead.  *Id.* at 6215.

b.     Javad Trew

Javad Trew testified that he was assaulted by Nelson and HASC member Jeremy Greer.  *Id.* at 1043.  Trew explained that he considered joining HASC after meeting Greer at a tattoo convention in 2015.  *Id.* at 1029.  Greer then began to ask favors of Trew.  In one instance, Greer called Trew late at night asking to borrow Trew's utility trailer.  *Id.* at 1034.  When Trew declined, Greer became "very aggressive on the phone about it."  *Id.*  Next, Greer asked to borrow Trew's vehicle.  *Id.* at 1035.  Trew again declined, and Greer again became aggressive.  *Id.*  Eventually, in approximately 2016, Trew told Malvino, a member of the HASC support club Ghost Warriors, that he was uncomfortable with Greer's aggressive responses.  *Id.* at 1036.

joined the enterprise agreeing members would engage in a pattern of racketeering.  *See United States v. Jaimez*, 45 F.4th 1118, 1122 (9th Cir. 2022) (utilizing assaults as evidence of an enterprise); *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) (utilizing evidence of assaults to prove a defendant's participation in an enterprise).

Malvino subsequently told Trew to go to the HASC clubhouse. *Id.* at 1038. When Trew arrived, Greer and Nelson were waiting for him with a clear plastic sheet spread across the floor. *Id.* at 1043. Greer began yelling at Trew for talking about him to Malvino. *Id.* at 1043. Nelson then struck Trew in the back of his head with a baseball bat. *Id.* at 1044. Others at the clubhouse joined in and beat Trew for a few minutes. *Id.* at 1045. Trew stated that he thought he "was going to die," *id.* at 1044, and that there was a lot of blood on his face and body. *Id.* at 1046. Malvino then walked Trew to the bathroom and instructed Trew to clean himself off with a bottle of bleach. *Id.* at 1045-46. After leaving the bathroom Nelson asked Trew "What the fuck happened tonight?" *Id.* at 1047. Trew responded, "Nothing happened tonight" because he was under the impression that he would be killed if he told anyone about the assault. *Id.* at 1047. On his way home after the assault, he discovered that his phone was factory reset and all his data was cleared. *Id.* at 1048.

        c.   Mariano Malvino

Mariano Malvino was assaulted by HASC members Nelson and Lyles for interacting with David Clark, a non-member in bad standing with the Hells Angels. *Id.* at 1107-1109. Malvino was a member of the Ghost Warriors, a support or "stepping-stone" club to HASC. *Id.* at 1090. Lyles had previously informed HASC and Ghost Warrior members that they could not associate with David Clark. *Id.* at 1106. Despite Mr. Lyles' instruction, Malvino continued to do so, and was arrested after committing a robbery with David Clark. *Id.* at 1106-07. While released on bail, Malvino told the Ghost Warriors about his and David Clark's arrest. *Id.* at 1108. The Ghost Warriors told Malvino he was required to inform Lyles about the incident, and Malvino did so. *Id.* at 1108. Lyles told Malvino to meet at the clubhouse. *Id.* at 1108.

When Malvino arrived, Lyles and Nelson attacked him. *Id.* at 1109. Lyles punched Malvino in the face. *Id.* at 1110. Malvino was struck in the head with what he described as the teeth side of a framing hammer. *Id.* at 1110. When the assault ended, Malvino was on the ground and saw a pool of blood. *Id.* at 1111. Members of the Ghost Warriors then went to Malvino's house and took all of his Ghost Warrior paraphernalia. *Id.* at 1112.

United States District Court
Northern District of California

1        2.    <u>Witness Intimidation and Extortion</u>

2        The night Troy Conte was severely beaten and removed from HASC, Mr. Foakes sexually

3    assaulted Conte's wife, Michelle Conte, and subjected her to witness intimidation.  *Id.* at 5373-

4    5378.  During the assault on Troy Conte, Mr. Foakes called Ms. Conte and told her to come to the

5    HASC clubhouse.  *Id.* at 5372.  Once she arrived, Mr. Foakes drove Ms. Conte to a secluded

6    location.  *Id.* at 5372.  He told her, "if I don't do what he says, that Troy is going to get worse than

7    what he already has, and if I say anything to anybody, then he'll come after me."  *Id.* at 5374.  Mr.

8    Foakes then forced Ms. Conte to perform fellatio on him.  *Id.* at 5375.  Ms. Conte then returned

9    home.  *Id.* at 5376.  Mr. Foakes returned to the clubhouse to resume the beating of Troy Conte,

10   and while doing so, informed Troy Conte about his actions towards Ms. Conte.  *Id.* at 5050.

11   Before Troy Conte returned from the HASC clubhouse, Mr. Foakes went to the Contes' house and

12   attempted to assault Ms. Conte again while she was in her bed.  *Id.* at 5377.  HASC member Josh

13   Johnson, who was bringing Troy Conte home after the assault at the clubhouse, arrived before Mr.

14   Foakes could do so and convinced Mr. Foakes to leave.  *Id.* at 5378.  Ms. Conte then took her

15   husband to the hospital.  *Id.* at 5380.  The next day, Ms. Conte informed her husband that Mr.

16   Foakes sexually assaulted her.  *Id.* at 5381.  Even though the Contes typically avoided dealing

17   with law enforcement, Troy Conte told Ms. Conte that she should report the incident to the

18   police—a normally forbidden act by a member or association of the Hells Angels.  *See id.* at 5381;

19   5059.  Ms. Conte did so, and Mr. Foakes was arrested.  *Id.* at 5383.

20       As to the beating of Malvino, after Malvino was beaten, Nelson and Lyles told Malvino to

21   "get [his] story straight."  *Id.* at 1112.  Malvino drove himself to the hospital and lied about what

22   happened.  *Id.* at 1113.  After Trew was beaten, he was also threatened into saying "Nothing

23   happened tonight." *Id.* at 1047.

24       3.    <u>Spencer Robbery</u>

25       The Government also presented evidence of two robberies committed in furtherance of

26   HASC.  In 2015, HASC members Damien Cesena and Jeremy Greer showed up at the house

27   Nicholas Spencer was in to claim marijuana that Spencer had taken from a person named Casey

28   Jones.  *Id.* at 1759, 1766.  Cesena and Greer told Spencer that the marijuana belonged to the Hells

United States District Court
Northern District of California

7

Angels and to give it back so nothing would happen to Spencer. *Id.* at 1763. When Spencer declined to give them the marijuana, Greer and Cesena forced themselves in through the gate, and Cesena struck Spencer with a pistol. *Id.* at 1769-71. After he was struck, Spencer fled through the back door. *Id.* Later that night, Spencer returned home and found that Cesena and Greer had taken several marijuana plants and a duffel bag with approximately six to eight points of marijuana. *Id.* at 1771, 1781. A couple of days later while only Nicholas Gruber's mother was home, Cesena returned to the house wearing his Hells Angels patch and said that he wanted to talk to Spencer. *Id.* at 1802; 5019. Troy Conte testified that Cesena's purpose in returning to Cesena's home was for intimidation. *Id.* at 5018-19.

Notably, both the robbery and Cesena's return were captured by Gruber's surveillance system. *Id.* at 1803-04. Gruber showed the surveillance footage to his martial arts instructor, HASC member Herb Cody. *Id.* at 1804. Upon viewing the footage, Herb Cody asked to purchase the surveillance hard drive from Gruber and purchased it. *Id.* at 1804-05. At the next "church", when the other HASC members learned of the robbery, Greer and Cesena were made to split the proceeds because Cesena wore his Hells Angels patch when he returned to the grow house. *Id.* at 5018-19.

### 4. Eban Hale Robbery

HASC was also implicated in the robbery of Eban Hale. *Id.* at 2133-35. In the spring of 2016, Hale won an auction for an abandoned storage unit and, much to his surprise, discovered around 200 pounds of packaged marijuana inside. *Id.* at 2124. Eventually, word of Hale's find spread, and individuals began harassing Hale, demanding he give them some of the marijuana. *Id.* at 2127-30. Hale met with Troy Conte, then a Hells Angels member, to exchange 30 pounds of marijuana for protection. *Id.* at 2133-35. Hale testified that he felt as if he had no option but to pay for his protection. *Id.* at 2133-35. After the meeting, the harassment immediately ceased. *Id.* at 2135.

In December 2016, shortly after Troy Conte was thrown out of HASC, HASC member Jeremy Greer showed up at Hale's home. *Id.* at 2138. When Hale saw Greer, he was already inside the house holding a gun. *Id.* at 2138. Greer told Hale that the marijuana was his and

United States District Court
Northern District of California

demanded its return. *Id.* at 2139. When Hale explained to Greer that he had already sold the marijuana for $100,000, Greer cocked his gun and demanded the $100,000. *Id.* at 2140. After Hale told Greer he didn't have the money, Greer stated "Do you know who I represent?" *Id.* at 2141. Hale understood Greer to be referencing the Hells Angels. *Id.* at 2139. Hale then gave Greer everything he had on hand: $4,000 worth of marijuana and $1,000 in cash. *Id.* at 2143.

     5.   <u>Violence Against Rivals</u>

The Government provided evidence that HASC contemplated violence which could result in the killing of rival OMGs. Rival OMGs—such as the Mongols, Vagos, and Wanted—were considered enemies, *id.* at 1418, and Hells Angels members were expected to attack enemies on sight. *Id.* at 3972. Government Witness Joseph Hardisty testified that the Hells Angels recruited him for "big game hunting and small game hunting," *i.e.*, to hunt and kill Mongols ("big game") and Vagos ("small game"), *id.* at 3961, though he never tried to kill nor planned to kill any specific enemy. *Id.* at 3972.

In one instance, after a member of the Mongols murdered the president of the San Francisco Hells Angels, *id.* at 5049–50, HASC members were told to look out for Mongols and attack them on sight. *Id.* Members who failed to do so lost status in Hells Angels. *Id.* at 5052. For example, a full-patch HASC member who failed to report seeing a Mongol license plate in Hells Angels territory was relegated to a prospect. *Id.*

Verhagen testified that he participated in two "runs" to Arizona in which HASC and related charters contemplated the possibility of killing rivals. Verhagen explained that after a Phoenix Hells Angels member was killed by a Mongol, HASC travelled to Arizona in force for the funeral. *Id.* at 1418. The members chose to take a route through Mongol territory rather than the most direct route to "make a statement; we were showing force." *Id.* at 1420. Before leaving, Nelson gave a speech in which he explained that they could be ambushed by other motorcycle clubs and there was a "very good chance that we might not come home from it." *Id.* at 1423. Verhagen testified that on that trip, he felt prepared to die for the Hells Angels and that he desired "to have that honor." *Id.* at 1423.

6.    Drug Trafficking and Fraud

Around 2008, Lyles operated a marijuana grow house in Willits, California.  *Id.* at 1175.

Mr. Foakes' then girlfriend, M.J., *id.* at 1152, testified that Mr. Foakes ordered her to move to the

location of the grow house and work for Mr. Lyles' grow without pay.  *Id.* at 1163.  M.J.

explained that Hells Angels members would often visit the grow house, including a member of the

Boston Hells Angels charter.  *Id.* at 1170.  Eventually, the grow house was raided, and Lyles was

arrested.  *Id.* at 1175-76, 1181.  A member from the Boston Hells Angels was also present at the

raid.  *Id.* at 1198.  Law enforcement discovered Hells Angels paraphernalia and a number of

firearms in the grow house.  *Id.* at 1793, 1795–97. A sign on the window of the grow house read

"This property belongs to a Hells Angel.  Fuck around and find out.  I don't call the Sheriff."  *Id.*

at 1172.

C.    Murder of Joel Silva

Among the RICO acts, and the basis for Mr. Ranieri's VICAR murder conviction, is the

conspiracy to murder and murder of former HASC member Joel Silva.

Silva was a sergeant-at-arms of HASC and had been in the club for five years at the time of

his death.  *Id.* at 4631-32.  In June 2014, Silva attended the annual Laconia Motorcycle Week in

New Hampshire with Mr. Hardisty, and Fresno charter members Wendt, Robbie Huff, and Tio

Bueno.  *Id.* at 3848-49.  While there, Silva and Mr. Hardisty spent time at the Laconia charter

clubhouse, where they were reckless and causing problems.  *Id.* at 3849.  At one point, a dispute

arose between Silva and Boston charter member "Sweeney," who was Mr. Ranieri's best friend.

*Id.* at 3850.  Silva got upset and jealous that a prospect was wearing a chain that Sweeney had

previously given to Silva, but then had taken back.  *Id.* at 3900-03; 3907.  Silva threatened

Sweeney, stating that he would kill him.  *Id.* at 3850.  After Silva made the threat, he told Wendt,

Huff, and Mr. Hardisty.  *Id.* at 3851.  Mr. Hardisty explained that Silva's threat was a significant

problem because "you're talking about killing a member over a chain, just 'cause your feelings are

hurt."  *Id.* at 3900.  Wendt was "very upset," and went to tell Mr. Ranieri.  *Id.* at 3851.  The Fresno

charter gave Mr. Hardisty an ultimatum to go with them or stay with Silva.  *Id.* at 3852.  Mr.

Hardisty chose to go with the Fresno charter because "I knew if I stayed with [Silva], that meant I

10

1    was going to face the same fate as him" and the Fresno charter "were the more powerful ones."

2    *Id.* at 3853.

3       Mr. Hardisty testified that he and the Fresno charter went to Mr. Ranieri's house in Boston,

4    Massachusetts, where Mr. Ranieri and Wendt privately discussed Silva's threat. *Id.* at 3854. Mr.

5    Ranieri and Wendt then rejoined the group, and told Mr. Hardisty that Silva "had to go," *i.e.*, Silva

6    "had to be killed." *Id.* at 3855. Mr. Hardisty and the Fresno charter flew back to California. *Id.* at

7    3855-56. The next day at Mr. Hardisty's residence in Antioch, the HASC president Nelson,

8    Wendt, and a few other Fresno charter members had a discussion about the need to kill Silva. *Id.*

9    at 3856. They decided to kill him. *Id.* at 3856.

10       After the meeting in Antioch, Mr. Hardisty and Nelson had a separate meeting where

11    Nelson asked Mr. Hardisty to "take care of" the murder because there was no place to do it in

12    Sonoma. *Id.* at 3857. Mr. Hardisty initially agreed, and even moved to Sonoma to make Silva

13    feel more comfortable. *Id.* at 3858. At this time, Silva became more withdrawn and unusual, as

14    he "knew that everyone was mad at him." *Id.* at 3858. Mr. Hardisty then repudiated his role in the

15    murder to Nelson, after spending more time with Silva. *Id.* at 3859. Nelson said that the Fresno

16    charter would take care of it, but Mr. Hardisty was still to help Silva feel comfortable to get down

17    to Fresno. *Id.* at 3859-60.

18       During this time, Mr. Hardisty remained in frequent contact with Silva until he received a

19    text "letting [him] know that it was taken care of and not to text [Silva] anymore." *Id.* at 3859-61.

20    A few weeks later, Mr. Hardisty went to the Fresno clubhouse for a party, where Wendt told him

21    the details of the murder as follows. Wendt told Silva to come to the Fresno club house to "squash

22    the beef they had" and "move some weed" that was for Silva. *Id.* at 3862. After Silva arrived at

23    the Fresno clubhouse, Wendt told him to grab marijuana from a cubby under a stage. *Id.* When

24    Silva bent down to grab the marijuana, Wendt shot Silva in the back of the head. *Id.*

25       Other evidence and testimony corroborated Mr. Hardisty's testimony. Cell-site data

26    showed that Silva and several Fresno charter members were in Boston and Laconia, New

27    Hampshire areas in June of 2014. *Id.* at 3498-99. By 3:30 p.m. on June 16th, Wendt's and Huff's

28    phones registered in Lynn, Massachusetts, near the residence of Mr. Ranieri, while Silva's phone

United States District Court
Northern District of California

11

shortly after was registered at the Manchester Boston Airport. *Id.* at 3501-02. By 6:00 p.m. that evening, Wendt's phone registered at the Boston Logan International Airport. *Id.* at 3501. The next day, June 17, 2014, cell-site data placed Wendt's, Huff's, and Nelson's phones in the proximity of Antioch, California, near the residence of Mr. Hardisty. *Id.* at 3503. This was consistent with Mr. Hardisty's testimony about that meeting.

Approximately one month later, on July 14, 2014—only one day before Silva's disappearance—cell-site data showed that Nelson and Wendt's phones were in the vicinity of Mr. Ranieri's residence in Lynn, Massachusetts from 8:00 a.m. to 4:00 p.m. *Id.* at 3504, 3506. Mr. Ranieri was in regular contact with Wendt and Nelson. *Id.* at 3505. From 5:00 p.m. to 5:55 p.m., cell-site records show Wendt was at Boston Logan International Airport, where contacts between him, Nelson, and Mr. Ranieri continued. *Id.* at 3508-08.

Then, on the morning of July 15, 2014, the day of Silva's disappearance, cell-records show that Mr. Ranieri was in regular contact with Wendt, Silva, and Nelson. *Id.* at 3516. The same morning, the Silva phone reached out to Ott's phone, and Ott reached back out to the Silva phone. *Id.* at 3517. Wendt was shortly in touch with Mr. Ranieri for a series of text messages and a phone call. *Id.* at 3520. Around an hour after the 11:06 a.m. call, Ott's phone and Silva's phone travelled in tandem from Santa Rosa to the vicinity of the Fresno clubhouse. *Id.* at 3520. Cell-site data showed that after arriving in the vicinity of the Fresno clubhouse, Silva's phone made a series of outgoing contacts to Wendt's phone, the last of which was an outgoing call made at 4:36 p.m. *Id.* at 3520-21. Despite numerous incoming contacts, no outgoing calls or texts were made from Silva's phone thereafter. Gov't Ex. 127 at 27-36. Unlike Silva's phone, however, Mr. Ranieri's phone continued to make outgoing calls to Wendt. Gov't Ex. 127 at 25. Although Ott was driven by Silva to Fresno and had no way home without him, Ott never tried to call Silva that evening or the next morning. Instead, he arranged to have Nelson drive to Fresno to pick him up. *See* TT at 3523-24.

Cell data also corroborates Mr. Hardisty's testimony about the cover-up. Records show that on the morning of July 16, 2014—the day after Silva's disappearance—Fresno charter member Merl Hefferman contacted Levi Phipps, the manager of the crematory associated with the

Yost & Webb funeral home in Fresno.  TT 3527.  Mr. Phipps testified that Hefferman asked him if he could make a body disappear, and that if that were to happen, "You better be there."  *Id.* at 2943.  Afterwards, two men arrived at the crematory, flashed a gun at Mr. Phipps, and moved from their vehicle what appeared to be a body and placed it in the crematory incinerator.  *Id.* at 2947-2950.  Mr. Phipps set the time for the body to be cremated.  *Id.* at 2952.  Hefferman later contacted Mr. Phipps and told him to keep quiet.  *Id.* at 2953.  Cell-site data further showed that Robbie Huff was in the vicinity of Dos Palos on July 16, 2014, near where Silva's burned-out truck was found on fire in an isolated area later that day.  *Id.* at 3529, 2721.  The fire captain who found Silva's truck testified that he believed the fire was most likely the result of arson.  *Id.* at 2725.

A month after Silva disappeared, HASC members went to his house to take all of his Hells Angels related materials.  *Id.* at 3178-80.  Silva's daughter Stevie Silva saw an HASC member riding Silva's bike.  *Id.* at 3135-37.  Law enforcement also found Silva's dog tags during a search of Lyles' residence.  *Id.* at 4630.  None of the Hells Angels approached Silva's family to offer assistance in locating him, even though they had done so once previously when Silva was missing.  *Id.* at 3177.  Members also shunned Silva's family members in public.  *Id.* at 3128-29; 3182.  Silva was also voted out of HASC.  *Id.* at 5026.

## IV.  **DISCUSSION**

A.  COVID-19 Procedures

Like the Group One trial, the Group Two trial took place within the context of the COVID-19 pandemic.  The Court instituted the same protocols as it did previously.  First, the Court required that jurors social distance by being seated across both the jury box and the pews.  Docket No. 3258 (Pretrial Conference Minute Entry).  *Id.*  The Court allowed jurors to rotate into the jury box if they wanted to, and would consider lifting the social distancing requirement if the jurors all agreed that they did not mind sitting together.  *Id.*  Ultimately, as in the Group One trial, half of the jurors sat in the jury box and half sat in the pews. Second, the Court required trial participants—unless speaking—and members of the audience to wear masks.  *Id.*  Counsel was permitted to remove their masks while examining witnesses and during opening statement and

13

closing arguments. *Id.* Witnesses were unmasked. *Id.*

Mr. Ranieri argues that his Fifth and Sixth Amendment rights were violated by the COVID-19-related trial conditions. Ranieri Motion at 16. He points to the fact that society has a "deeply ingrained bias" against masks as evidenced by many statutes that make mask-wearing under certain circumstances a criminal offense. He also cites studies that show masks impair recognition of facial emotions. Motion at 12-16. Thus, the masking of trial participants and members of the audience deprived him of a fair trial because it "imposed negative implications as to how the jury perceived Mr. Ranieri and his co-defendants, their counsel, and their supporters in the courtroom." *Id.* at 12.

Mr. Ranieri's arguments here are nearly identical to those raised in the Group One motion for new trial. The Court rejects these arguments for same reasons as it did in its order denying the Group One motion for new trial. Docket No. 3710. First, the Court's COVID-19 policies did not unconstitutionally deprive Defendants of any identifiable right. Witnesses' voices were amplified throughout the courtroom. Exhibits were displayed on a large screen right in front of the jurors seated in the pew, just like in the Group One trial. Docket No. 3258. Witnesses and counsel who were questioning the witnesses remained unmasked when speaking, and parties used microphones to speak so that the jury could hear. The jury had a full opportunity to observe the witnesses and parties that were speaking and the substance of the evidence at trial. Even from the last seat in the pew, each juror had a full view of the witnesses.

As the Court noted in its prior order, this case is similar to *United States v. Tagliaferro*, 531 F. Supp. 3d 844, 850 (S.D.N.Y. 2021), where the court rejected the defendants' arguments that the trial's social distancing protocols violated his Sixth Amendment right to cross-examination. The defendant argued that by requiring members of the jury to sit in the public gallery as opposed to the jury box, they could not fully "observe the witness's demeanor." *Id.* at 850. The court disagreed. Because witnesses were unmasked while testifying and used a microphone, the jury had a "full opportunity" to assess witness "demeanor" and the substance of the testimony. *Id.*; *see also People v. Cuadras*, No. C093607, 2023 WL 2820216, at *6 (Cal. Ct. App. Apr. 7, 2023) ("Defendant has not cited any authority, and we have found none, holding that

14

United States District Court
Northern District of California

1    jurors must be seated in the jury box or within a certain distance of the witness stand."). The same

2    is true here.

3         The Court also noted in its prior order that reasonable COVID-19 safety precautions which

4    may impair some minor aspect of the jury trial right are within the trial court's discretion and the

5    Constitution. *See United States v. Thompson*, 543 F. Supp. 3d 1156, 1164 (D.N.M. 2021).

6         Also as noted, the Ninth Circuit has upheld convictions in the face of similar challenges to

7    COVID-19 protocols. For instance, in *United States v. Knight*, 56 F.4th 1231, 1235 (9th Cir.

8    2023), the defendant asserted that permitting a juror to participate remotely via Zoom in a criminal

9    trial violated his Fifth and Sixth Amendment rights including those to: a jury trial, a fair and

10   impartial jury, a representative jury, and his right to confront witnesses. *Id.* at 1236. In addition to

11   the fact that the defendant consented to remote juror participation, the court explained:

12            Unlike a deprivation of counsel, a biased adjudicator, or the failure
13            to ensure that the jurors are instructed on the law, allowing remote
              juror participation does not impact the entire framework of the trial
14            in ways that cannot be accurately measured on review. Rather, it
              merely creates room for the types of problems and errors identified
15            by Knight, such as difficulties in seeing exhibits, hearing testimony,
              and/or viewing witnesses. But none of those errors will necessarily
16            arise simply because a juror is participating remotely.

17   *Id.* at 1236-37. The instant case is easier. All jurors who participated in deliberations were

18   present in the courtroom.   Witness testimony and cross-examination took place in the courtroom.

19   There is no evidence that the seating arrangement "impact[ed] the entire framework of the trial in

20   ways that cannot be accurately measured on review." *Id.*

21        Finally, the COVID pandemic greatly reduced any "deeply ingrained bias" against mask-

22   wearing by those accused of committing criminal offenses. *See* Ranieri Motion at 15. At the time

23   of trial, which was the height of the pandemic, mask-wearing connoted responsible compliance

24   with Center for Disease Control and Prevention guidance. The requirement that Defendants wear

25   masks also extended to everyone on the prosecution team, the Judge, marshals, court security

26   officers, court staff and court reporter, and the jurors. Mask-wearing alone did not likely impose

27   negative perceptions of any of the people in the courtroom.

28

B.      Severance

Only Mr. Ranieri moves for a new trial on the basis of severance. "Defendants jointly indicted ordinarily should be jointly tried . . . The burden is on the defendant to show clear, manifest, or undue prejudice from a joint trial." *United States v. Mikhel*, 889 F.3d 1003, 1046 (9th Cir. 2018) (quotation marks and citation omitted).  "Severance should be granted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Id.* at 1046 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).  Even if there is risk of prejudice, Rule 14 does not require severance.  "[R]ather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."  *Zafiro*, 506 U.S. at 539 ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.").

The Ninth Circuit has outlined several factors that a court may consider in inquiring into the prejudicial effect of a joint trial, including: (1) the jury's ability to "collate and appraise the individual evidence against each defendant"; (2) the judge's diligence in providing limiting instructions to the jury; (3) "whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror"; and (4) whether "joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004).  The *Fernandez* court stated that "[t]he first two factors are the most important in this inquiry." *Id.* And with respect to the first factor, the court observed "that a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *Id.* at 1242.  Finally, "neither a better chance of acquittal in a separate trial nor the mere fact of joint trial with a more culpable defendant is sufficient in itself to require severance." *Id.* at 1241 (citing *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993)).

Mr. Ranieri argues that the Court erred in denying severance from a joint trial with Mr. Foakes and Mr. Burke.  Ranieri Motion at 16.  First, he argues that prejudicial, non-cross-

admissible evidence was introduced against him at trial.  Second, he incorporates the arguments in his pre-trial motion for severance, which the Court denied.  Docket No. 3218.  Third, the Court infrequently instructed the jury that the evidence was admissible against him only for limited purposes.

The first argument is without merit because Mr. Ranieri does not point to any "prejudicial, non-cross-admissible evidence."  The third argument is without merit too, because to the contrary, the Court's instruction on the scope of evidence against Mr. Ranieri was frequent throughout trial. *See, e.g.,* TT 1059 ("to the extent that you have heard and will hear about incidents that do not involve any of the three defendants on trial, this evidence is admitted for the limited purpose of establishing the existence, nature, and purpose of the HASC enterprise"), 1238 ("Just a reminder that to the extent that you have heard, and will hear, about incidents which do not involve any of these three defendants, the evidence, again, is admitted for the limited purpose of establishing the existence, nature, and purpose of the HASC enterprise, and that's the purpose of that testimony."), 2203 ("let me remind the jury that to the extent you've heard and will hear incidents that do not involve any of the three defendants, the evidence is admitted for the limited purpose of establishing the existence, nature, and purpose of the HASC enterprise."), 3790 (same), 4391 (same), 2253 (instructing the jury that Government witness Savano's testimony was allowed for the limited purpose to illustrate Mr. Ranieri's state of mind at the time of a motorcycle drive-by incident and not for the truth or accuracy of what he stated.).  It was also in the pretrial jury instructions, TT 930, 933 ("Some evidence may be admitted only for a limited purpose.  When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purposes."). This instruction was repeated in the final jury instructions. TT 6583 (same, but in past tense).

As to the second argument, the Court correctly denied Mr. Ranieri's motion for severance prior to trial, and there is no compelling reason to revisit its reasoning.  Docket No. 3218 (Order Denying Group Two Defendants' Motion to Sever).[3]

---

[3] As the Court noted in that Order:

[A] joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *United States v. Fernandez,* 388 F.3d 1199, 1242 (9th Cir. 2004).

Further, Count One of the Superseding Indictment charges Ranieri (and several others) with conspiring to violate 18 U.S.C. § 1962(c), *i.e.*, conspiring "to conduct . . . the affairs of the HASC enterprise through a pattern of racketeering activity," in violation of § 1962(d). *See* Superseding Indictment ¶ 20. The indictment defines the HASC enterprise as "including its leadership, members, and associates," *id.* ¶ 11 (emphasis added), and identifies HASC associates as including "members of the Boston…chapter[] of the Hells Angels" such as Ranieri. *Id.* ¶ 1. The indictment further states, at multiple points, that both "members and associates" share a common purpose, means, and method in carrying out the enterprise's criminal affairs. *Id.* ¶¶ 12–17. Ranieri fails to explain why these allegations are insufficient to plead his affiliation with the HASC enterprise, especially given that the RICO Act defines an "enterprise" as encompassing "any union or group of individuals associated in fact" and contains no formal membership requirement. *See* 18 U.S.C. § 1961(4); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that an association-in-fact enterprise need only possess "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose").

The Government, in any event, is not required to prove that Ranieri himself participated in the conduct of the HASC enterprise as either a member or an associate, since Count One charges him and others with conspiracy to violate § 1962(d), rather than a substantive RICO offense. *See* Superseding Indictment ¶¶ 19–21; *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("[A] conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself."). Evidence of other HASC members' and associates' unlawful conduct is equally relevant against all alleged conspirators to prove the existence and scope of the racketeering enterprise, as well as the conspirators' agreement to further the objectives of that enterprise. Thus, Ranieri's objection based on the relative absence of overt acts ascribed specifically to him in the indictment is without merit because a "disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance." *See United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991).

Furthermore, this is not a case where one defendant asserts prejudice because of a huge disparity in culpability compared to others based on his far less culpable conduct. *See, e.g., United States v. Gary Joe Littrell*, 02-CR-0938-CJC (C.D. Cal. Jan. 29, 2007); Docket No. 4469. Here, Ranieri is charged with participation in premeditated

C.      Evidentiary Error

      1.      False Testimony

Mr. Ranieri argues that the Government knowingly introduced false testimony at trial, and specifically that Mr. Hardisty's testimony was inconsistent with the cell-site evidence.  There was no cell-site analysis (CAST) evidence by the Government that Wendt was at or near Mr. Ranieri's house on June 16, 2014, contradicting Mr. Hardisty's testimony that Wendt and Mr. Ranieri met in private at Mr. Ranieri's house, where they decided that Silva "had to go."  Mr. Ranieri also previously made this exact argument to the jury at trial, TT 6763-67 (Mr. Ranieri's closing argument), but the jury found otherwise.

The Government's CAST analysis does not contradict Mr. Hardisty's testimony.  To the contrary, it showed that on June 16, 2014, Mr. Wendt's phone traveled from Laconia to the Boston area, and then Logan airport, which is consistent with Mr. Hardisty's testimony.  *See* Exhibit 127 at 73, 75, 76.  The Government provided justification for the lack of specific CAST evidence pinpointing Mr. Wendt's location at Mr. Ranieri's house in the two hours between Mr. Wendt's phone location at the Salem Hells Angels clubhouse and the airport: cell location only works when a phone is active.  FBI Special Agent Meredith Stanger testified that CAST analysis cannot determine a phone's location if it is not engaging with the network.  TT 3501, 3583.  If Wendt did not use his phone in those two hours, then there would be no location information.  The Court does not find that "the evidence weighs heavily against the verdict." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012).

Mr. Hardisty's testimony is credible because when he testified that Wendt and Mr. Ranieri had a private meeting in Mr. Ranieri's garage, he recalled Mr. Ranieri's home and garage in great

---

murder, the most serious act alleged in this case.

Finally, the Court can cure any prejudice by "carefully instruct[ing] the jury about the compartmentalization of the evidence as to each defendant." *United States v. Roselli,* 432 F.2d 879, 902 (9th Cir. 1970).

For the foregoing reasons, the Court **DENIES** Ranieri's motion to sever.

United States District Court
Northern District of California

detail. TT 3928; 3919. He described how the garage was separate from the house, how inside the garage there was a weight room with Hells Angels items, that he lifted weights on a bench there, and even how the house was on the right side at the end of a long driveway. *Id.* at 3919. This testimony was unimpeached; it was never challenged by the defense.

Moreover, based on Mr. Hardisty's demeanor, lack of motivations to fabricate evidence implicating Mr. Ranieri, and consistency with other evidence (e.g. other cell-site information, the pattern of phone calls, Wendt's visit to Mr. Ranieri just before the murder), the Court finds his testimony implicating Mr. Ranieri credible. The fact that there is no cell-site data to corroborate Mr. Hardisty's testimony about Wendt's conversation with Mr. Ranieri does not prove that Mr. Hardisty lied. As the jury was instructed, "The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence." Docket No. 3444 at 5 (Jury Instructions). The jury was well-equipped to weigh Mr. Hardisty's testimony and the circumstantial evidence. The Court does not disagree with its conclusion.

2.     Testimony of M.J.

Mr. Foakes asserts that M.J.'s testimony that he repeatedly assaulted her should have been excluded under Federal Rule of Evidence 403 because it had no probative value and was prejudicial. Foakes Motion at 4. The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of, *inter alia,* unfair prejudice. Fed. R. Evid. 403. At trial, M.J. testified that Mr. Foakes sexually assaulted her on one occasion in 2008 at a Hells Angels event called the "Redwood Run", and that other similar assaults took place. TT 1173-74, 1175.

The Court has previously addressed this issue at least twice. First, in the pretrial conference order, the Court permitted M.J.'s testimony of the sexual assaults committed by Mr. Foakes, explaining that her testimony is "relevant not only to establish the enterprise, but also [Mr. Foakes'] direct participation by engaging in specific acts sanctioned by and pursuant to the enterprise." Docket No. 3224 (pretrial conference order). Then at trial, the Court denied Mr. Foakes' request to strike M.J.'s testimony under Rule 403, finding that her testimony "that members of Hells Angels were present and were knowledgeable and in a way facilitated or

20

1    tolerated the alleged incident if it is to be believed" could create an evidenced connection to the

2    enterprise.  *See* TT 6139-40.  Now in the instant motion, the Court still finds that testimony about

3    Mr. Foakes' sexual assault is relevant to establish the HASC enterprise and Mr. Foakes' direct

4    participation within it, and is not excluded by Rule 403 because it is not substantially outweighed

5    by any unfair prejudice, for the reasons below.

6           Mr. Foakes argues that M.J.'s testimony lacked sufficient evidence of the nature and

7    means of the enterprise for several reasons.  First, she did not have any details about the role of

8    women in the club and did not know of the term "old ladies."  *Id.* at 1149-50.  Second, she

9    provided no evidence of Mr. Foakes' participation in the enterprise while in prison.  Third, she

10   provided no testimony as to her sexual assault in a tent at the Redwood Run beyond the fact it

11   happened and there were other members present, and no testimony as to other sexual assaults

12   beyond the fact they happened.  *Id.* at 1173.  There was also testimony from someone at the camp

13   that there were no Hells Angels surrounding a tent at the camp and no indication that sexual

14   assault occurred.  *Id.* at 5838-39.  M.J. also frequently asserted that she did not know or could not

15   remember details when testifying.  *See, e.g., id.* at 1163, 1179, 1181.

16          As for the first two arguments, M.J.'s lack of knowledge of some facts about HASC and

17   lack of evidence from Mr. Foakes' time in prison does not invalidate her testimony showing

18   evidence relevant to establishing the HASC enterprise and Mr. Foakes's involvement in it.  M.J.

19   testified that she was Mr. Foakes' girlfriend for about a year while he was President of HASC.  TT

20   1152, 54.  As his girlfriend, someone from the club was usually with her.  *Id.* at 1153.  She did not

21   ignore Mr. Foakes' calls, and never said no to seeing him.  *Id.*  Mr. Foakes was "the main guy" of

22   HASC and he acted like he had a special role, given his "confidence" and "the way he held

23   himself."  *Id.* at 1154.  Other members looked up to him.  *Id.*  M.J.'s testimony tended to establish

24   the HASC enterprise and Mr. Foakes' direct participation in it even without the specific details

25   that Mr. Foakes argues are lacking.  To the extent that some of her testimony lacked detail, she

26   was subject to cross-examination.  And while the lack of detail goes to the weight the jury may

27   have afforded her testimony, it does not render it necessarily false and irrelevant.

28          As for the Redwood Run sexual assault, it was clear that M.J. struggled to testify due to

United States District Court
Northern District of California

21

trauma from the experience and from her relationship with Mr. Foakes.  When asked about it, she responded "I don't remember.  I'm being treated for PTSD.  I am dealing with medications and everything else.  I don't remember."  TT 1176.  When asked about other assaults in addition to the Redwood Run, she replied "I don't remember in great detail.  That's why I don't talk about it." And "I have no concept of time with this is what I'm trying to explain to you."  *Id.* at 1179.  And further, she said "I've blocked everything out.  You're not hearing me here.  Bad things happened. My way of dealing with it was to try and block it out.  I'm now being treated for all of those things."  *Id.* at 1180.  She also said "I can't control my brain or how it works or what it chooses to block things out because I'm traumatized by something.  I'm trying to move on with my life, and it keeps coming back at me."  *Id.* at 1182.  M.J.'s testimony that Mr. Foakes sexually assaulted her at the Redwood Run, and that there were other similar sexual assaults, was admissible for its relevance and probative value, despite the fact M.J. was unable to recall specific details.  Again, her inability to provide details was grounds for impeachment but not inadmissibility.  While the Court has some reservations about the credibility of parts of her testimony, crediting the main thrust of it would not result in a miscarriage of justice.

Mr. Foakes argues that M.J.'s breakdown on the stand and statements that she suffered from PTSD were prejudicial because they "inflamed the jury" against him.  Foakes Motion at 7. However, the Court finds that the probative value of her statements, whose factual underpinnings indicate she experienced sexual assault, are not substantially outweighed by prejudice here.  Mr. Foakes also argues that M.J.'s lack of memory "thwarted" his confrontation clause rights.  *Id.* at 8. But Mr. Foakes exercised his confrontation clause rights by cross-examining M.J. and questioning her vigorously about her lack of memory in front of the jury.

Finally, even if M.J.'s testimony was admitted in error, the other evidence of Mr. Foakes' role in HASC was overwhelming to show that he participated in the HASC enterprise, was a leader, and agreed to commit a pattern of racketeering acts.  As such, a new trial without her testimony would not lead to acquittal, and therefore a new trial is not warranted.

3.    Mr. Hardisty's Text Message Statements

Defendants argue that the Government's post-trial evidentiary disclosures involving

22

1    witness Mr. Hardisty warrant a new trial, largely for the same reasons asserted by the Group One

2    defendants.

3            Mr. Hardisty sent two series of text messages to FBI Special Agent Kassandra Lane that

4    Mr. Foakes argues show that Mr. Hardisty is an unreliable witness.  First, on May 8, 2023, Mr.

5    Hardisty explained that he wanted to talk about witness protection.  HA-150116.  This was three

6    weeks after he testified in the Group Two trial.  TT 3814.  He followed up that same day asking

7    "can i call you tomorrow about [Witness Protection]."  After SA Kassandra Lane explained there

8    was a selection process for the program and that she would obtain more information about it, Mr.

9    Hardisty said "thanks…i mean, that's something that was always on the table from when i

10   understood."  HA 150117.  On May 18, after the jury returned a verdict of guilty on all counts for

11   Mr. Ranieri and Mr. Foakes, Mr. Hardisty wrote: "… you think i can get the witness protection

12   information and the reimbursements."  HA 150119 and "I'm getting a feeling im losing my witness

13   protection promise which was promised in front of my lawyer if I choose I really hope thats not

14   the case because it would be very sad."  HA-150119.

15           Second, on August 14, 2023, Mr. Hardisty sent a text message to SA Lane that said "Such

16   Bullshit im contacting the defense layer and telling them rainman wasnt involved i cant say he was

17   you guys forced me."  HA-150102 – HA-150103.

18           The Court held an evidentiary hearing about this statement as well as the prior statement

19   from May 2023.[4]  *See* Docket No. 2641 (November 27, 2024 Evidentiary Hearing) (HT).  Mr.

20   Hardisty testified that his testimony in the Group One and Group Two Trials was truthful, saying

21   "When I was under oath, I told the truth. When I sent the text messages, I wasn't."  HT at 89, 98.

22   He also denied that anyone from the Government forced him to implicate Mr. Ranieri in his

23   testimony about the murder of Silva.  *Id.* at 90.

24           a.    Brady/Giglio Violation

25           Mr. Foakes argues that the text messages between Mr. Hardisty and SA Lane violated the

26

27   _____

28   [4] The Evidentiary Hearing also addressed a third statement, about Mr. Hardisty's use of Xanax, from earlier in 2023.  However, neither Mr. Foakes nor Mr. Ranieri's challenges address this statement in the instant motion.

United States District Court
Northern District of California

*Brady* doctrine.  In *Brady v. Maryland*, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *Giglio v. United States*, the Supreme Court extended this principle to include suppression of evidence that impeaches a witness's credibility.  405 U.S. 150, 154 (1972).  These cases combined create a *Brady/Giglio* standard that obligates the prosecution to disclose evidence that may be material to the outcome of a trial.

A defendant must establish three elements to prevail on a *Brady/Giglio* claim: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  As to the first element, evidence is favorable if it is exculpatory or impeaches a government witness. *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014).  As to the second element, a "*Brady* analysis [is] limited to the evidence known at the time of the trial."  *United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir. 1995).  "Any knowledge gained by the prosecution after the trial is irrelevant to a *Brady* claim." *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005).  As to the third element, evidence is prejudicial or material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  However, if suppressed evidence is "merely cumulative," then the failure to disclose is not a violation. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006). Additionally, the evidence "must be admissible or capable of being used to impeach a government witness." *United States v. Kohring*, 637 F.3d 895, 903 (9th Cir. 2011) (quotation marks and citations omitted).

i.   WITSEC

Mr. Foakes contends that Mr. Hardisty's statements about WITSEC could be favorable

24

1   impeachment evidence because they show that Mr. Hardisty believed he was promised entry into

2   WITSEC, and thus he was willing to testify falsely knowing that he would receive WITSEC

3   protection.  The Government contends that while the issue of Mr. Hardisty's protection and safety

4   as a witness was a topic of frequent discussion, and the Government did offer to look into

5   WITSEC, there is no evidence that WITSEC was guaranteed or promised.

6          Mr. Foakes' argument is without merit.  First, there is no convincing evidence that a

7   WITSEC promise was made because the text exchange indicates no promise or guarantee was in

8   fact made.  Second, Mr. Hardisty's stated belief in his text that WITSEC was a real option was not

9   made until after the trial; thus, that evidence was not "suppressed," and the Government disclosed

10  it immediately upon discovering that Mr. Hardisty indicated he held such a belief.

11         Lastly, Mr. Hardisty's belief that the Government promised him WITSEC entry did not

12  prejudice the Defendants.  The subject of his fear of the HASC and his wanted protection was

13  disclosed prior to trial.  So was the fact that he sought favors from his government handler,

14  Docket No. 3577 at HA-00149840 (Barry Decl. Ex. D) (February 2023 disclosure referring to Mr.

15  Hardisty's request for a trained protection canine, a name change, and a Concealed Carry Weapon

16  permit), and had received some relocation money prior to trial, Docket No. 3653 at 10 (Barry

17  Decl. Exhibit 2) (March 2022 disclosure of relocation benefits).  Evidence about WITSEC would

18  at most have been incremental; it was not a game changer.

19         Moreover, it seems highly unlikely that Defendants would have vigorously sought to elicit

20  the fact of his seeking WITSEC because this would only underscore Mr. Hardisty's stated fear of

21  retaliation from the HASC, and thus HASC's culture of witness intimidation and potential for

22  violence.  WITSEC would also have emphasized the apparent truthfulness of Mr. Hardisty's

23  testimony given the fact that he was willing to testify in the face of a perceived threat, a threat so

24  real and ominous that he would take the extreme step of entering into a witness protection program

25  which would transform the lives of himself and his family.  Lack of an earlier disclosure was not

26  prejudicial.

27         Finally, the jury was aware of evidence that was actually impeaching, given that Mr.

28  Hardisty admitted he lied to the FBI about his whereabouts during the murder of Joel Silva.  TT

United States District Court
Northern District of California

25

1    3868, 3890, 3946-47.  In sum, Mr. Hardisty's post-trial statements, even if they had been

2    presented to the jury, would not likely have changed the outcome of trial.

3                            ii.    Threat to contact the Defense

4            Mr. Hardisty's threat to contact the Defense lawyers and tell them that Mr. Ranieri was

5    innocent and the Government forced him to testify, if true, would imply a recantation of his

6    testimony at trial.  Mr. Hardisty was the sole witness for key evidence at trial that implicated Mr.

7    Ranieri in the murder of Joel Silva.  He testified that Mr. Ranieri and Wendt had a private

8    conversation at Mr. Ranieri's house and returned to the larger group to discuss how Joel Silva

9    "had to go."  A recantation of his testimony could "undermine[] confidence in the outcome of the

10   trial."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

11           But here, the statement does not constitute a *Brady* violation because Mr. Hardisty's

12   statement was made after trial; there was no governmental suppression of evidence.  *United States*

13   *v. Veras*, 51 F.3d 1365, 1375 (7th Cir. 1995) ("*Brady* analysis [is] limited to the evidence known

14   at the time of the trial."); *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005) ("Any

15   knowledge gained by the prosecution after the trial is irrelevant to a *Brady* claim.").

16           Nor was the statement prejudicial to Mr. Ranieri because it was consistent within a known

17   pattern of Mr. Hardisty's earlier recantation of threats, and the jury heard evidence of Mr. Hardisty

18   making false statements.  The Government previously produced evidence showing Mr. Hardisty

19   asserted vague threats to cease cooperation with the Government and speak with the Defense.  *See*

20   Docket No. 3577 at HA-00149471, HA-00149479 (Barry Decl. Ex. B) ("I'm ready for war…,"

21   and "I think my next phone call will be to the defense attorney and wont speak to Kevin again").

22   SA Lane testified that each time that Mr. Hardisty threatened to switch sides, he followed up with

23   an apology.  HT 46.  Although the text threat at issue was more specific as to Mr. Ranieri, it was

24   consistent with his pattern of behavior.  Additionally, Defendants emphasized throughout trial Mr.

25   Hardisty's previous false statements and cross-examined him about them, including a false

26   statement he made to FBI agents that he was outside the Fresno clubhouse when Joel Silva was

27   murdered.  *See, e.g.,* TT 2930-36.  Yet, the jury evidently still found Mr. Hardisty's testimony

28   credible in returning a verdict against Defendants on all counts.  As noted above, having observed

United States District Court
Northern District of California

26

1    his demeanor and considering the circumstances of his testimony, as well as the consistency of

2    that testimony with other evidence, the Court also credits his testimony.

3           Moreover, the statement in the text, even if taken as true, was not a true recantation.  Mr.

4    Hardisty did not state unequivocally that Mr. Ranieri was innocent, but rather threatened to tell

5    Defense counsel so; thus, the statement was a threat, not a recantation.  The part of the message

6    "[I] cant say he was" was not a statement of fact, but rather a statement about Mr. Hardisty's

7    ability to speak on the subject.  The part of the message "You guys forced me" was neither

8    supported by testimony nor any evidence that the Government coerced him.

9           More critically, at the evidentiary hearing, Mr. Hardisty stated that he testified truthfully at

10   trial and that the text message statements to SA Lane were not accurate.   Mr. Hardisty testified

11   that his testimony in the Group One and Group Two Trials was truthful, saying "When I was

12   under oath, I told the truth. When I sent the text messages, I wasn't."  HT at 89, 98.  He also

13   denied that anyone from the Government forced him to implicate Mr. Ranieri in his testimony

14   about the murder of Joel Silva.  *Id.* at 90.  Defendants cross-examined Mr. Hardisty about his

15   statements.  Mr. Hardisty's statement "Such Bullshit im contacting the defense layer and telling

16   them rainman wasnt involved i cant say he was you guys forced me" did not prejudice the

17   Defendants because it was in fact false as the Court so finds.  *See* HA-150102 – HA-150103.

18   Having observed his testimony at trial and at the post-trial hearing, despite certain inconsistencies

19   and an admitted lie to FBI agents about being in Fresno for the killing, the Court finds Mr.

20   Hardisty's post-trial testimony credible and that introduction of the text in a new trial would not

21   result in a different verdict.  Generally, post-trial recantations (if it was such) are treated with a fair

22   degree of skepticism. *See, e.g. Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014).  Such

23   skepticism is especially appropriate here given the circumstances surrounding Mr. Hardisty's

24   statement.

25                  b.    Newly Discovered Evidence

26          A defendant seeking a new trial based on newly discovered evidence must prove each of

27   the five *Harrington* factors: "(1) the evidence must be newly discovered; (2) the failure to discover

28   the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the

United States District Court
Northern District of California

evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). Newly discovered evidence is merely impeaching unless it is "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).

Mr. Ranieri argues that the discovery of the new evidence of J.H's text message statements warrants a new trial because it would show that Mr. Ranieri was "not in any way involved in any such conspiracy" and would show that Mr. Hardisty lied at trial. Ranieri Motion at 20-21. He argues that Mr. Hardisty's text message threat "Such Bullshit im contacting the defense layer and telling them rainman wasnt involved i cant say he was you guys forced me" shows that the Government coerced Mr. Hardisty to falsely implicate Mr. Ranieri. Second, Mr. Ranieri argues that the text message exchange regarding WITSEC impeaches Mr. Hardisty's credibility because it shows that he expected to receive benefits from the Government in exchange for his testimony. Ranieri Motion at 19-20.

First, the text message exchange regarding WITSEC fails to meet the *Harrington* factors because the evidence is "merely impeaching," as Mr. Ranieri asserts. It does not render Mr. Hardisty's testimony at trial "totally incredible." *United States v. Davis*, 960 F.2d at 825; *see United States v. Scherer*, 673 F.2d 176, 179 (7th Cir. 1982) ("Speculation as to what probably occurred or what may have been possible does not lead to the conclusion that [the defendant's] trial was so fundamentally flawed as to constitute a miscarriage of justice, [citation omitted], or that the newly discovered document would have allowed him to present his case in a manner likely to produce a different result.").

Second, the text message statement was not material to the issues at trial for many of the same reasons stated above in the *Brady/Giglio* analysis. As noted above, it was consistent with a known pattern of false threats, was not a true recantation, and Mr. Hardisty admitted that it was false. The Court finds Mr. Hardisty was truthful when he said his text message statement to SA Lane was not accurate and was false. *See* HT at 89-90.

A new trial would not likely result in an acquittal given the credible nature of Mr. Hardisty's trial testimony.  If there were a new trial, Mr. Hardisty would likely again testify to the fact that Mr. Ranieri was involved in planning the murder of Silva.  That testimony would be consistent with cell-site evidence; he would likely again prove to be a credible witness, and his explanation of the text would likely again be believable.

<div align="center">c.     <u>False Testimony</u></div>

Finally, Mr. Ranieri argues that a new trial is warranted because he was convicted on false testimony by Mr. Hardisty.  "A new trial is not automatically required when false evidence is discovered. Rather, a constitutional error resulting from the use of false evidence by the government requires a new trial, 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154.  The Court finds Mr. Hardisty's trial testimony was not false.  Therefore, a new trial based on assertedly false testimony is not warranted here.

D.     <u>Prosecutorial Misconduct</u>

Mr. Ranieri asserts numerous instances of prosecutorial misconduct that warrant a new trial.  These include some of the Government's statements made during closing argument, witness questioning, the Government's response to the Defense's *Touhy* request, and the Government's reference to HASC's "toy run" fundraiser fraud.  Ranieri Motion at 27-38.

<div align="center">1.     <u>Closing Arguments</u></div>

<div align="center">a.     <u>Evidence of Conspiracy to Commit an Act</u></div>

Mr. Ranieri argues that it was improper for the Government to explain to the jury that evidence of a completed act can serve as evidence that there was an agreement to commit that act, *i.e.*, a conspiracy.  *See* TT 6664.

At closing argument, the Government stated that the evidence of murder in the trial proved a conspiracy:

> AUSA Peng: The evidence that Joel Silva was actually murdered is proof that there was a conspiracy to murder him, the conspiracy that Chris Ranieri was a part of.  You know there was an agreement to kill him because he was actually killed.

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

1    TT 6664.

2         The Government's statement correctly applies the law of conspiracy. The crime of

3    conspiracy is completed "when an overt act [to] effect the object of the conspiracy is done by at

4    least one of the conspirators." *Marino v. United States*, 91 F.2d 691, 694 (9th Cir. 1937). "An

5    overt act is something apart from the conspiracy, and is an 'act to effect the object of the

6    conspiracy.' [citation omitted]. It need be neither a criminal act, nor the very crime that is the

7    object of the conspiracy.  It must, however, accompany or follow the agreement, and must be done

8    in furtherance of the object of it." *Id.* at 694-95.  Here, the Government pointed to the overt act of

9    the murder of Silva as evidentiary proof that there was an agreement to murder, and therefore a

10   conspiracy.  *See also Salinas v. United States,* 522 U.S. 52, 66 (1997) (evidence that a conspirator

11   accepted bribes is evidence of conspiracy to participate in a RICO conspiracy); *United States v.*

12   *Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (stealing eight kilograms of cocaine from a shipment is

13   evidence of a conspiracy to possess with intent to distribute cocaine).  Indeed, virtually every

14   RICO conspiracy prosecution involves evidence of completed predicate racketeering acts.

15   "[C]ommon sense suggests that the existence of an association-in-fact is often-times more readily

16   proven by what it *does*, rather than by abstract analysis of its structure."  *Fernandez*, 388 F.3d at

17   1224 (emphasis in original) (citation omitted).  Courts overseeing RICO conspiracy prosecution

18   admit predicate racketeering acts as evidence of conspiracy to conduct the affairs of an enterprise

19   through a pattern of racketeering activity because those completed acts are within the scope of the

20   conspiracy. *See United States v. Cervantes*, 170 F. Supp. 3d 1226, 1234 (N.D. Cal. 2016); *United*

21   *States v. Rizk*, 660 F.3d 1125, 1131-32 (9th Cir. 2011).  While AUSA Peng's use of the word

22   "proof," to the extent it implied it was conclusive proof, was an overstatement and should not have

23   been expressed as such, the evidence and the arguments at trial placed her statement in proper

24   context.  There was no prejudice.

25              b.   Vouching

26        Mr. Ranieri argues that the Government engaged in "improper vouching" in its closing

27   argument rebuttal by describing Mr. Hardisty as "forthright and cooperative." TT 6973.  "It is

28   improper vouching for the prosecutor to offer personal assurances of the veracity of government

30

1   witnesses or to suggest that their testimony is supported by information not introduced as

2   evidence." *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999).

3          Here, the Government's rebuttal statement of Mr. Hardisty as "forthright and cooperative"

4   was a direct quote from a Defense witness' testimony:

5              A.U.S.A. Barry: And you heard Special Agent O'Brien say: I was
              working on a PG&E shooting investigation.  I interviewed [Mr.
6              Hardisty]; I found him – what was the phrase? – I found him
              forthright and cooperative.  Again, your memory of what he said
7              controls, but something along those lines.

8   TT 6973.  This was in reference to the Government's cross-examination of O'Brien:

9              Q.  And did you describe him on direct as being forthright and
              cooperative?
10             THE WITNESS:  I did.

11  *Id.* at 5955-56.  Because the Government restated witness testimony, they did not personally

12  assure O'Brien's veracity nor suggest his testimony was supported by unpermitted evidence. *See*

13  *United States v. Rios-Morales*, 878 F.3d 978, 987-88 (10th Cir. 2017) (finding that "A simple

14  reference to corroborating trial evidence conveys neither a personal assurance of the witness's

15  veracity nor an implicit indication that there is other evidence, unknown to the jury, that supports

16  the witness's testimony.").  There was no improper vouching.

17         c.     Reasonable doubt standard

18         Mr. Ranieri argues it was improper for the Government to tell the jury that they could not

19  base reasonable doubt on a lack of evidence, but mischaracterizes what the Government actually

20  said in the closing argument rebuttal:

21             AUSA Barry: And then there's the idea, again, you saw the same
              thing in every – in every other Defense argument – is what's not in
22             evidence.  What about all of the corroboration they couldn't – they
              didn't bring?
23                 That's not your assessment, ladies and gentlemen.  Yeah,
              you can say, well, **there's a lack of evidence and therefore, there**
24             **is reasonable doubt, but you also have to consider the evidence**;
              you can consider whether Michelle Conte is believable.
25
    TT 7021-22 (emphasis added).  In considering the full context of the statement, the Government
26
    explained that a juror can find reasonable doubt after both finding a lack of evidence and
27
    considering the evidence, which accurately rephrased the jury instructions. The relevant part of
28

31

Jury Instruction No. 43 stated:

> A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of *all the evidence, or from lack of evidence*.
> If after a careful and impartial consideration of *all the evidence*, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration *of all the evidence*, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

Docket No. 3444 at 21. Both the jury instructions and the Government's closing argument rebuttal stated that a juror can find reasonable doubt based on lack of evidence, but only after considering all of the evidence. Therefore, the Government's statement in closing argument rebuttal was proper.

         d.    <u>Evidence Against Mr. Foakes Imputed to Mr. Ranieri</u>

Mr. Ranieri argues that the Government improperly stated that evidence of RICO conspiracy as to Mr. Foakes could also be used as evidence of RICO conspiracy as to Mr. Ranieri. *See* TT 6984. The relevant portion of the Government's closing argument rebuttal is as follows:

> AUSA Barry: So my – as I indicated, my remarks on Count 1 are going to focus more on Mr. Foakes, but you can also consider them in assessing the evidence of whether Christopher Ranieri is guilty of Count 1 as well.
> You heard, time and time again, Mr. Boro say: This crime – this category of crime, there's no evidence that Raymond Foakes was involved in that.
> That doesn't matter. That's not the law. The agreement is the crime…
> …The key for racketeering conspiracy is that there's an agreement that someone is going to commit the various types of acts of racketeering; but the individual member of that conspiracy doesn't actually have to want to do it himself, just that they know what other people are doing, agree that other people might do them, and that's enough.

TT 6984-85.

Mr. Ranieri mischaracterizes the Government's statement, which appears to explain to the jury that they can apply the "remarks" on the law of conspiracy to both Mr. Foakes and Mr. Ranieri. The Government correctly stated the law of conspiracy in explaining that a defendant does not have to commit a predicate racketeering act himself, but "just that they know" and

1   "agree" that other members of the enterprise would.  This law applies to both Mr. Foakes and Mr.

2   Ranieri.  As the Government properly stated for example, "It doesn't matter whether Raymond

3   Foakes had his own marijuana grow or not."  TT 6985.  Applying the remarks to Mr. Ranieri, it

4   also did not matter whether Mr. Ranieri personally committed a predicate racketeering act, like

5   murder.

6          There was in fact trial evidence of elements of RICO conspiracy which applied to both Mr.

7   Foakes and Mr. Ranieri.  For example, showing that HASC was a "One Percent" of Outlaw

8   Motorcycle Gangs established that HASC was an enterprise.  This evidence, untethered to a

9   particular Defendant, could properly be used as evidence of RICO conspiracy as to both Mr.

10  Foakes and Mr. Ranieri.

11                        e.      Misrepresentation of VICAR

12         Mr. Ranieri again raises the same argument as he did in his Rule 29 motion, that there was

13  no evidence that he sought to become a member of the enterprise, was a member, or sought to

14  maintain or increase his position in it under VICAR.  Ranieri Motion at 34-35.  Thus, the

15  Government committed prosecutorial misconduct in stating that he was a "member of the

16  enterprise" and that he "had status in the HASC enterprise.  *See* TT 6663-64; 6663.

17         The VICAR statute makes it an offense to commit a violent crime in aid of racketeering

18  activity. 18 U.S.C.A. § 1959.  Specifically, the statute provides, *inter alia*, that whoever for the

19  purpose of maintaining or increasing position in an enterprise engaged in racketeering activity,

20  murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious

21  bodily injury upon, or threatens to commit a crime of violence against any individual or attempts

22  or conspires so to do, may be punished under the VICAR statute. 18 U.S.C.A. § 1959.

23         First, it is true that the Government incorrectly stated that Mr. Ranieri was a "member" of

24  the enterprise when in fact he was an associate.  However, this statement did not prejudice Mr.

25  Ranieri, because both members and non-member associates of an enterprise can be convicted of

26  VICAR.  *Rodriguez*, 971 F.3d at 1011 (holding that the enterprise charged in the indictment

27  encompassed the organization's "leadership, membership, and associates" and concluding that

28  official membership was not a prerequisite to a VICAR conviction.").  The Court previously

1    addressed similar arguments in its Order denying Mr. Ranieri's Rule 29 motion for acquittal.

2    "Even as a non-member of HASC, Mr. Ranieri can commit a violent offense for the purpose of

3    maintaining or increasing his position in HASC as an associate of the enterprise.  Formal

4    membership in an enterprise is not necessary to sustain a VICAR conviction.  *Rodriguez*, 971 F.3d

5    at 1011."  Docket No. 3672 at 29 (Order).

6         Despite not being a member, Mr. Ranieri was properly charged as an "associate" of the

7    HASC enterprise and qualified as an "associate" by virtue of his close association with HASC and

8    "agreement to facilitate their affairs, particularly through the Silva murder."  *Id.* at 30.  There was

9    substantial evidence of Mr. Ranieri's association with the HASC.  Given the context of the entire

10   trial, the Government's argument that he was an associate of the HASC was clear.

11        Additionally, the Government's statement that Mr. Ranieri "had status in the HASC

12   enterprise" is generally consistent with the language of the VICAR statute requiring that the

13   defendant maintain or increase his position in the enterprise.  The Court also previously found

14   there that the evidence was sufficient to show that Mr. Ranieri's purpose in the murder of Silva

15   was to "improve or maintain his status with HASC" in violation of VICAR, given his closeness

16   with the HASC leaders and his high status among the charter.  *Id.* at 30.

17        Therefore, the Court finds that the Government did not commit prejudicial prosecutorial

18   misconduct in its statements relating to Mr. Ranieri's VICAR charge.

19        2.    Witness Questioning

20        The Government questioned several witnesses about whether they were subpoenaed and

21   whether they were afraid to testify.  Mr. Ranieri argues that these questions were improper.  This

22   issue was briefed and argued in pretrial litigation.  Prior to trial, the Court explicitly permitted

23   questioning about witnesses' fear of testifying because it is "relevant to witness credibility and

24   motive."  Docket No. 3224 (Pretrial conference order).  The Court cited its order on motions in

25   limine from the Group One trial, where it previously concluded the same:

26            Witnesses may testify about their fear, if any.  It is relevant to
                witness credibility and motive.

27   Docket No. 2513 at 29 (Group One MIL Order).  Therefore, the witness questioning was proper.

28

United States District Court
Northern District of California

3.    <u>Response to the Defense's *Touhy* request</u>

Mr. Foakes argues that the government engaged in improper gamesmanship in response to the Defense's *Touhy* request, and therefore violated his Fifth and Sixth Amendment rights of due process, a fair trial, and the right to confront witnesses.  On March 21, 2023, M.J. testified that Mr. Foakes sexually assaulted her on one occasion in 2008, and that other similar assaults took place. TT 1173-74, 1175.  Then, on April 19, 2023, Mr. Foakes submitted a subpoena request to the Government for the testimony of several witnesses, including Agent Dutton, in compliance with the requirements of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 462 (1951).  Mr. Foakes sought to challenge M.J.'s testimony against him by asking Agent Dutton about his interviews with M.J. in 2008 and 2011, which did not mention any sexual assaults.[5]

But Mr. Foakes overlooks the fact that he submitted the *Touhy* request impermissibly late, and the Court found as such at trial.  In response to Mr. Foakes' request to delay trial until Mr. Dutton was obtained, the Court reasoned:

> THE COURT: Well, I mean, the Government's point is that this was late. I mean, you can't sort of take advantage of a last-minute attempt to subpoena and then the person's not available, and then you want to strike testimony which you claim would have been impeached by that testimony for a witness that wasn't timely subpoenaed.
>
> It was -- you knew what she was going to testify. She testified in the first trial. You've had a year's notice; and if you were going to impeach her with the theory that she didn't report this earlier, I mean, there was no surprise. So the idea that we would, number one, postpone trial or grant a mistrial because of the unavailability of a witness that was just subpoenaed, you know, weeks into this trial, that's a tough one to me.

TT 5924-25.  The Court properly addressed Mr. Foakes' concerns regarding the *Touhy* request at trial, correctly noting that his request to delay the trial to obtain Dutton was unjustified given he had ample notice of M.J.'s testimony and the substance of her testimony and should have attempted to obtain him earlier.  The failure to obtain Dutton is a result of Defendants' own failure to include Dutton in their initial witness list and their unreasonable delay in submitting a *Touhy* request to subpoena him during trial.

---

[5] Additionally, those interviews related to Mr. Foakes' mortgage fraud.

1    Further, the Government did attempt to respond to the *Touhy* request, because they

2    forwarded the request to the FBI the next business day.  TT 5679.  On May 1, 2023, the FBI

3    notified the Government that they were unable to locate Dutton.  On May 2, 2023, the

4    Government disclosed this to the Defendants.  The Government's timely action in response to the

5    *Touhy* request is not evidence of any sort of gamesmanship, much less prejudicial gamesmanship.

6        4.    Reference to "Toy Run Fraud"

7    Mr. Foakes argues that the Government's rebuttal argument improperly mentioned that

8    HASC's "toy runs," which were children's fundraisers, involved fraud that could constitute

9    racketeering activity.  *See* Motion at 12.  Troy Conte testified that some of the money from the

10   HASC toy run fundraisers went to the charter, and "they didn't go a hundred percent to the kids."

11   TT 4993.

12   Under 18 U.S.C. § 1961(1), racketeering acts include specific types of fraud, such as

13   identification fraud, gambling fraud, mail fraud, wire fraud, financial institution fraud, securities

14   fraud, and fraud related to controlled substances.  Given the limited testimony on the toy runs, it is

15   unclear whether HASC's toy run fraud, if accepted, constitutes racketeering.  But even if the

16   Government's rebuttal argument made improper mention of the toy run fraud as a predicate

17   racketeering act, the other evidence of numerous other predicate and other racketeering acts was

18   more than enough to find Mr. Foakes guilty of racketeering.  The evidence of Mr. Foakes'

19   involvement in HASC and leadership role, even while he was incarcerated, was substantial. Even

20   if the Government were to present the toy runs as "criminal activity" instead of "racketeering

21   activity" in a new trial, the outcome would not be different.

22   Nor was there improper variance because the indictment need not allege predicate acts and

23   every racketeering activity.   A variance involves a divergence between the allegations set forth in

24   the indictment and the proof offered at trial. *United States v. Ward*, 747 F.3d 1184, 1189-90 (9th

25   Cir. 2014).  If the divergence prejudices the defendant's rights, the conviction must be reversed.

26   *Id.*; *see also United States v. Miller*, 471 U.S. 130, 135 (1985) (finding that the variance between

27   the indictment and the charges did not prejudice the fairness of the respondent's trial in any way).

28   Here, the evidence of toy runs was raised by the defense.  It was in that context that Mr. Conte

United States District Court
Northern District of California

36

1   testified that not all of the proceeds went to charity.  This evidence did not diverge from and arose

2   from the basic allegations about the HASC as a RICO enterprise.  That the prosecutor

3   characterized it as racketeering activity did not alter the evidentiary proof at trial in a way that

4   rises to the level of a variance.  This is particularly so because the indictment need not allege all

5   evidence of enterprise and racketeering activity. *United States v. Rizk*, 660 F.3d 1125, 1131 (9th

6   Cir. 2011) ("The rule is well established that the government in a conspiracy case may submit

7   proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in

8   the indictment.").

9        Moreover, even if the prosecutor's characterization in closing argument of the toy run as

10   racketeering activity constituted a variance, it was not material given the other substantial

11   evidence of Mr. Foakes' involvement and leadership in HASC and the extensive racketeering

12   activities of the HASC that were far more substantial than the toy run fraud.  *Berger v. United*

13   *States*, 295 U.S. 78, 81 (1935).  Any variance was not prejudicial.

14        5.    Cumulative Misconduct

15        Finally, Mr. Ranieri asserts that the multiple instances of prosecutorial misconduct

16   cumulatively deprived him of a fair trial.  Ranieri Motion at 38.  "In some cases, although no

17   single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the

18   cumulative effect of multiple errors may still prejudice a defendant."  *United States v. Wilkes*, 662

19   F.3d 524, 542 (9th Cir. 2011).  Here, for all of the reasons discussed above, no underlying errors

20   exist to establish a basis for cumulative error.  *See United States v. Spangler*, 810 F.3d 702, 711

21   (9th Cir. 2016) (finding no cumulative error because the defendant "has not demonstrated any

22   errors by the district court.").  Therefore, the cumulative error doctrine does not warrant relief.

23   E.    Jury Verdict

24        1.    Insufficient Evidence

25        Mr. Foakes requests that the arguments in his Rule 29 motion, where he asserts

26   insufficiency of the evidence, support granting a new trial.  Foakes Motion at 12.  Previously, the

27   Court denied his Rule 29 motion, and finds no reason to reconsider its prior order here.  *See*

28   Docket No. 3673.  Because of the substantiality of the evidence of guilt, there is no serious risk of

1    a miscarriage of justice.

2          2.        Special Sentencing Factor

3          Incorporating all of the reasoning in his motion, Mr. Ranieri asserts that a new trial is

4    warranted as to his conviction of the special sentencing factor.  Ranieri Motion at 54.

5          In addition to the jury finding Mr. Ranieri guilty of Count One of RICO conspiracy, the

6    jury also found him guilty of the Count One special sentencing factor: conspiracy to commit

7    murder.  Docket No. 3496 at 2 (Jury Verdict) (finding that Mr. Ranieri "knowingly and

8    intentionally agreed to join a conspiracy to commit deliberate and premeditated murder within the

9    essential nature and scope of the HASC enterprise.").  They also found him guilty of Count Two

10   of VICAR.

11         There is no basis for a new trial based on the special sentencing factor, given that Mr.

12   Ranieri was convicted of VICAR.  The Court previously found that the evidence was sufficient to

13   show that under VICAR, Mr. Ranieri conspired to commit murder for the purpose of maintaining

14   or promoting his position in the HASC enterprise.  *See* Docket No. 3672 at 30 (Order).  It follows

15   that he would also be guilty of the special sentencing factor of conspiracy to commit murder.

16   F.    Denial of Mr. Ranieri's Subrebuttal Request

17         Finally, Mr. Ranieri argues that the Court's denial of his request to make a subrebuttal

18   closing argument violated his due process rights.  *See* Docket No. 3449 (Motion for subrebuttal);

19   TT 6882.  He argues that the Court prejudiced him by denying his request because "he was denied

20   the opportunity to affect the final narrative the jurors would rely upon to reach their verdict; and

21   prevented him from responding to the Government's rebuttal closing, and, as it turned out, an

22   opportunity to respond to the misconduct committed by the Government."  Ranieri Motion at 54.

23         The Federal Rules of Criminal Procedure do not permit Mr. Ranieri to give a subrebuttal.

24   "Closing arguments proceed in the following order: (a) the government argues; (b) the defense

25   argues; and (c) the government rebuts."  Fed. R. Crim P. 29.1.  Mr. Ranieri fails to provide any

26   compelling reason as to why the Court should deviate from the rule here.

27                            V.        **CONCLUSION**

28         The Court **DENIES** Mr. Ranieri's and Mr. Foakes' Rule 33 Motions for New Trial.

38

1   **IT IS SO ORDERED**.

2

3 Dated: April 16, 2024

4

5                _____

6             EDWARD M. CHEN
              United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California